IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

WAYNE MITCHELL,

        Petitioner,

        v.

JOHN E. WETZEL, Secretary, Pennsylvania
Department of Corrections; ROBERT
GILMORE, Superintendent of the State
Correctional Institution at Greene;
STEPHEN A. ZAPPALA, JR., District
Attorney of Allegheny County; and MARK
GARMAN, Superintendent of the State
Correctional Institution at Rockview,

        Respondents.

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

CIVIL ACTION NO. 2:15-1465

**THIS IS A CAPITAL CASE.**

---

**MEMORANDUM OF LAW IN SUPPORT OF
AMENDED PETITION FOR WRIT OF HABEAS CORPUS
BY A PRISONER IN STATE CUSTODY**

MATTHEW LAWRY
MICHAEL GONZALES
Assistant Federal Defenders
Capital Habeas Corpus Unit
Federal Community Defender Office
for the Eastern District of Pennsylvania
Suite 545 West
601 Walnut Street
Philadelphia, PA 19106

ANNA AHRONHEIM
Assistant Federal Defender
Capital Habeas Corpus Unit
Office of the Federal Public Defender
1450 Liberty Center
1001 Liberty Avenue
Pittsburgh, PA 15222-3714

## PRELIMINARY STATEMENT

The transcripts from trial and penalty phase are consecutively numbered and cited as "NTT." Transcripts from the post-conviction proceedings are consecutively numbered and cited as "NTP." Transcripts from hearings on pretrial motions and jury selection were bound together and are cited as "NTJS." Transcripts from other proceedings are cited as "NT" followed by the date and page number. Documents in the Appendix are cited as "A" followed by the page number.

The Pennsylvania Supreme Court has issued three opinions in Petitioner's case: the first on direct appeal, *Commonwealth v. Mitchell*, 902 A.2d 430 (Pa. 2006) ("*Mitchell-1*"); the second after the initial post-conviction proceedings, *Commonwealth v. Mitchell*, 105 A.3d 1257 (Pa. 2014) ("*Mitchell-2*"); and the third following the second post-conviction proceedings. *Commonwealth v. Mitchell*, 141 A.3d 1277 (Pa. 2016) ("*Mitchell-3*").

The trial court issued two opinions regarding the post-conviction petitions: *Commonwealth v. Mitchell*, CC Nos. 199711609 et al. (Allegheny Ct. Com. Pl. July 31, 2013) ("PCRA Op.-1"); and *id.* (Allegheny Ct. Com. Pl. Dec. 10, 2015) ("PCRA Op.-2").

All other citations are either self-explanatory or will be explained.

All emphasis in this Memorandum is supplied unless otherwise indicated.

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................. i

STANDARD OF REVIEW ..................................................................................... 1

CLAIMS FOR RELIEF ......................................................................................... 3

I.   PETITIONER'S WAIVER OF HIS *MIRANDA* RIGHTS WAS NOT KNOWING,
     VOLUNTARY, OR INTELLIGENT; TRIAL COUNSEL'S FAILURE TO PRESENT ANY
     EVIDENCE TO SUPPORT HIS SUPPRESSION MOTION PRE-TRIAL, OR TO RAISE
     REASONABLE DOUBT AS TO THE RELIABILITY OF THE CONFESSION AT
     TRIAL, CONSTITUTES INEFFECTIVE ASSISTANCE. ................................... 3

     A.  Information Requested by the Court ............................................... 3

     B.  The Merits of the Claim. .............................................................. 3

          1.  Deficient performance. .......................................................... 4

          2.  Prejudice ............................................................................. 5

     C.  The State Court Opinions ............................................................. 9

II.  PETITIONER WAS DEPRIVED OF HIS SIXTH AND FOURTEENTH AMENDMENT
     RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL WHEN HE PLED GUILTY,
     IN RELIANCE ON HIS ATTORNEY'S UNREASONABLE ADVICE, TO FELONIES
     THAT MADE HIM ELIGIBLE FOR THE DEATH PENALTY. ......................... 12

     A.  Information Requested by the Court ............................................. 12

     B.  The Merits of the Claim ............................................................. 13

          1.  Deficient performance .......................................................... 14

          2.  Prejudice ............................................................................ 16

     C.  The State Court Opinions ........................................................... 17

III. PETITIONER'S SIXTH, EIGHTH AND FOURTEENTH AMENDMENT RIGHTS WERE
     VIOLATED WHERE TRIAL COUNSEL FAILED TO INVESTIGATE, DEVELOP, AND
     PRESENT EVIDENCE UNDERMINING THE CREDIBILITY OF A KEY
     GOVERNMENT WITNESS, SHELIA BRITTON .......................................... 19

     A.  Information Requested from this Court .......................................... 19

     B.  The Merits of the Claim ............................................................. 20

          1.  Deficient Performance .......................................................... 20

      2.   Prejudice ................................................................................ 21

           a.     Guilt Phase ................................................................22

           b.     Penalty Phase .............................................................24

  C.  State Court Opinion .................................................................. 24

IV.  THE COMMONWEALTH VIOLATED ITS DUE PROCESS OBLIGATIONS WHEN IT SUPPRESSED IMPEACHING AND EXCULPATORY EVIDENCE REGArDING A KEY COMMONWEALTH WITNESS, SHELIA BRITTON. ................................................... 26

  A.  Information requested by the Court ........................................... 26

  B.  The Merits of the Claim ........................................................... 27

      1.   Suppression ..................................................................... 27

      2.   Favorable evidence ........................................................... 28

      3.   Materiality ...................................................................... 29

           a.     Guilt Phase ................................................................30

           b.     Penalty Phase.............................................................32

  C.  State Court Opinion .................................................................. 34

V.    PETITIONER'S CONVICTION AND DEATH SENTENCE ARE BASED ON UNRELIABLE EVIDENCE, IN VIOLATION OF DUE PROCESS .................................. 35

  A.  Information Requested by this Court .......................................... 35

  B.  The Merits of the Claim ........................................................... 35

  C.  State Court Opinion .................................................................. 38

      1.   Not adequate and independent ........................................... 39

      2.   Miscarriage of justice ....................................................... 42

VI.  PETITIONER WAS DEPRIVED OF HIS RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL AT BOTH GUILT AND PENALTY PHASES WHERE TRIAL COUNSEL INEFFECTIVELY FAILED TO PROVIDE CRITICAL EVIDENCE TO THE DEFENSE PSYCHIATRIC EXPERT. ................................................................ 43

  A.  Information Requested by the Court ........................................... 43

  B.  The Merits of the Claim. .......................................................... 43

       1.  Deficient performance.................................................................. 43

       2.  Prejudice....................................................................................... 45

           a.     Guilt Phase................................................................45

           b.     Penalty Phase.............................................................47

   C.  The State Court Opinions......................................................... 48

       1.  Deficient performance.................................................................. 48

       2.  Prejudice....................................................................................... 49

           a.     Guilt Phase............................................................…...49

           b.     Penalty Phase....................................................…....52

VII.   TRIAL COUNSEL INEFFECTIVELY FAILED TO PRESENT EVIDENCE IN THEIR POSSESSION WHICH IRREFUTABLY ESTABLISHED THAT WAYNE MITCHELL HAD STRUGGLED SINCE CHILDHOOD WITH SEVERE ALCOHOLISM; PETITIONER WAS PREJUDICED BY COUNSEL'S DEFICIENT PERFORMANCE AT BOTH THE GUILT AND PENALTY PHASES......................................................... 54

   A.  Information Requested by the Court.......................................... 54

   B.  The Merits of the Claim ........................................................... 54

       1.  Deficient performance.................................................................. 55

       2.  Prejudice....................................................................................... 57

   C.  The State Court Opinions.............................................…....58

VIII.  TRIAL COUNSEL'S FAILURE TO TIMELY PREPARE AND TO INVESTIGATE, DEVELOP AND PRESENT CREDIBLE AND PERSUASIVE MITIGATING EVIDENCE DEPRIVED PETITIONER OF HIS CONSTITUTIONAL RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL.................................................. 60

   A.  Information Requested by the Court.......................................... 60

   B.  The Merits of the Claim............................................................ 61

       1.  Deficient performance.................................................................. 61

       2.  Prejudice....................................................................................... 63

   C.  The State Court Opinions......................................................... 68

1. Deficient representation. ................................................................................ 68

2. Prejudice ........................................................................................................... 70

IX. THE TRIAL COURT VIOLATED DUE PROCESS AND THE EIGHTH AMENDMENT
BY EXCLUDING TESTIMONY BY BEHAVIOR CLINIC EXPERTS AND USE OF
THOSE EXPERTS' REPORTS BY THE DEFENSE; TRIAL COUNSEL'S FAILURES
TO USE THE REPORTS AND TO OBJECT TO THE TRIAL COURT'S RULING WERE
DEFICIENT PERFORMANCE THAT PREJUDICED PETITIONER AT CAPITAL
SENTENCING. .......................................................................................................... 74

A. Information Requested by the Court ............................................................... 74

B. The Merits of the Claims. ............................................................................... 74

1. The due process and Eighth Amendment violation. .................................. 75

2. The Sixth Amendment violation. ............................................................... 75

a. Deficient Performance ............................................................. 75

b. Prejudice ................................................................................... 77

C. The State Court Opinions ............................................................................... 78

X. TRIAL AND APPELLATE COUNSEL WERE INEFFECTIVE FOR FAILING TO
PROPERLY RAISE AND LITIGATE THE INVALID USE OF CONVICTIONS FROM
THE GUILT PHASE OF THE TRIAL TO REBUT THE EXISTENCE OF THE (E)(1)
MITIGATING FACTOR, AND FOR FAILING TO RAISE AND LITIGATE THE TRIAL
COURT'S FAILURE TO INSTRUCT THE JURY TO FIND LACK OF A RECORD AS
A MITIGATING CIRCUMSTANCE UNDER THE "CATCH-ALL" MITIGATING
FACTOR. .................................................................................................................... 80

A. Information requested by the Court ................................................................ 80

B. The Merits of the Claim .................................................................................. 81

C. The State Court Opinion ................................................................................. 83

XI. PETITIONER'S DEATH SENTENCE SHOULD BE VACATED BECAUSE THE
PENALTY PHASE JURY INSTRUCTION VIOLATED THE EIGHTH AMENDMENT
AND TRIAL COUNSEL UNREASONABLY FAILED TO OBJECT TO THE COURT'S
IMPROPER INSTRUCTION REGARDING THE DEFINITION, WEIGHT AND VALUE
OF MITIGATING EVIDENCE IN THE CASE. ......................................................... 84

A. Information Requested by this Court ............................................................... 84

B. The Merits of the Claim .................................................................................. 85

     1.   Petitioner's jury received improper instructions on mitigating circumstances .............. 85

     2.   Counsel was ineffective ................................................................................... 86

  C.  State Court Opinion .......................................................................................... 87

XII.   PETITIONER IS ENTITLED TO RELIEF FROM HIS CONVICTION AND
       SENTENCE BECAUSE OF THE PREJUDICIAL EFFECTS OF THE CUMULATIVE
       ERRORS IN THIS CASE ...................................................................................... 87

  A.  Information Requested by the Court .................................................................. 87

  B.  The Merits of the Claim .................................................................................... 88

  C.  The State Court Opinion ................................................................................... 88

CONCLUSION ...................................................................................................... 90

# STANDARD OF REVIEW

**A.**     The Anti-Terrorism and Effective Death Penalty Act ("AEDPA") applies to this case.  For issues as to which there is an adverse state court decision on the merits, review is governed by 28 U.S.C. § 2254(d), and relief is appropriate where the state court decision is "contrary to" or "an unreasonable application of" clearly established federal law, or involves an "unreasonable determination of the facts," § 2254(d)(1) and (2).  Habeas review under § 2254(d) remains robust; any "deference" required by § 2254 "does not imply abandonment or abdication of [federal] judicial review." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003); *accord McKernan v. Sup't Smithfield SCI*, 849 F.3d 557, 564 (3d Cir. 2017).[1]

**B.**     Some issues are not subject to § 2254(d) at all because the Pennsylvania Supreme Court did not actually decide them on the merits.  Federal habeas review of those issues is the same *de novo*, plenary review that was required before AEDPA.  *See Rompilla*, 545 U.S. at 390 (where state court did not address "prejudice" prong of ineffective assistance of counsel claim, habeas review is *de novo*); *Jacobs*, 395 F.3d at 100 ("AEDPA's deferential standards of review do not apply unless it is clear from the face of the state court decision that the merits of the petitioner's constitutional claims were examined in light of federal law as established by the Supreme Court of the United States" (citations and quotation marks omitted)); *Bronshtein*, 404 F.3d 700, 710 n.4, 715 (3d Cir. 2005) (*de novo* review of claims where Pennsylvania Supreme

---

[1] *See also Panetti v. Quarterman*, 551 U.S. 930 (2007) (granting habeas relief under AEDPA); *Miller-El v. Dretke*, 545 U.S. 231 (2005) (same); *Rompilla v. Beard*, 545 U.S. 374 (2005) (same); *Wiggins v. Smith*, 539 U.S. 510 (2003) (same); *Williams v. Taylor*, 529 U.S. 362 (2000) (same); *Bond v. Beard*, 539 F.3d 256, 278-92 (3d Cir. 2008) (same); *Outten v. Kearney*, 464 F.3d 401, 409-23 (3d Cir. 2006) (same); *Jacobs v. Horn*, 395 F.3d 92, 107 (2005) (same); *Holloway v. Horn*, 355 F.3d 707, 729-30 (3d Cir. 2004) (same); *Hardcastle v. Horn*, 368 F.3d 246 (3d Cir. 2004) (finding state court decision unreasonable and remanding for evidentiary hearing), *on remand*, 521 F.Supp.2d 388 (E.D. Pa. Oct. 19, 2007) (granting habeas relief), *aff'd*, 332 F. App'x 764 (3rd Cir. 2009).

Court denied them as procedurally barred); *Wilson v. Beard*, 426 F.3d 653, 659 (3d Cir. 2005) (same).

      **C.**      Some of Petitioner's claims involve ineffective assistance of counsel. The Sixth Amendment right to effective assistance of counsel is violated when counsel's representation is deficient, i.e., falls below "an objective standard of reasonableness"; and the defendant is prejudiced, i.e., when confidence is undermined in the outcome of the proceeding (trial, sentencing and/or direct appeal). *See Wiggins*, 539 U.S. at 521; *Strickland v. Washington*, 466 U.S. 668, 694 (1984). The "undermines confidence" prejudice standard requires only a "reasonable probability" of a different result and it "is not a stringent one. It is less demanding than the preponderance standard." *Hull v. Kyler*, 190 F.3d 88, 110 (3d Cir. 1999) (citations omitted). Where counsel's performance is deficient in more than one respect, courts are to consider the prejudicial effect of counsel's errors as a whole. *Williams*, 529 U.S. at 397.

      In evaluating counsel's representation, the Court should consider the American Bar Association's STANDARDS FOR CRIMINAL JUSTICE (1980) ("ABA STANDARDS") and GUIDELINES FOR THE APPOINTMENT AND PERFORMANCE OF COUNSEL IN DEATH PENALTY CASES (1989) ("ABA GUIDELINES"), which articulate "reasonable" professional "standards for capital defense work" and are the "norms" and "standards to which [the Supreme Court] long ha[s] referred as 'guides to determining what is reasonable'" under the Sixth Amendment. *Wiggins*, 539 U.S. at 522-25 (citing *Strickland* and *Williams*); *see also Outten*, 464 F.3d at 417 (counsel's representation is "assessed by looking to '[p]revailing norms of practice as reflected in [the] American Bar Association'" Standards and Guidelines (quoting *Strickland* and citing *Williams*, *Wiggins*, and *Rompilla*)).

## CLAIMS FOR RELIEF

I.    **PETITIONER'S WAIVER OF HIS *MIRANDA* RIGHTS WAS NOT KNOWING, VOLUNTARY, OR INTELLIGENT; TRIAL COUNSEL'S FAILURE TO PRESENT ANY EVIDENCE TO SUPPORT HIS SUPPRESSION MOTION PRE-TRIAL, OR TO RAISE REASONABLE DOUBT AS TO THE RELIABILITY OF THE CONFESSION AT TRIAL, CONSTITUTES INEFFECTIVE ASSISTANCE.**

### A.    Information Requested by the Court[2]

Petitioner relies upon the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution as bases for relief.

This claim has been exhausted in the state courts. *See Mitchell-2* at 1266-1271.

Federal review of this claim is not barred by the doctrine of *Teague v. Lane*, 489 U.S. 288 (1989). Petitioner does not rely on a "new" constitutional rule of criminal procedure announced after the date his conviction became final. *See id.* at 310. Specifically with regard to Petitioner's ineffectiveness claims, subsequent decisions applying *Strickland* do not constitute "new" law for purposes of *Teague*. *See Wiggins*, 539 U.S. at 521 ("We established the legal principles that govern claims of ineffective assistance of counsel in *Strickland*"); *id.* at 522 (Court "made no new law" in *Williams v. Taylor*, 529 U.S. 362 (2000), but instead "applied the same 'clearly established' precedent of *Strickland* we apply today"); *accord Outten*, 464 F.3d at 414.

### B.    The Merits of the Claim.

Around noon on September 10, Mr. Mitchell sought psychiatric treatment at St. Francis Hospital. At 1:54 p.m., Pittsburgh Police arrested him at the hospital and transported him for questioning regarding Ms. Little's death. NTT 358. After questioning by the police, he waived his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966), and gave a statement to police.

---

[2] This Court's Order of August 11, 2016, ECF No. 11, directed Petitioner to discuss within each claim the constitutional bases for relief, exhaustion, whether the claim is barred by *Teague v. Lane*, 489 U.S. 288 (1989), the merits of the claim, and the state court adjudication of the claim. Petitioner discusses the first three issues under subheading "A" of each claim, the merits under subheading "B" of each claim, and the state court opinion under subheading "C" of each claim.

In the statement, he said that he went to Ms. Little's house around 1:30 A.M. on September 10 and argued with her, then assaulted her with his fists and with a knife that he found. He went on to state that he raped her vaginally and anally, and then stabbed her in the neck. NTT 380-88; A552-64.

### 1. Deficient performance.

A defendant's statement will be suppressed if it was involuntary, i.e., it resulted from government pressure or coercion; or not knowing and intelligent, i.e., it was not made with full comprehension of the rights being abandoned and the consequences of waiving them. With respect to both inquiries, the "physical and mental state" of the suspect is among the factors to be considered. *Culombe v. Connecticut*, 367 U.S. 658, 601 (1961).

Trial counsel filed a motion to suppress the statement on the grounds that Mr. Mitchell was mentally incapable of making a valid waiver of his rights. A hearing was held on the motion on September 27, 1999. NTJS 36. However, trial counsel offered *no evidence whatsoever* in support of the motion, and never attempted to investigate, prepare or present any such evidence. As a result, the motion to suppress was denied and the statement in its entirety was admitted at trial. In post-conviction, trial counsel testified that he failed to prepare for the suppression hearing because in the Allegheny County Court of Common Pleas there were no judges who would ever suppress a defendant's statement in a homicide case. Therefore, he only filed the motion to protect himself ("CYA."). *See* NTP 36, 52.

Trial counsel's failure to investigate, develop and present the trial court with any of the available evidence to support the suppression motion, as shown below, constitutes ineffective assistance of counsel in violation of the Sixth Amendment and *Strickland v. Washington*, 466 U.S. 668 (1984).

4

## 2.     Prejudice

Counsel's failures prejudiced Petitioner.  There was ample evidence available to counsel that Mr. Mitchell's confession was not the result of a valid waiver and was not reliable.

The St. Francis Hospital records – which were available to but not reviewed by trial counsel – showed that there was an extensive family history of alcoholism, and that Petitioner himself was alcohol dependent by age fourteen.  See NTP 610, 621-22 (testimony of Commonwealth expert, Dr. Wright).  The records also revealed that Mr. Mitchell had a history of binge drinking and withdrawal.  NTP 390-91, A468 (testimony and report of Dr. Clark).  This alcohol dependence and binge drinking could have been confirmed by Louis Harrell, Petitioner's drug and alcohol counselor at St. Francis Hospital when he was fourteen.  NTP 478-85.  Neither trial attorney met with Mr. Harrell prior to trial, but he was called at the penalty phase where he was asked a few cursory superficial questions.  NTP 863-65.  Mr. Mitchell's binge drinking could also have been confirmed by Cory Powell, who saw Petitioner nearly every day when they were both thirteen and fourteen years old.  *See* A530-31 (sworn declaration accepted by the PCRA court in lieu of live testimony).

Pretrial discovery revealed that Mr. Mitchell was visited at the police station interrogation room very close in time to his confession by Brian Dallas.  Mr. Dallas is a rare lay witness to Petitioner's condition *in the interrogation room* who was never contacted by trial counsel.  Mr. Dallas testified in post-conviction that Mr. Mitchell had bloodshot eyes and looked "confused" and "out of it," and that Mr. Mitchell appeared to be in a state of shock and smelled of alcohol.  Mr. Harrell's description is consistent with a state of withdrawal after binge drinking. NTP 398-99, 543-44.

Wayne Mitchell, Sr., Petitioner's father, who was living in Pittsburgh and attended the penalty phase of trial, was never interviewed by the defense before trial.  NTP 503-04.  Wayne,

Sr. testified about his own history of alcohol abuse, and Petitioner's drinking as an adolescent. *See* NTP 506-20. He testified that he saw Petitioner for about fifteen minutes on September 9, around 2:30 in the afternoon, walking near his house. At that time Petitioner was more intoxicated than his father had ever seen him before. Wayne, Sr. described Wayne, Jr. as slurring his speech and staggering. NTP 522-24.

At trial, counsel presented testimony from Mr. Mitchell's uncle, Curtis Mitchell, that Petitioner drank seven or eight sixteen ounce beers and several drinks of whiskey starting at 8:00 p.m. on June 9. NTT 477-79. Counsel also presented the testimony of, Rosalyn Guy-McGorkle, Petitioner's attorney at the September 9 and 10, 1997 hearings. Ms. Guy-McGorkle testified that Petitioner was incoherent and seemed not to understand what was happening at those proceedings. NTT 452-53, 456, 458-59. Petitioner's mother, Linda Mitchell, testified at trial about Petitioner's history of alcohol-related problems, and that on the morning of September 10 he was incoherent and appeared to have gotten drunk the night before. NTT 504-08.

Trial counsel also knew that Petitioner, who was nineteen at the time of the offense, had a documented history of alcohol dependence going back at least to age fourteen. And Dr. Bernstein, the psychiatric expert counsel secured for trial, had informed counsel that Mr. Mitchell suffered from alcohol dependence and acute alcohol-caused impairments on the night of the offense. A473-76.

Additionally, Dr. Barry Crown, who conducted a post-conviction neuropsychological evaluation of Mr. Mitchell, found that Petitioner has brain damage, primarily impacting his fronto-temporal functioning, and that Mr. Mitchell's childhood onset of alcohol abuse and dependence impaired his brain development. NTP 290, 306. Dr. Crown found that Mr.

Mitchell's memory and recall, judgment and reasoning ability, and his control of emotions were all impaired as a result. NTP 296.

Trial counsel also failed to present to the suppression court available evidence that Petitioner's statement was unreliable. After reviewing the medical and forensic laboratory reports pertaining to Ms. Little's killing and sexual assault, and Petitioner's statement in the post-conviction proceedings, Dr. Charles Wetli, a former medical examiner, testified that if the offender had ejaculated in the victim during the anal rape, as Petitioner's statement indicates, he would expect biological evidence from the offender would have been found in her rectum. NTP 493-94. No evidence from Petitioner was found in her rectum. In addition, Dr. Wetli testified that if the killing had occurred in the manner described in Petitioner's statement, he would expect that the victim's blood would have been found on his clothing. NTP 496-97. Mr. Mitchell's clothing had no blood on it.

Had trial counsel presented all of the available evidence, the trial court would have been faced with evidence that Mr. Mitchell was an alcoholic with a documented history of binge drinking followed by withdrawal; that he also suffers from brain damage; that his mental state at the time of the statement was likely affected both by his brain damage and alcohol withdrawal; and that some of the purported facts in his statement are inconsistent with the physical evidence. In these circumstances, it is reasonably likely that Petitioner's statement would have been suppressed.

Petitioner was prejudiced by counsel's failure to investigate, develop and present evidence in support of the motion to suppress his confession. As the United States Supreme Court explained in *Fulminante v. Arizona*, 499 U.S. 279 (1991), a "confession is like no other evidence" because of the "profound impact that the confession has upon the jury . . . ." *Id.* at

296. Here, Petitioner's confession, if credited, eliminated any doubt as to the identity of Ms. Little's killer and supported premeditation. It also provided the sole evidence of rape. Had the confession been excluded, it is reasonably likely either that Petitioner would have been acquitted of all charges, or at least that he would have been acquitted of rape and first degree murder. If counsel had presented the available records and witnesses, it is reasonably likely that the statement would have been suppressed, establishing prejudice. *See Smith v. Dugger*, 911 F.2d 494, 497-8 (11th Cir. 1990) (counsel's failure to litigate a suppression motion prejudicial when confession was cornerstone of prosecution's case and bore indications of an invalid waiver).

Moreover, Petitioner was also prejudiced by counsel's failure to challenge the reliability of the confession.[3] The circumstances in which a confession is given affect its overall reliability. *See e.g.*, *Crane v. Kentucky*, 476 U.S. 683 (1986). Here, if the jury had been allowed to consider the true nature of Mr. Mitchell's statement to the police and its inherent lack of reliability, it is reasonably likely that they would have found that his "confession" lacked credence. Mr. Mitchell's statement was the cornerstone of the Commonwealth's case; if the jury refused to credit his statement, it is likely they would have concluded that the Commonwealth had not met its burden regarding Mr. Mitchell's guilt. Petitioner was therefore prejudiced by trial counsel's deficient performance in this respect as well.

---

[3] In this case, the reliability of Mr. Mitchell's confession is called into question by his substance abuse, mental illness, and youth. *See* S.M. Kassin, & G.H. Gudjonnson, *The Psychology of Confessions: A Review of the Literature and Issues*, Psychological Science in the Public Interest, Vol. 5, Issue 2 (2004), at 5. All three of these factors make Mr. Mitchell uniquely vulnerable and more likely to make a false or unreliable confession. In their analysis of false confessions, Drizin and Leo conclude that confessions should "initially be treated as a neutral hypothesis to be objectively tested against the case facts." Steven Drizin & Richard Leo, *The Problem of False Confessions in the Post-DNA World*, 82 N.C.L. Rev. 891, 1006 (2004). Here, significant information in Mr. Mitchell's confession contradicts the facts of the case. These discrepancies should have sounded alarm bells for trial counsel, and the jury should have been made aware of them.

C.    **The State Court Opinions**

The state court decisions appear to address only the prejudice prong of the *Strickland* claim.  Therefore, this Court should review the deficient performance prong *de novo*.  *See Rompilla*, 545 U.S. at 390.

To the extent that either court addressed deficient performance, the PCRA court unreasonably mischaracterized trial counsel's testimony.  According to the PCRA court, attorney Harper "credibly testified that he did not believe that *based on the evidence* that it was likely that the confession would be suppressed and *did not want to dedicate resources* on obtaining experts to support the motion."  PCRA Op.-1, 29 (citing NTP 36).

There is not a shred of evidence to support for the italicized portions of the court's statement.  Attorney Harper's actual testimony was as follows:

> Q.    But you did recognize that his confession was damaging to your case and tried to suppress it?
>
> A.    Truthfully, in *every murder case I have ever tried* there hasn't been a suppression hearing.  I have known the results of those suppression hearings going into the trial in this courthouse, even when I think that the issues are very, very meritorious.  *In a homicide there is no suppression....* A suppression motion in a homicide are very much CYA, preservation of issues for appeal.

NTP 36.

From attorney Harper's testimony, it is clear that his decision was not "*based on the evidence*" in this case, but on his assumptions about what happens in "*every murder case.*"  Nor is there any evidence that attorney Harper was concerned about resources or experts – his view is clearly stated that in *no* homicide case can a suppression motion succeed, so there is *never* any reason – regardless of the evidence – for counsel to investigate or consider the merits of a suppression motion in *any* homicide case.  Counsel's defeatism, however, is not a reasonable basis for failing to investigate a critical issue in a capital case.  *Cf. Blanco v. Singletary*, 943 F.2d

9

1477, 1501 (11th Cir. 1991) (counsel ineffective for acquiescing in the client's "defeatism without knowing what evidence [the client] was foregoing."). Here, *counsel's* defeatism blinded him from even considering professional litigation of the suppression issue.

In its prejudice analysis, the Pennsylvania Supreme Court relied on the credibility determinations of the PCRA court. *Mitchell-2* at 1270-71. The state court findings, however, were based on unreasonable applications of *Strickland* and were based on factual determinations that are objectively unreasonable in light of the evidence presented in the state court proceeding. While a state court merits decision "will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state court proceeding," *Miller-El*, 537 U.S. at 340, deference "does not imply abandonment or abdication of judicial review." *Id.* (citations omitted). Here, the state court decision was unreasonable.

First, the state courts addressed each item of evidence that Petitioner presented in post-conviction individually. The state courts never considered the cumulative prejudicial effect of all the available evidence, *see Mitchell-2* at 1268-71; PCRA Op.-1, 18-28, as required under *Strickland*. It is well established that a court considering prejudice under *Strickland* must "evaluate the totality of the available... evidence..." *Williams*, 529 U.S. at 397.

For example, the PCRA court stated that when Dr. Clark testified that Mr. Mitchell's heart rate of 104 on admission to St. Francis Hospital was consistent with alcohol withdrawal, Dr. Clark "ignored" other St. Francis notations that the court thought were inconsistent with withdrawal. *See* PCRA Op.-1, 21-22. In fact, however, Dr. Clark testified that Mr. Mitchell could have been intoxicated the night before but still have a blood alcohol level of 0 and be suffering from withdrawal the next day. NTP 406. Moreover, the court's reading of the St. Francis records is entirely speculative – the Commonwealth did not cross-examine Dr. Clark

about the records cited by the PCRA court. With no basis in the record, the PCRA court improperly undertook to "cross-examine" Dr. Clark for itself, and then simply assumed that the notations it cited are inconsistent with withdrawal.[4]

Based on this type of piece by piece analysis of the evidence, the state courts concluded that portions of the St. Francis Hospital records along with Detective Logan's testimony completely rebutted each of the separate witnesses presented in the post-conviction proceedings. *Mitchell-2* at 1270. This piecemeal approach to prejudice analysis is an unreasonable application of *Strickland* and its progeny, which require a cumulative assessment of the totality of the evidence. *See Williams*, 529 U.S. at 397-98 (state court ruling unreasonable because it "failed to evaluate the totality of the available ... evidence – both that adduced at trial, and the evidence adduced in the [post-conviction] proceeding" in determining whether counsel's deficient performance prejudiced defendant). The state courts unreasonably failed to consider whether there was a reasonable likelihood that all of the post-conviction evidence together would have resulted in suppression of Mr. Mitchell's statement.

The PCRA court also apparently discredited Dr. Wetli's PCRA testimony about the absence of physical evidence of rape on September 10 as having been contradicted by Dr. Sutkin's trial testimony. *See* PCRA Op.-1 at 27-28. Dr. Sutkin, however, was testifying about the September 1 rape, NTT 100-01, during which Mr. Mitchell used a lubricated condom. There is no evidence of condom use with respect to the September 10 alleged rape. Nothing in Dr.

---

[4] Similarly, the court discredited Brian Dallas's testimony because it thought his observation that he "believed [he] smelled alcohol" on Mr. Mitchell, NTP 545, was inconsistent with the absence of any notation in the St. Francis records concerning an odor when Mr. Mitchell was admitted. PCRA Op.-1, 25. There is nothing in the record, however, to show the significance of an absence of any notation as to odor. Moreover, Mr. Dallas's other observations, e.g., that Mr. Mitchell's "eyes were bloodshot," and that he "looked out of it," NTP 544, are more significant to the question of withdrawal than Mr. Dallas's equivocal belief there was alcohol on Mr. Mitchell's breath.

Sutkin's testimony affects Dr. Wetli's testimony that seminal fluid should have been but was not found.

Petitioner has shown that his Sixth Amendment rights were violated, and that the state court decisions denying relief were at best unreasonable. Accordingly, this Court should grant him habeas relief as to his death sentence.

**II. PETITIONER WAS DEPRIVED OF HIS SIXTH AND FOURTEENTH AMENDMENT RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL WHEN HE PLED GUILTY, IN RELIANCE ON HIS ATTORNEY'S UNREASONABLE ADVICE, TO FELONIES THAT MADE HIM ELIGIBLE FOR THE DEATH PENALTY.**

**A. Information Requested by the Court**

This claim is based on the Sixth and Fourteenth Amendments to the United States Constitution.

The claim has been exhausted in state court. It was first raised in a motion to vacate guilty plea filed in 2000 and denied after a hearing. On direct appeal, the Pennsylvania Supreme Court ruled that review should be deferred to PCRA proceedings. *Mitchell-1* at 457-59. The claim was then exhausted in the PCRA proceedings. *See Mitchell-2* at 1271-73.

Federal review is not barred by *Teague v. Lane*, 489 U.S. 288 (1989). Petitioner does not rely on a "new" constitutional rule of criminal procedure announced after the date his conviction became final. *See Id.* at 310. Rather, his claim is based on the long-settled rule that a guilty plea is not valid if it is induced by objectively unreasonable advice of counsel, and but for that advice the defendant would not have pled guilty. *Hill v. Lockhart*, 474 U.S. 52 (1985); *Strickland v. Washington*, 466 U.S. 668 (1984).

## B.    The Merits of the Claim

Mr. Mitchell was convicted in this case of raping his estranged wife on September 1, 1997, and raping and killing her on September 10, 1997. The September 10 rape is the basis for one of the death-qualifying aggravating factors and was also used to rebut a mitigating factor.

Although he characterized the evidence of the September 10 rape as weak, *see* NTJS 65-66, NTP 42, immediately after jury selection, guilt phase counsel Harper announced that Mr. Mitchell would enter a plea of guilty to the September 10 rape. NTJS 762-64. This announcement took co-counsel Cribbins and the prosecutor by surprise. Amended Pet., ECF No. 12, ¶ 101.

Mr. Mitchell entered the guilty plea in accordance with attorney Harper's advice, believing that the plea would remove the evidence of the September 10 rape from the trial. NT 1/7/00, at 4-5. Mr. Harper stated that his strategy was to "minimize the amount of evidence and data coming out about those particular crimes," and claimed that he did everything he could "to keep a lot of the facts about these rapes out. . . ." NTP 46. However, he did nothing to advance such a "strategy," by, for example, moving to quash the rape charge. Amended Pet., ECF No. 12, ¶¶ 106, 120-123. Because the plea was entered in reliance on objectively unreasonable advice from counsel, Mr. Mitchell was deprived of the right to effective assistance of counsel. *Hill*, 474 U.S. at 58-59.

Because Petitioner would not have pled guilty but for the unreasonable advice of counsel, NT 1/7/00, at NT 4-5, he has demonstrated prejudice. *Lafler v. Cooper*, 566 U.S. 156, 163 (2012) (prejudice shown where "the outcome of the plea process would have been different with competent advice"). The appropriate remedy in this case is the vacation of the rape conviction.

In addition, because of its impact on the homicide conviction and death sentence, it tainted the entire proceedings, warranting a new trial on all charges.

### 1. Deficient performance

Attorney Harper decided to plead guilty to the September 10 rape charge based on the mere hope that doing so would minimize evidence of the rape – a hope that he did nothing to make come true and that was not realized. Amended Pet., ECF No. 12, ¶¶ 106-08. A vain hope for a particular result does not constitute objectively reasonable strategy, the foundation of which is thorough investigation and preparation. *Wiggins*, 539 U.S. at 522-23; *Rompilla*, 545 U.S. at 387; *Blystone v. Horn*, 664 F.3d 397, 420 (3d Cir. 2011). Here, counsel's decision was based on a mere hope, rather than preparation and investigation.

Mr. Harper's testimony reveals his lack of reasonable preparation. When confronted with the fact that the evidence of the September 10 rape was introduced at trial, despite his purported strategy to minimize it, all counsel could say was that the prosecutor "whipped my tail." NTP 30. When asked why he failed to seek suppression of the confession on the grounds that physical evidence contradicted it, counsel explained was that he was trying to minimize the rape evidence *at trial*, NTP 35, although professionally reasonable counsel would have sought to exclude it before trial.

Again, Mr. Harper asserted his decision was based on his belief that Mr. Mitchell had confessed to the September 10 rape, but not to the September 1 rape. When confronted with the fact that there was evidence of confessions to *both*, counsel stubbornly declared without explanation that he was "not giving" Mr. Mitchell a conviction on the September 1 rape. NTP 45-46.

Attorney Harper's performance was also deficient because he failed to advise his client of the negative consequences of the plea. *See* Am. Bar Ass'n, *Guidelines for the Appointment &*

*Performance of Counsel in Death Penalty Cases* (1989) (hereafter "ABA Guidelines"),

Guideline 11.6.1(A) (prior to entry of a guilty plea, "counsel should fully explain the rights that

would be waived by a decision to enter a plea instead of proceeding to trial, and should explain

the legal and/or factual considerations that bear on the potential results of going to trial");

Guideline 11.6.4(A)(2) (counsel must ensure that client understands "the maximum punishment,

sanctions and other consequences the accused will be exposed to by entering a plea.").

Mr. Mitchell did not know that he was pleading guilty to death penalty eligibility. In

fact, counsel had told him precisely the opposite -- that a guilty plea to the predicate rape would

"take that evidence away" and it could not be used as an aggravating factor. NT 1/7/00 at 4.

Providing such misinformation was deficient performance. *United States v. Bui*, 795 F.3d 363,

367 (3d Cir. 2015) (in advising a defendant on a possible plea of guilty, counsel is required to

give defendant enough information to make an informed decision, and potential sentencing

exposure is an important factor in the decision making process).

In addition, counsel advocated the plea without first investigating potential defenses,

specifically, heat of passion voluntary manslaughter. *See United States v. Kauffman*, 109 F.3d

186 (3d Cir. 1997) (counsel ineffective for failing to investigate insanity defense prior to

negotiated plea of guilty). Attorney Harper testified that he thought there was a potential

voluntary manslaughter defense, NTP 57-58, but that he "didn't have the guts" to present that

defense, and "didn't think in today's climate that it was a viable defense." NTP 61-62.

However, counsel did nothing to investigate the factual basis for such a defense, *see*

Amended Pet., ECF No. 12, ¶¶ 125-27, nor did counsel investigate whether it was viable "in

today's climate." The subject could have been probed with the potential jurors. *See*

Commentary to ABA Guidelines, Guideline 8.1 (Counsel . . . in capital cases must engage in

ongoing research in order to keep abreast of the rapidly changing legal developments in the complex body of law surrounding death penalty issues. In order to make use of sophisticated jury selection techniques . . . for example, the defense requires access to social scientists and other experts who can assist in voir dire questioning and the profiling of prospective jurors"). Instead of formulating any jury selection strategy, however, Mr. Harper relied on his gut impressions. NTP 59. Such lack of preparation in favor of "winging it" in a capital case is objectively unreasonable.

Counsel also asserted that presenting a voluntary manslaughter defense would have required Mr. Mitchell to testify. NTP 62. This was an objectively unreasonable mistake of law. *See* Amended Pet., ECF No. 12, ¶ 128. Whether evidence of provocation is sufficient to prove voluntary manslaughter is an objective standard, which is not satisfied by self-serving testimony from the defendant. *Commonwealth v. Thornton*, 431 A.2d 248, 252 (Pa. 1981). It was deficient performance for counsel to make such a decision based on a mistake concerning the applicable law. "An attorney's ignorance of a point of law that is fundamental to his case combined with his failure to perform basic research on that point is a quintessential example of unreasonable performance under *Strickland.*" *Hinton v. Alabama*, 134 S. Ct. 1081, 1089 (2014); *see Kimmelman v. Morrison*, 477 U.S. 365, 385 (1986) (counsel's misunderstanding of discovery procedure rendered counsel's performance deficient).

### 2. Prejudice

To establish *Strickland* prejudice in the context of a guilty plea, a showing must be made that "the outcome of the plea process would have been different with competent advice." *Lafler*, 566 U.S. at 163. There is no dispute on this point. Mr. Mitchell testified that he would not have entered the plea but for counsel's advice. NT 1/7/00, 4-5. Moreover, the guilty plea deprived

16

Petitioner of a viable voluntary manslaughter defense. *See* Amended Pet., ECF No. 12, ¶¶ 134-42. Therefore, he is entitled to vacation of his conviction for the September 10 rape.

The constitutional error tainted the conviction and death sentence for the homicide. Without the felony murder aggravating factor, it is reasonably likely that at least one juror would have voted for life. *Wiggins*, 539 U.S. at 537 (prejudice turns on whether "one juror would have struck a different balance"). The single remaining aggravating factor was not overwhelming. Amended Pet., ECF No. 12, ¶ 145. Furthermore, the constitutional error must be considered cumulatively with Claim X in particular, which establishes that the September 10 rape conviction was also used to rebut the mitigation. *Id.* at ¶¶ 378-93.

### C. The State Court Opinions.

This claim is based on the clearly established law set forth in *Strickland* and *Hill v. Lockhart*, which require a showing of both deficient performance and prejudice. Relying strictly on state law, the State courts rejected the claim that trial counsel's performance was deficient. *Mitchell-2* at 1271-73. This does not constitute adjudication of the merits for purpose of § 2254(d). *Jacobs*, 395 F.3d at 100 ("AEDPA's deferential standards of review do not apply unless it is clear from the face of the state court decision that the merits of the petitioner's constitutional claims were examined in light of federal law as established by the Supreme Court of the United States") (citations and quotation marks omitted)).

Assuming the state court's deficient performance analysis can be deemed an adjudication of the merits, *de novo* review is still warranted because the state court improperly equated the ineffective assistance claim with an involuntary plea claim, stating: "Allegations of ineffectiveness in connection with the entry of a guilty plea will serve as a basis for relief only if the ineffectiveness caused [A]ppellant to enter an involuntary or unknowing plea." *Mitchell-2* at

17

1272 (citations omitted). This analysis is contrary to clearly established federal law. *See Lafler*, 566 U.S. at 173 (Under *Hill*, "[a]n inquiry into whether the rejection of a plea is knowing and voluntary . . . is not the correct means by which to address a claim of ineffective assistance of counsel").

The state court ruled that counsel's performance was not deficient because it credited counsel's testimony that he advised Mr. Mitchell to plead guilty in an attempt to "minimize" the evidence of rape. *Mitchell*-2 at 1273. While that may be an accurate description of trial counsel's subjective state of mind, it does not answer the question whether counsel conducted an adequate investigation before coming to that decision. *See Harrington v. Richter*, 562 U.S. 86, 110 (2011) (*Strickland* . . . calls for an inquiry into the objective reasonableness of counsel's performance, not counsel's subjective state of mind"); *Wiggins*, 539 U.S. at 523 (focus for deficient performance analysis is on "whether the investigation supporting counsel's decision . . . *was itself reasonable*.") (emphasis original); *Muff v. Dragovich*, 310 F. App'x 522, 525 (3d Cir. 2009) (*Strickland* instructs that reasonableness is to be judged objectively according to what might be considered sound strategy, not subjectively according to what the attorney in question thought was best").

Here, as discussed above, counsel never (a) explored whether there was any objective basis for his "hope" that a guilty plea would minimize the evidence of rape; (b) made any attempt to exclude the evidence of rape or quash the September 10 rape charge; or (c) investigated the viable alternative defense of voluntary manslaughter. In the absence of any such investigation, it was unreasonable for the state court to find that counsel had an objectively reasonable strategy.

Alternatively, the state court's rejection of the claim was based on an unreasonable determination of the facts under § 2254(d)(2), because the state court overlooked critical facts. *See Grant v. Lockett*, 709 F.3d 224, 233 (3d Cir. 2013). The state court never addressed counsel's failure to inform Mr. Mitchell that he was effectively pleading guilty to death penalty eligibility. Nor did the state court consider counsel's failure to inform Mr. Mitchell that he was foregoing a manslaughter defense.

Neither state court addressed the prejudice prong of *Strickland*. *See Mitchell-2* at 1271-73; PCRA Op.-1 at 29-38. Consequently, federal review of *Strickland-Hill* prejudice is *de novo*. *Rompilla*, 545 U.S. at 390.

For the reasons stated here as well as those set forth in the Amended Petition, Mr. Mitchell should be granted a new trial.

**III.    PETITIONER'S SIXTH, EIGHTH AND FOURTEENTH AMENDMENT RIGHTS WERE VIOLATED WHERE TRIAL COUNSEL FAILED TO INVESTIGATE, DEVELOP, AND PRESENT EVIDENCE UNDERMINING THE CREDIBILITY OF A KEY GOVERNMENT WITNESS, SHELIA BRITTON**

**A.    Information Requested from this Court**

Petitioner relies upon the Sixth and Fourteenth Amendments to the United States Constitution as bases for relief.

This claim has been exhausted in the state courts. *See Mitchell-2* at 1273-77.

Federal review of this claim is not barred by the doctrine of *Teague v. Lane*, 489 U.S. 288 (1989). Petitioner does not rely on a "new" constitutional rule of criminal procedure announced after the date his conviction became final. *See id.* at 310. Specifically with regard to Petitioner's ineffectiveness claims, subsequent decisions applying *Strickland* do not constitute "new" law for purposes of *Teague*.

## B.    The Merits of the Claim

Trial counsel's failure to investigate, interview and impeach Shelia Britton, the Commonwealth's star witness, denied Mr. Mitchell his Sixth and Fourteenth Amendment rights to the effective assistance of counsel. The Commonwealth's case, and Mr. Mitchell's defense at the guilt and penalty phases of trial, depended on the testimony of Ms. Britton. At trial, Ms. Britton testified that Mr. Mitchell called her twice on the night of Ms. Little's killing. According to Ms. Britton, Mr. Mitchell called her at 1:00 a.m., and told her that he was going to kill Ms. Little; then called her again around 3:00 to 4:00 a.m., and told her that Ms. Little was no more. A542-43.

Trial counsel knew that it took Ms. Britton almost ten months to report this information to the police. Her statement to the police gave no explanation for her failure to come forward earlier. Trial counsel never sought the answer to the glaring question regarding Ms. Britton's testimony – why it took her over ten months to contact police. NTP 50-51. Had he done so, he would have learned that Ms. Britton's trial testimony regarding the phone calls was based on a dream. NTP 82. Counsel's abdication of his duties – failing to investigate or interview the Commonwealth's star witness – constitutes ineffective assistance.

### 1.    Deficient Performance

Trial counsel's performance is deficient where counsel fails to adequately investigate and prepare for trial. *See, e.g. Strickland*, 466 U.S. at 691 ("Counsel has a duty to make reasonable investigation or to make a reasonable decision that makes particular investigation unnecessary."). Counsel has "a duty to bring to bear such skill and knowledge as will render the [proceeding] a reliable adversarial testing process." *Id.* at 688. This can be done only if counsel prepares and investigates thoroughly. *Williams*, 529 U.S. at 397.

In *Rolan v. Vaughn*, 445 F.3d 671 (3d Cir. 2006), the court found that counsel's failure to interview potential defense witnesses to a murder was deficient performance. Here, as in *Rolan*, trial counsel failed to interview a key witness, Ms. Britton. Counsel admitted that was "error on [his] part." *Mitchell-2* at 1276. The deficient performance here is more egregious than that in *Rolan*, because Petitioner's counsel knew that Ms. Britton was the *Commonwealth's* star witness, and that it took her ten months to contact police. Even more disturbing is that penalty phase counsel did not learn until the trial proceedings were underway of Ms. Britton's allegations relating to Mr. Mitchell's phone calls on the night of the killing. NTP 123. Not having interviewed Ms. Britton, neither trial counsel nor penalty counsel asked her about the lapse in time between the alleged phone calls and the reporting of those calls. Had they done so, they would have learned that she remembered the phone calls in her dreams. A545. Counsel's inaction falls far below the objective standard of reasonableness, and constitutes deficient performance.

### 2. Prejudice[5]

Trial counsel's deficient performance prejudiced Mr. Mitchell. To establish prejudice, there need only be a "reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. A reasonable probability is less demanding than a preponderance standard, but rather that the error was "sufficient to undermine confidence in the outcome." *Id.* at 693-94.

In *Berryman v. Morton*, 100 F.3d 1089, 1098-99 (3d Cir. 1996), the court found that defense counsel's failure to impeach the key prosecution witness "border[ed] on the inconceivable," and that the petitioner was prejudiced. *Id.* Similarly, in *Wilson v. Beard*, 589

---

[5] *See* Claim IV. B 3, *infra*, discussing materiality with respect to the *Brady* claim, for further discussion of the prejudice that Mr. Mitchell suffered.

F.3d 651, 662 (3d Cir. 2009), the court held that a witness's history of mental health problems and psychiatric intervention could have been used for impeachment, and that its absence from trial prejudiced the defendant.

Here, the Commonwealth's case depended on the testimony of Ms. Britton to prove specific intent at the guilt phase, and was used to discredit the defense mental health expert at the guilt and penalty phase. *See* Claims VI and VIII, *infra*. At the guilt phase, Ms. Britton's testimony regarding Mr. Mitchell's phone calls shortly before and shortly after the killing established that Mr. Mitchell acted with specific intent. Mr. Mitchell's sole defense at trial was diminished capacity. Ms. Britton's testimony vitiated Mr. Mitchell's defense, and left him with no defense at the guilt phase. NTP 43-44 (testimony from trial counsel).

### a. Guilt Phase

Had trial counsel investigated, interviewed Ms. Britton, and asked her the obvious question -- why did it take her over ten months to go to the police? -- he would have discovered that Ms. Britton learned of the alleged phone calls with Mr. Mitchell in her dreams. Specifically, trial counsel would have learned that on the morning of September 10, after the alleged phone calls took place, Ms. Britton spoke to police but could not remember anything about the telephone calls. It was only after she went to sleep the next night that she remembered the calls in her dreams. The next day she sought mental health treatment after she started hearing Mr. Mitchell's voice in her head. After months of therapy and counseling, she told her story to the police. A518-519, 545, NTP 79-82.

These facts could have been used to impeach Ms. Britton at trial. *See* Pa. R. Evid. 613; *Cohen v. Albert Einstein Med. Ctr.*, 592 A.2d 720, 726 (Pa. Super 1991) (evidence regarding witness's ability to "remember and narrate perceptions accurately" admissible for impeachment purposes.). This powerful impeachment evidence would have created strong doubts in the

22

jurors' minds about Ms. Britton's testimony. That she learned of the alleged phone calls while dreaming, that she could not remember the phone calls only hours after they purportedly happened, and that her dreams led her to receive mental health treatment for almost a year before going to police all call her testimony into question.

All of the key participants at trial, including the Commonwealth's mental health expert, testified that this new information would have dramatically impeached Ms. Britton's credibility. If Ms. Britton's testimony regarding the alleged phone calls was doubted by the jury, serious questions would arise regarding Mr. Mitchell's intent on the night of the killing.[6] Instead, at trial when defense expert Dr. Lawson Bernstein was confronted by the Commonwealth with Ms. Britton's testimony, he was entirely discredited, *see* NTT 564-65, 567-68, and Mr. Mitchell was left with no defense. *See* Claim VI, *infra.* Had Dr. Bernstein been aware that Ms. Britton's account of the alleged phone calls was based on a dream, he could have explained that her account was highly unreliable. NTP 195.

---

[6] Trial counsel testified at the PCRA hearing that if he had known this information, he would have "gutted [Ms. Britton]" and "ripped her a new one." NTP 17, 20, 51. Trial counsel also testified that he would have used this information to rehabilitate the defense expert, Dr. Bernstein, leaving his diminished capacity opinion intact. *Id.* at 21. Dr. Bernstein agreed, and testified that if he would have been presented with all of Ms. Britton's statements, he would have found her account about the alleged phone calls highly questionable. NTP 194-95. The Commonwealth's expert, Dr. Bruce Wright agreed. NTP 637. Specifically, Dr. Wright testified that Ms. Britton's version of events sounds like a dream and that "it kind of says it was a dream . . .." NTP 637, 642.

### b.    Penalty phase

Despite being discredited at the guilt phase, Dr. Bernstein was called to testify for a second time at the penalty phase of trial. Mr. Mitchell's penalty phase presentation depended on the jury believing Dr. Bernstein's testimony. Once Dr. Bernstein was impeached with Ms. Britton's statement during his guilt phase testimony his credibility was destroyed. NTP 118-20 (Cribbins). Trial counsel admitted that he left penalty phase counsel "impotent" for her penalty phase presentation. NTP 61.

Had counsel known that Ms. Britton talked to police on the day of the killing and reported that she knew no relevant information, and that she dreamt the phone calls, counsel would have used those facts to shield Dr. Bernstein from cross-examination, which would have supported her mitigation case. NTP 122-23. Had the jurors been inform of these facts, they would have seriously questioned the accuracy and reliability of Ms. Britton's testimony. In turn it is reasonably likely that at least one juror would have accepted Dr. Bernstein's testimony and found sufficient mitigating evidence to support a life sentence. *See also* Claim VIII, *infra*.

### C.    State Court Opinion

The state court decisions appear to primarily or entirely address the prejudice prong of this claim. Where the state courts address only the prejudice prong of *Strickland*, this Court reviews the deficient performance prong *de novo*. *Dennis v. Sec'y, Pa. Dep't of Corr.*, 834 F.3d 263, 285 (3d Cir. 2016) (en banc). Applying *de novo* review, counsel's performance was deficient for the reasons set forth above. Even if it is assumed that the state courts applied both prongs of *Strickland*, they relied on a single finding of fact – that Ms. Britton would not have revealed the manner in which she "remembered" her phone conversations with Mr. Mitchell, even if defense counsel had directly asked her that question. *Mitchell-2* at 1276. That finding was unreasonable in light of the state court record. 28 U.S.C. § 2254(d)(2).

Section 2254(d)(2) directs that a decision "adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state court proceeding." *Miller-El*, 537 U.S. 322 at 340. Deference, however, "does not imply abandonment or abdication of judicial review." *Id.* (citations omitted). Thus a federal habeas court can "disagree with a state court's credibility determination." *Id.*; *see also Dennis*, 834 F.3d at 281; *Lambert v. Blackwell*, 387 F.3d 210, 234-35 (3d Cir. 2004).

In *Rolan*, the court ruled that the state court's fact findings were unreasonable because they were not supported by the record, and the petitioner was entitled to relief. *Rolan*, 445 F.3d at 681. In *Rolan*, the petitioner challenged his counsel's ineffectiveness for failure to interview a potential self-defense witness. The state court had found that the petitioner was not prejudiced because the witness was unwilling to cooperate with a detective at the time of trial, and thus would have been unwilling to testify on behalf of the petitioner. *Id.* The *Rolan* court ruled that the state court unreasonably "conflated [the witness's] unwillingness to cooperate with the police with a purported unwillingness to testify to for the defendant," and held that the state court's "finding of fact that [the witness] would not have testified for Rolan was not supported by the record. Indeed, because [the witness's] testimony and affidavit establishes that [the witness] would testify for Rolan, and there is no evidence that [the witness] would not testify for Rolan, it was unreasonable for the Superior Court to find that [the witness] was unwilling to testify for Rolan." *Id.*

Similar to *Rolan*, the state court here conflated Ms. Britton's failure to affirmatively disclose how she "remembered" the alleged phone calls with a willingness to lie if she had been asked about it. *Mitchell-2* at 1276. Here, the state court found that because Ms. Britton did not

disclose the information at issue when she made her initial statement to the police, when she later made handwritten corrections to that statement, when she testified at trial, and when she was initially interviewed by PCRA counsel, she would not have told trial counsel had he interviewed her pre-trial and asked her why it took her ten months to come forward. *Id.* The state court's finding is unreasonable because on the occasions when Ms. Britton did not disclose the information at issue, she was not directly asked why it took her ten months to come forward. For example, the state court asserted that because Ms. Britton did not disclose this information at trial – when she was asked no questions about why she did not come forward earlier -- she would not have told trial counsel had he asked her the question directly. That was unreasonable, given that when she was finally asked, for the first time, why it took her so long to go to the police, she answered fully and honestly: that she learned of the phone calls in a dream.

Had trial counsel asked Ms. Britton why it took her ten months to go to police, she would have told him. NTP 82. As in *Rolan*, Ms. Britton's testimony and affidavit explain that she would have told trial counsel the truth had he interviewed her, and there is no evidence to the contrary. Thus, the state court's finding that Ms. Britton would not have told counsel the truth had he interviewed her, is unsupported by the facts and unreasonable. Trial counsel's failure to interview Ms. Britton prejudiced Mr. Mitchell at the guilt and penalty phases of his trial. *See* Claim IV, *infra.* This Court should grant relief.

## IV. THE COMMONWEALTH VIOLATED ITS DUE PROCESS OBLIGATIONS WHEN IT SUPPRESSED IMPEACHING AND EXCULPATORY EVIDENCE REGARDING A KEY COMMONWEALTH WITNESS, SHELIA BRITTON.

### A. Information requested by the Court

Petitioner relies upon the Fifth and Fourteenth Amendments to the United States Constitution as bases for relief.

This claim has been exhausted in state courts. *See Mitchell-2* at 1277-78.

Federal review of this claim is not barred by the doctrine of *Teague v. Lane*, 489 U.S. 288 (1989). Petitioner does not rely on a "new" constitutional rule of criminal procedure announced after the date his conviction became final. *See id.* at 310.

## B. The Merits of the Claim

The prosecution violated its *Brady* obligations when it failed to disclose material exculpatory information about the Commonwealth's key witness, Shelia Britton. Specifically, the prosecution failed to disclose that on the morning after the murder, and after the alleged phone calls between Mr. Mitchell and Ms. Britton took place, Ms. Britton told police that she had no information about the murder. NTP 79-80, 82. The suppression of this exculpatory evidence violated due process. *Brady v. Maryland*, 373 U.S. 83 (1963).

There are three essential elements to a *Brady* violation: (1) the prosecution suppressed or withheld evidence; (2) the evidence is favorable to the accused; and (3) the evidence is material, i.e., the suppression prejudiced the accused. *Banks v. Dretke*, 540 U.S. 668, 691 (2004).

### 1. Suppression

Prosecutors have an affirmative duty to "'disclose [*Brady*] evidence . . . even though there has been no request [for the evidence] by the accused,' which may include evidence known only to the police." *Dennis*, 834 F.3d at 284 (quoting *Strickler v. Greene*, 527 U.S. 263, 280 (1999)). "To comply with *Brady*, prosecutors must learn of any favorable evidence known to the others acting on the government's behalf . . . including the police." *Id.* (citation and quotations omitted). Once police detectives obtain information, the prosecution has constructive possession of that information and, if the evidence is favorable and material, the prosecution is required to disclose it to the defense. *Id.* at 288.

Here, it is undisputed that Ms. Britton was interviewed by police officers on the morning after the murder. NTP 79-80. That day, Ms. Britton met with two uniformed police officers at the local firehouse near where the killing occurred. NTP 79. Ms. Britton sat at a table in the firehouse, with her daughter next to her, and told police officers that she did not know anything about the murder. NT 80. During the initial investigation at a crime scene, it is common for Pittsburgh police officers to fill out a "3-0" form, which is used to register persons at the scene. NTP 173-174 (testimony of trial prosecutor). The uniformed officer would also likely have a notepad, or some other way of taking down information relating to the investigation. NTP 174. Despite these routine practices, no information about Ms. Britton's appearance at the firehouse or her statements that day was ever disclosed to the defense.[7] NTP 19. The prosecutor's failure to turn this information over to the defense, even if he was unaware that such evidence existed, amounts to suppression. *Strickler*, 527 U.S. at 280.

## 2.    Favorable evidence

Ms. Britton's appearance at the firehouse and her statement that she had no information relating to the crime directly contradicted her trial testimony about Mr. Mitchell's phone calls. Evidence is favorable to the accused when it can be used as impeachment evidence. *Banks*, 540 U.S. at 691; *Giglio v. United States*, 405 U.S. 150, 154 (1972). Evidence is also favorable if it "may well alter the jury's judgment of the credibility of a crucial prosecution witness." *Dennis*, 834 F.3d at 287.

Evidence that Ms. Britton told police officers that she did not know of the alleged phone calls hours after they purportedly occurred goes directly to her reliability, credibility and whether

---

[7] During the post-conviction hearing, post-conviction counsel moved for discovery of any such report or notepad, or any documentation related to her interaction with the police on the morning after the killing. NT 157-58.

the calls actually happened. This evidence likely would have altered the jury's judgment of the credibility of Ms. Britton. Moreover, even if the jury accepted Ms. Britton's testimony at the guilt phase, the suppressed evidence would have made her testimony less reliable, which would have bolstered Dr. Bernstein's credibility at the penalty phase. Thus, it was favorable at both the guilt and penalty phases of Mr. Mitchell's trial.

### 3. Materiality

For suppressed evidence to be material, a petitioner need only show a reasonable probability of a different result. *Kyles v. Whitley*, 514 U.S. 419, 434 (1995). The reasonable probability standard is lower than the preponderance standard, and only requires the petitioner to show that confidence in the outcome of the trial is undermined. *Id.* When making this determination, courts are to look to what competent counsel would have done with the suppressed evidence. *Id.* at 441.

In *Dennis*, the Third Circuit held that suppressed evidence was material where it supported the defense theory and its suppression left the defense "powerless to impeach" one of the Commonwealth's key witnesses. *Dennis*, 834 F.3d at 293-94. In analyzing materiality, the *Dennis* court gave significant weight to the prosecution's reliance on the witness's testimony during opening and closing arguments. *Id.*; *see Kyles*, 514 U.S. at 444 ("The likely damage [of suppression of impeachment evidence] is best understood by taking the word of the prosecutor"). As in *Dennis*, the suppressed evidence here went to Mr. Mitchell's defense strategy at guilt and penalty phases, and left Ms. Britton's testimony unassailable. Also as in *Dennis*, the prosecution heavily relied on Ms. Britton's testimony to argue for a first-degree murder conviction at the guilt phase, and to argue for a death sentence at the penalty phase.

### a.    Guilt phase

Mr. Mitchell's defense at guilt phase was based on diminished capacity, caused by voluntary intoxication. The jury had to believe the testimony of the defense mental health expert, Dr. Bernstein, for the defense to succeed. Evidence that Mr. Mitchell called Ms. Britton shortly before and shortly after the murder discredited Dr. Bernstein's opinion that Mr. Mitchell qualified for a voluntary intoxication defense. As Mr. Mitchell's trial counsel testified at the PCRA hearing, Ms. Britton's testimony concerning Mr. Mitchell's phone calls shortly before and after the killing "vitiated" Mr. Mitchell's defense at the guilt phase. NTP 43.

In the guilt phase closing argument, the prosecution's theory centered on Ms. Britton's testimony and the alleged phone calls. The prosecutor seized on Ms. Britton's unrebutted testimony to argue that Mr. Mitchell was not drunk on the night of the killing. *See* NTT 650 ("So I'm suggesting to you that the hard evidence in this case, the credible evidence from this witness stand from Shelia Britton indicated quite a different picture" about Mr. Mitchell's alcohol consumption.).

The prosecutor also relied on Ms. Britton to establish that Mr. Mitchell acted with specific intent, and to argue that Dr. Bernstein was not credible. *See* NTT 659 ("Within an hour of Robin Little's death, the Defendant told Shelia Britton not once but more than once, as many as three times, that he was going over there to kill her; and he didn't leave it in a vacuum. He told Shelia Britton why he was going over there to kill her, because she was disrespectful to him, because she was with another man. Where is that factored into Bernstein's opinion?"). The prosecutor's argument that the alleged phone calls rebutted the defense theory spanned many more transcript pages. *See* NTT 660 ("Doesn't that tell you something about his mental state? The same mental state that he described to Shelia Britton a half hour, hour before he went over to

kill her."); NTT 660-61 ("I would suggest to you that any bona fide psychiatric opinion would take into account . . . the substance of which Shelia Britton told you occurred in the hour before Robin Little's death.").

The prosecutor returned to the alleged phone calls to rebut the defense evidence that Mr. Mitchell's intoxication negated the specific intent necessary for a first degree murder conviction. NT 666 ("Shelia Britton told you she talked to him at 1:00 in the morning, he was not slurring his words. His words and sentences were fine. Syntax, context making sense, as horrid as they were. She explicitly stated he wasn't drunk. He was not drunk . . . ."); NT 668 ("He wasn't so incapacitated that he was unable to . . . carry on another conversation with Shelia Britton."); NT 669 ("[Shelia Britton] came on and told you the truth about what he said and what he did a half hour, and hour before Robin Little died. His own conduct negotiating that, his own words of how his thought process before, during and after the slaying of Robin Little are reflective of his state of mind."); NT 671 ("He told Shelia Britton before he went over there, that she had disrespected him and he was going to kill her.").

The prosecutor concluded his argument by reiterating the import of the phone calls to show Mr. Mitchell's callousness. NT 671 ("That's exactly what he did. 'I have to do what I have to do.' That is what he told her, Shelia Britton. When he came back at 4:00 in the morning, even though, apparently, he had taken a while disposing of the evidence or however long it was, he called her again; and he said, 'Robin Little is no more.' 'Robin Little is no more,' almost like he was bragging about it."); NT 675 ("The clear and compelling evidence is that he told Shelia Britton about it an hour before, and he almost bragged about it an hour or two later.").

The prosecutor's reliance on Ms. Britton's testimony about the alleged phone calls underscores its importance. *See Banks*, 540 U.S. at 700 (the prosecutor's argument "left no

doubt about the importance the State attached to [the witness's] testimony"). If the accuracy or veracity of those phone calls was in doubt, it is reasonably likely that the Commonwealth would not have been able to rebut Mr. Mitchell's diminished capacity defense to first degree murder.

If the prosecution had disclosed evidence that on the morning after the murder, Ms. Britton told police officers she had no knowledge of the crime -- which would have included no knowledge of the purported phone calls -- there is a reasonable probability that the jurors would have doubted her testimony that Mr. Mitchell called her both before and after the killing. In turn, there is a reasonable probability that the jury would have accepted Mr. Mitchell's diminished capacity defense and found him not guilty of first degree murder.

**b.    Penalty phase**

This evidence was also material at the penalty phase. At penalty phase, Mr. Mitchell's defense attempted to show substantial impairment as a result of voluntary intoxication, which again depended on the jury crediting Dr. Bernstein when he testified at penalty phase. Once Dr. Bernstein was impeached with evidence of the phone calls during the guilt phase, however, Mr. Mitchell was left with no defense at the penalty phase. NTP 20, 43 (testimony of trial counsel); NTP 187, 200 (testimony of Dr. Bernstein); NTP 118-120 (testimony of penalty phase counsel).

At penalty phase closing argument, the prosecutor again relied heavily on the purported phone calls to rebut Mr. Mitchell's evidence in mitigation. First, the prosecutor used the purported phone calls to argue that Mr. Mitchell was not substantially impaired at the time of the killing, to rebut the § 9711(e)(3) mitigating circumstance. *See* NTT 885-86 ("Another allegation or representation you will hear is the capacity of the Defendant to appreciate the criminality of his conduct or conform his conduct to the requirements of law was substantially impaired. Impaired by what? A couple drinks that he had? I would suggest to you not enough. The

support for that is totally lacking or nonexistent. He knew what he was doing. *He told Shelia Britton that he was going over there to do it.*") (emphasis added). Then the prosecutor relied on the phone calls to argue that Mr. Mitchell's crime was aggravating and one for which the death penalty should be imposed. NTT 886 ("That's not a person who failed to understand the nature of his acts. That is a person that fully contemplated his acts before, during and after. He called Shelia Britton and told her, he almost bragged about the fact that 'Robin Little is no more.'"). The prosecutor reiterated that the phone calls disproved any argument that alcohol played a role in the offense, and that the killing was solely about jealousy and revenge. NTT 890 ("Alcohol played no role in the offense: Shelia Britton told you that. She talked to him until 1:00-1:30; and although he said he was drinking, she found him not to be drunk, to be coherent, logical, as abhorrent as his thoughts were, his acting on rage in terms of his jealousy and his anger toward Robin's moving on and having sex, having an affair, as he viewed it, with somebody else.").

Had reasonable trial counsel been aware that Ms. Britton told police that she knew nothing about the crime the morning after it happened – and ultimately that Ms. Britton dreamt the alleged phone calls – he could have used that information to powerfully impeach her testimony about those calls. This impeachment would have led the jurors to question the accuracy and veracity of Ms. Britton's testimony. If the jurors doubted Ms. Britton's testimony regarding the alleged phone calls, the prosecutor would not have been able to rebut Mr. Mitchell's penalty phase presentation relating to voluntary intoxication and substantial impairment. In turn, it is reasonably likely that at least one juror would have found the mitigating circumstance and sentenced him to life imprisonment.

## C.     State Court Opinion

The state court denied this claim on the ground that the "credible evidence failed to establish that the responding officers in this case completed a '3-0' form or other record indicating Ms. Britton had contact with the police on the morning [Ms. Little's] body was discovered." *Mitchell-2* at 1277. The state court's decision was based on an unreasonable determination of facts and was contrary to and an unreasonable application of clearly established federal law. 28 U.S.C. § 2254(d)(1) & (2).

First, the state court's decision was unreasonable in light of the state court record because it relied on its belief that "ADA Borkowski testified there was no report generated from Ms. Britton's alleged initial contact with police on the morning Robin's body was discovered." *Mitchell-2* at 1277. This was unreasonable because ADA Borkowski did not testify that there was no report generated; rather, he testified that *he had no knowledge* of any such report. NTP 166-67. 173-74. Under *Strickler*, Mr. Borkowski's knowledge of such a report is irrelevant; once the police are in possession of exculpatory evidence, the prosecutor is in constructive possession of that evidence and has a duty to turn it over to the defense. *Dennis*, 834 F.3d at 288.

For the same reason, the state court's decision was an unreasonable application of clearly established federal law. The state court found that Mr. Mitchell's *Brady* claim failed based on the trial prosecutor's testimony that he had no knowledge of such evidence. *Mitchell-2* at 1276-77. As explained above, the prosecutor's knowledge of the evidence is irrelevant to the *Brady* analysis. Because the Pennsylvania Supreme Court's denial of this claim was based on an unreasonable application of *Strickler*, this Court should review this claim *de novo*, and grant Mr. Mitchell a new trial.

## V. PETITIONER'S CONVICTION AND DEATH SENTENCE ARE BASED ON UNRELIABLE EVIDENCE, IN VIOLATION OF DUE PROCESS.

### A. Information Requested by this Court

Petitioner relies on the Fifth, Eighth and Fourteenth Amendments to the United States Constitution as bases for relief.

This claim has been exhausted in state court. *See Mitchell-3* at 1283. The state court held that this claim was untimely, and therefore did not reach the merits. *Id.* at 1284.

Federal review of this claim is not barred by the doctrine of *Teague v. Lane*, 489 U.S. 288 (1989). Petitioner does not rely on a "new" constitutional rule of criminal procedure announced after the date his conviction became final. *See id.* at 310.

### B. The Merits of the Claim

Petitioner was denied his right to due process because his conviction and death sentence were based on unreliable evidence from the Commonwealth's key witness, Shelia Britton. *See* Claims III & IV, *supra*.

"Reliability is ... a due process concern." *White v. Illinois*, 502 U.S. 346, 363-64 (1992). Hence, due process requires that criminal convictions be reliable and trustworthy. *See Donnelly v. DeChristoforo*, 416 U.S. 637, 646 (1974); *Thompson v. City of Louisville*, 362 US 199, 204 (1960). The requirement of reliability stretches across our criminal justice system and is the backbone of much constitutional analysis. Thus, the Sixth Amendment standard of ineffective assistance of counsel looks at whether counsel's error or omissions undermines confidence in the reliability of the outcome. *Strickland*, 466 U.S. at 693-94. Due process precludes the admission of identification evidence if, under the totality of the circumstances, the identification process was impermissibly suggestive so as to give rise to a substantial risk of misidentification. *Stovall v. Denno*, 388 U.S. 293 (1967). The linchpin for the admission of identification testimony is its

reliability. *E.g., Manson v. Braithwaite*, 432 U.S. 98, 114 (1977); *Neil v. Biggers*, 409 U.S. 188 (1972). Unless a confession is free and voluntary, it is legally unreliable and its admission at a criminal trial violates the Fifth and Fourteenth Amendments. *Malloy v. Hogan*, 378 U.S. 1 (1964); *Culombe v. Connecticut*, 367 U.S. 568 (1961).

Accordingly, the Third Circuit has recognized that where unreliable evidence "undermine[s] fundamental fairness of the entire trial," *Lee v. Glunt*, 667 F.3d 397, 403 (3d Cir. 2012), habeas relief should be granted.

When it comes to capital sentencing, the Eighth Amendment imposes a standard of heightened reliability:

> Death, in its finality, differs more from life imprisonment than a 100-year prison term differs from one of only a year or two. Because of that qualitative difference, there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case.

*Woodson v. North Carolina*, 428 U.S. 280, 305 (1976). "It is of vital importance to the defendant and to the community that any decision to impose the death sentence be, and appear to be, based on reason rather than caprice or emotion." *Gardner v. Florida*, 430 U.S. 349, 358 (1977). The heightened reliability required by the Eighth Amendment is a bedrock principle of Eighth Amendment jurisprudence. *See, e.g., Lockett v. Ohio*, 438 U.S. 586, 603 (1978) ("qualitative difference between death and other penalties calls for a greater degree of reliability when the death sentence is imposed"); *Zant v. Stephens*, 462 U.S. 862, 888 (1983) (same). It is imperative that the sentencing process "facilitate the responsible and reliable exercise of sentencing discretion." *Caldwell v. Mississippi*, 472 U.S. 320, 329 (1985).

Here, Ms. Britton's testimony regarding purported phone calls that occurred between Petitioner and her shortly before and shortly after the murder was the linchpin of the Commonwealth's case to convict Petitioner and secure a death sentence against him. *See* Claims

36

III & IV, *supra*. Armed with Ms. Britton's post-trial statements, trial counsel would have been able to discredit her highly prejudicial testimony. Trial counsel emphasized that he would have thoroughly cross-examined her with that information. *See* NTP 17, 20-21, 51. Trial counsel also testified that he could have used the post-trial statements to rehabilitate Dr. Bernstein's testimony in support of the diminished capacity defense. *Id.* at 21. Furthermore, if the defense had been able to undercut Ms. Britton's testimony that Mr. Mitchell planned to assault Ms. Little before he arrived at her house, a heat of passion defense could also have been available.

The mental health experts also agreed that the post-trial statements cast great doubt on Ms. Britton's trial testimony. Dr. Bernstein testified that if he had had the post-trial statements, he would have found Ms. Britton's trial testimony about the phone conversations highly questionable. NTP 194-95. The Commonwealth's expert, Dr. Bruce Wright, agreed. NTP 637. Specifically, Dr. Wright testified that Ms. Britton's October 3, 2012 statement "kind of says it was a dream" when she "remembered" the phone conversations. *Id.* at 637, 642.

The post-trial statements and testimony, however, do much more than just impeach Ms. Britton's credibility. The post-trial statements cast doubt on her reliability, even if she believes and has long believed her account of the phone calls. It is well understood that various factors, including experiencing a traumatic event, can cause people to confabulate false memories, which they thereafter firmly believe to be true. *See, e.g.*, Ronald Kellogg, *Fundamentals of Cognitive Psychology*, at 179 (2007) (discussing confabulation of false memory as one of the possible responses to trauma); Harry N. McLean, *Once Upon a Time: A True Story of Memory, Murder, and the Law* 240 (1993) ("The experts in this field don't deny there are both true traumatic memories and false traumatic memories. What they don't agree on is how to tell one from the other, or whether that is even possible.").

The fact that a particular "memory" was recovered during a dream strongly suggests that the "remembered" incident never actually took place. Thus, the evidence concerning the manner in which Ms. Britton "remembered" the phone calls into question whether her vivid and repeatedly recounted "memory" of the phone calls is based on an actual event, or rather whether it was a false memory confabulated in response to the trauma she experienced because of Ms. Little's death.

We now know that Ms. Britton's testimony relating to the alleged phone calls was unreliable, but the impact of that testimony was devastating -- it directly rebutted Mr. Mitchell's guilt phase and penalty phase defenses. Had the jury known that Ms. Britton's testimony relating to the phone calls was at best unreliable – because Ms. Britton learned of the purported phone calls in her dreams – its impact on the jury would have been almost nil. Thus, her testimony about a crucial disputed fact in the case lacks the necessary indicia of reliability. Had the jury heard how Ms. Britton "remembered" these phone calls, it is likely that the jury would have rejected her testimony and found Mr. Mitchell not guilty of first degree murder.

Even if this Court finds that the evidence relating to Ms. Britton's dreams would not have caused an acquittal of first degree murder, it should nevertheless grant Mr. Mitchell a new penalty phase hearing because had the jury been aware that Ms. Britton's testimony was unreliable, they would have likely accepted the testimony of Dr. Bernstein and sentenced Mr. Mitchell to life imprisonment.

### C.     State Court Opinion

The state court denied this claim on the ground that it was untimely. *Mitchell-3* at 1285. The state court's ruling was not based on an adequate and independent state court procedural bar. Moreover, even if this claim is improperly deemed to be defaulted, the default is overcome because failure to consider this claim would result in a fundamental miscarriage of justice.

38

### 1. Not adequate and independent

Federal court review of the merits of a habeas claim is not precluded unless the state court applied an "adequate and independent" procedural bar. *Bronshtein v. Horn*, 404 F.3d 700 (3d Cir. 2005); *Harris v. Reed,* 489 U.S. 255 (1989). A state court procedural rule is not "adequate" -- and therefore will not create a habeas corpus procedural default -- unless the procedural rule is "strictly or regularly followed." *Johnson v. Mississippi*, 486 U.S. 578, 587 (1988); *Hathorn v. Lovorn*, 457 U.S. 255, 262-263 (1982); *see also Ford v. Georgia*, 498 U.S. 411, 424 (1991) (state procedural rule is not adequate and independent, and therefore will not create a procedural bar, unless it is "firmly established and regularly followed by the time as of which it is to be applied") (quotation marks omitted).

In *Bronshtein*, the Third Circuit held that Pennsylvania's one year statute of limitations to file a petition for post-conviction relief, pursuant to 42 Pa. C.S. § 9545(b), was not regularly followed at the time the petitioner filed his capital post-conviction petition, and therefore the doctrine of procedural default did not apply to the petitioner, who filed after the one year deadline. *Bronshtein*, 404 F.3d at 710.

Here, Petitioner filed a second post-conviction petition raising the instant claim after his initial petition was denied and after the one-year statute of limitations had run. He argued that the lower court's finding of fact that Ms. Britton would not have disclosed the manner in which she recalled the purported phone calls to trial counsel had he interviewed her, *see* Claim III.C., was a new fact for purposes of 42 Pa. C.S. § 9545(b)(1)(ii), which permits a petitioner to file a subsequent petition based on the discovery of a previously unknown fact within sixty days of the date that the claim could have been presented. *See* Mitchell-*3* at 1283.

The state court held that the petition was untimely, ruling that the lower court's finding that Ms. Britton would not have told trial counsel the manner in which she recalled the purported

phone calls was a legal conclusion, rather than a fact, and therefore did not qualify as a previously unknown fact under § 9545(b)(1)(ii). *Id.* at 1285. In its ruling, the state court relied on *Commonwealth v. Gamboa-Taylor*, 753 A.2d 780 (2000). *See Mitchell-3* at 1284. *Gamboa-Taylor* is inapposite to the instant claim. In *Gamboa-Taylor*, the petitioner alleged that because his prior PCRA counsel was ineffective, claims raised in a subsequent petition, which could have been raised earlier but for counsel's ineffectiveness, were timely under § 9545(b)(1)(ii). *Gamboa-Taylor*, 753 A.2d at 785. The *Gamboa-Taylor* court held that "a claim for ineffective assistance of counsel does not save an otherwise untimely petition for review on the merits" because it is not a "newly discovered fact." *Id.* The facts on which the petitioner relied were knowable to the petitioner even if his previous PCRA counsel was ineffective. *Id.* at 786.

Here, the fact on which Mr. Mitchell relied -- that Ms. Britton would not have told trial counsel the way she "remembered" the purported phone calls (no knowledge the morning after the calls, a dream, and months of counseling) -- was not knowable until the state court found, contrary to Ms. Britton's statements to current counsel and the police, and her testimony to the court, that she would not have disclosed this information had she been interviewed.

Until the state court made its ruling that Ms. Britton would not have disclosed the information at issue, Mr. Mitchell could not have raised a "newly discovered evidence" claim alleging those facts. A "newly discovered evidence" claim is viable under the PCRA only where there is "exculpatory evidence" that was "unavailable at the time of trial" but "has subsequently become available . . . ." 42 Pa. C.S. § 9543(a)(2)(vi). At no time prior to the state court's finding that Ms. Britton would not have disclosed the information to trial counsel did Petitioner have a basis to assert that this information was "unavailable at the time of trial." To the contrary, Ms. Britton told PCRA counsel that she *would have disclosed* this information to trial counsel if

asked. A518-19. Because the fact on which the claim is based was not knowable, *Gamboa-Taylor* is not relevant, and the bar is not adequate.[8]

Indeed, Mr. Mitchell's case is the first case in which the Pennsylvania Supreme Court ruled that a factual finding made by a lower court cannot serve as a basis for newly discovered evidence under § 9545(b)(1)(ii). That the state court characterized the lower court's finding as a legal conclusion rather than a finding of fact should not matter because the finding that Ms. Britton would not have told trial counsel, had he interviewed her, is a finding of fact. *See, e.g., Com., Dept. of Transp., Bureau of Driver Licensing v. Bender*, 529 A.2d 44, (Pa. Cmwlth. 1987) (reversed on other grounds) ("A 'finding of fact,' therefore, is a determination by the finder or trier of fact that certain things do exist or that certain events or conduct actually occurred."); *Commonwealth v. Watts*, 23 A.3d 980, 987 (Pa. 2011) ("A 'fact,' as distinguished from the 'law,' is that which is presumed to be proved to be or not to be for the purposes of applying or refusing to apply a rule of law") (citation and alterations omitted); *see also Mitchell-3* at 1286 (Saylor, J., concurring) ("My reasoning, however, does not wholly align with the majority's rationale insofar as the disposition rests on the proposition that the relevant post-conviction finding . . . entails a 'legal conclusion.'").

The state court's procedural rule was not adequate because it was novel and thus neither strictly nor regularly followed. Accordingly, this Court may review the merits of the claim *de novo*.

---

[8] The Pennsylvania Supreme Court has also not been consistent with regard to the issue whether ineffective assistance of counsel can serve as a newly discovered fact. In *Commonwealth v. Bennett*, 930 A.2d 1264 (Pa. 2007). PCRA counsel failed to file an appeal from the denial of the PCRA petition. The court found that counsel's failure to perfect an appeal constituted abandonment by counsel that could serve as a newly discovered fact under § 9545(b)(1)(ii).

## 2. Miscarriage of justice

As described above, Petitioner's claim is not procedurally defaulted. Even if this Court finds the claim is procedurally defaulted, any purported default is overcome because Petitioner can establish that failure to consider the claims would result in a fundamental miscarriage of justice. *Wainwright v. Sykes*, 433 U.S. 72, 91 (1977). As the Supreme Court has explained, "the principles of comity and finality that inform the concepts of cause and prejudice 'must yield to the imperative of correcting a fundamentally unjust incarceration.'" *Murray v. Carrier*, 477 U.S. 478, 496 (1986) (quoting *Engle v. Isaac*, 456 U.S. 107, 135 (1982)). The Supreme Court "has never provided a definitive interpretation of the term 'fundamental miscarriage of justice.'" *Noltie v. Peterson*, 9 F.3d 802, 806 (9th Cir. 1993). The Court has made clear, however, that the "miscarriage of justice" exception applies, at least, to cases of "probable innocence," *Schlup v. Delo*, 513 U.S. 298, 317, 324-25, 326-27 & n.42 (1995), and/or cases of "innocence of the death penalty," *Sawyer v. Whitley*, 505 U.S. 333, 340-47 (1992).

Here, Petitioner has pled facts that establish both of these "miscarriage of justice" criteria. As set forth above, Petitioner alleges that Ms. Britton's testimony itself was unreliable, and that because her testimony was so crucial to both the first degree murder conviction and the death sentence, the "fundamental fairness of the entire trial," *Lee*, 667 F.3d at 403, is undermined. Accordingly, this Court should review the merits of this claim and grant Petitioner a new trial or at least a new capital sentencing proceeding.

**VI. PETITIONER WAS DEPRIVED OF HIS RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL AT BOTH GUILT AND PENALTY PHASES WHERE TRIAL COUNSEL INEFFECTIVELY FAILED TO PROVIDE CRITICAL EVIDENCE TO THE DEFENSE PSYCHIATRIC EXPERT.**

**A.    Information Requested by the Court**

Petitioner relies upon the Sixth, Eighth and Fourteenth Amendments to the United States Constitution as bases for relief.

This claim has been exhausted in the state courts. *See Mitchell-2* at 1278-83.

Federal review of this claim is not barred by the doctrine of *Teague v. Lane*, 489 U.S. 288 (1989). Petitioner does not rely on a "new" constitutional rule of criminal procedure announced after the date his conviction became final. *See id.* at 310. Specifically with regard to Petitioner's ineffectiveness claims, subsequent decisions applying *Strickland* do not constitute "new" law for purposes of *Teague*.

**B.    The Merits of the Claim.**

**1.    Deficient performance.**

The sole defense argued at trial was that at the time of the homicide, Petitioner had a diminished capacity and was therefore incapable of forming the specific intent to kill. See NTT 42 (defense counsel's opening statement); NTT 630, 642-43 (defense counsel's closing argument). Under Pennsylvania law, diminished capacity reduces the degree of homicide from first to third degree, *Commonwelth v. Legg*, 711 A.2d 430, 436 (Pa. 1998). To be viable, a diminished capacity defense must be supported by expert testimony. *Commonwealth v. McCullum*, 738 A.2d 1007, 1009 (Pa. 1999). The defense obtained the appointment of psychiatrist Lawson Bernstein, M.D., as its sole expert. A546-48.

Prior to trial, the defense received in discovery: (a) the July 23, 1998 police report of Ms. Britton's account of Petitioner's purported phone conversations with her before and after the

murder, A542-43; (b) post-offense letters from Petitioner to Ms. Britton that contained damaging statements that the decedent deserved to die; and (c) decedent's diary entries, which indicated that Petitioner had threatened to kill decedent if she left him (hereafter, the "Britton and Little documents"). The Britton and Little documents purported to contain, inter alia, inculpatory statements made by Petitioner close in time to the offense. They were of obvious relevance to his state of mind at the time of the offense, and thus to mental health expert testimony in support of the diminished capacity defense, or of impaired capacity at the time of the offense as a mitigating factor. As such, they should have been provided to any defense mental health expert.

After examining Mr. Mitchell and reviewing records, Dr. Bernstein prepared a preliminary report discussing his opinions, including that Mr. Mitchell was incapable of forming specific intent at the time of the offense. A473. At the close of the report, Dr. Bernstein included the following "Addendum":

> Would you *please* forward to my attention all of the records that pertain to this gentleman's arrest, any written or signed statements, and any police records or other records in possession of the district attorney that are available for my review? It is essential that I review these prior to trial, and I will amend or expand my report after reviewing these documents, if appropriate.

A476 (emphasis original).

Despite their obvious importance and Dr. Bernstein's specific request, trial counsel failed to provide Dr. Bernstein with the Britton and Little documents. NTP 23, 62 (attorney Harper); NTP 187 (Dr. Bernstein). Attorney Harper had no strategic reason for failing to provide the Britton and Little documents to Dr. Bernstein; indeed, he said his practice was to provide everything to Dr. Bernstein. NTP 22-23. At trial, counsel presented Dr. Bernstein's testimony in support of a diminished capacity defense. NTT 538-59. Dr. Bernstein admitted that he had not previously seen the Britton and Little documents. NTT 564, 567-68, 577.

As the PCRA court found, "There is no dispute that counsel did not provide Dr. Bernstein with the materials at issue or that counsel had a reasonable strategy in failing to do so." PCRA Op.-1, 62. The Third Circuit has explained that such a failure constitutes deficient performance:

> When the key issue in a criminal case is whether the defendant suffered from diminished capacity, we can think of nothing more critical than ensuring that the defense's psychiatric expert has as complete and accurate a description of the facts and circumstances surrounding the crime as possible. The decision not to [provide the expert with the defendant's] statements defies logic. . . . This was not a trial tactic, it was gross incompetence.

*Affinito v. Hendricks*, 366 F.3d 252, 260 (3d Cir. 2004); *see also Bloom v. Calderon*, 132 F.3d 1267, 1278 (9th Cir. 1997) ("[W]hen the defense's only expert requests relevant information which is readily available, counsel inexplicably does not attempt to provide it, and counsel then presents the expert's flawed testimony . . ., counsel's performance is deficient.")..

Given counsel's testimony, the PCRA court's finding, and the Third Circuit's decision in *Affinito*, counsel's failure to provide the Britton and Little documents to Dr. Bernstein was deficient performance.

### 2. Prejudice

Counsel's failures prejudiced Petitioner. Dr. Bernstein was entirely discredited when cross-examination revealed that he had not reviewed the Britton and Little documents, which on their face supported specific intent and rebutted his opinion that Mr. Mitchell did not have the capacity to form specific intent.

### a. Guilt phase

Every post-conviction witness who was present at trial testified that the impeachment of Dr. Bernstein with the materials he had not reviewed was devastating to his credibility. *See* NTP 43 (attorney Harper testifies that the letters were damaging and the phone conversations "vitiated [Dr.] Bernstein" and his testimony that Mr. Mitchell "wasn't cognizant of what was going on,"

which was the "linchpin" of diminished capacity); NTP 119-20 (attorney Cribbins testifies that Ms. Britton's testimony "pretty much destroys" the diminished capacity defense, and that when the jury became aware that Dr. Bernstein had not reviewed Mr. Mitchell's alleged statements, Dr. Bernstein "ended up looking like somebody who didn't have a clue what he was talking about"); NTP 187 (Dr. Bernstein testifies that he was "presented with profoundly important information on cross-examination that undermined the credibility of my testimony."). Likewise, the prosecutor focused on this aspect of the impeachment of Dr. Bernstein at closing argument. *See* Amended Pet., ECF No. 12, ¶¶ 226-27 (quoting prosecutor's argument).

But for this devastating impeachment of Dr. Bernstein's credibility, it is reasonably likely that at least one juror would have credited the diminished capacity defense, and Petitioner would not have been convicted of first degree murder. As the Third Circuit explained in *Jacobs v. Horn*, 395 F.3d 92 (3d Cir. 2005) (granting relief on a diminished capacity claim), Petitioner "need not establish his diminished capacity defense conclusively for the purpose of demonstrating a Sixth Amendment violation"; rather, "he is required to show only a reasonable probability that the outcome of the proceedings would have been different," *id.* at 105 n.8, if counsel had presented credible evidence of diminished capacity.

Petitioner's claim is analogous to that on which the Supreme Court granted relief in *Hinton v. Alabama*, 134 S. Ct. 1081 (2014). In *Hinton*, counsel performed deficiently by presenting an expert, on a crucial forensic issue, whom counsel knew to be unqualified. While the unqualified expert offered favorable testimony, Petitioner was still prejudiced: "It is true that [the defense expert's] testimony would have done Hinton a lot of good *if the jury had believed it*. But the jury did not believe [the expert]." *Id.* at 1089. If, but for counsel's deficient performance, there is a reasonable probability that an expert's testimony "would have instilled in

46

the jury a reasonable doubt . . ., then [the petitioner] was prejudiced by his lawyer's deficient performance and is entitled to a new trial." *Id.* at 1089-90.

Here, Petitioner has met the standards set forth in *Jacobs* and *Hinton*, and thus has established prejudice.

### b.    Penalty phase

As set forth in the Amended Pet., ECF No. 12, ¶¶ 230-39, Petitioner was prejudiced in several respects at penalty phase by counsel's deficient failure to provide Dr. Bernstein with the Britton and Little documents: (1) Dr. Bernstein's credibility was irretrievably damaged; (2) had Dr. Bernstein timely received the documents, he would have joined Ms. Cribbins in recommending that the defense efforts focus on the penalty phase; and (3) had Dr. Bernstein focused on the penalty phase, he would have recommended neuropsychological testing, which would have developed powerful mitigating evidence not presented at trial. Thus, counsel's deficient performance not only weakened the value of Dr. Bernstein's testimony (as it did at the guilt phase) it also deprived the defense of additional mitigating evidence, including evidence of organic brain damage. Amended Pet., ECF No. 12, ¶ 237.

In order to establish prejudice at penalty phase, Petitioner need only show that but for counsel's deficient performance, it is reasonably likely that a single juror would have voted for a life sentence. *Wiggins*, 539 U.S. at 537 (prejudice analysis turns on whether "one juror would have struck a different balance"); *accord Bond*, 539 F.3d at 289; *Jermyn*, 266 F. 3rd at 312. It is well recognized that counsel's ineffective failure to present evidence of brain damage results in prejudice under this standard. *See, e.g., Porter v. McCollum*, 558 U.S. 30, 42 (2009) (finding prejudice based in part on failure to present evidence of brain abnormality and cognitive defects); *Rompilla*, 545 U.S. at 392 (evidence of organic brain damage); *Williams*, 529 U.S. at 396 (evidence of cognitive defects); *accord Blystone*, 664 F.3d at 427. Petitioner has established

penalty phase prejudice under these precedents. *See also Saranchak v. Beard*, 802 F.3d 579, 600 (3d Cir. 2015) (although petitioner had not established prejudice at guilt phase with respect to diminished capacity defense, petitioner did succeed in establishing prejudice at penalty phase).

## C. The State Court Opinions.

The PCRA court found that counsel failed to provide the Britton and Little documents to Dr. Bernstein, and that his failure to do so was deficient performance, PCRA Op.-1 at 62, but denied relief based on its ruling that Petitioner had not established prejudice. *Id.* The Pennsylvania Supreme Court affirmed the PCRA court's ruling as to prejudice, *Mitchell-2* at 1282-83, and declined to review the lower court's ruling on deficient performance. *Id.* at 1282 n.23. Under *Collins v. Secretary, Pa. Dep't of Corr.*, 742 F.3d 528 (3d Cir. 2014), where, as here, the state appellate court ruled on only one prong of *Strickland* but the PCRA court ruled on both prongs, this Court provides AEDPA review to the appellate court's ruling on the prong it reviewed (prejudice in this case) and to the lower court's ruling on the other prong (deficient performance in this case). *Id.* at 545-46.

### 1. Deficient performance.

The PCRA court's findings with regard to deficient performance are presumed correct pursuant to 28 U.S.C. § 2254(e)(1). *See, e.g., Burden v. Zant*, 498 U.S. 433, 436-37 (1991) (state court fact finding in Petitioner's favor "'presumed to be correct' for purposes of a federal habeas corpus proceeding."); *Brown v. Superintendent Greene SCI*, 834 F.3d 506, 518 n.8 (3d Cir. 2016) (presuming correctness of state court finding). With the presumption of correctness, it is clear that trial counsel's performance was deficient. Even without a presumption of correctness, this Court should find deficient performance for the reasons set forth in Part B.1, above.

### 2. Prejudice.

#### a. Guilt phase

The Pennsylvania Supreme Court set forth its ruling on guilt phase prejudice as follows:

> [A] detailed review of Dr. Bernstein's trial testimony indicates his credibility was called into question primarily based on discrepancies between his opinion and the medical forms he reviewed from St. Francis Hospital. Moreover, the record reveals the prosecutor limited his cross-examination of Dr. Bernstein concerning "the Britton and Little documents," and his questions did not yield a change in Dr. Bernstein's expert opinion.

*Mitchell-2* at 1282.

That ruling is based on unreasonable application of clearly established Supreme Court precedent, and is unreasonable in light of the state court record, for several reasons.

First, the state court ignored the close connection between this claim and the claim (Claim VII of the habeas petition) that counsel was ineffective for failing to use the St. Francis Hospital records to rehabilitate Dr. Bernstein's testimony that Mr. Mitchell had been a chronic alcoholic since the age of fourteen. That state court ruling was thus an unreasonable application of the basic *Strickland* principle that the prejudice flowing from all of counsel's deficient conduct must be considered together. See *Williams*, 529 U.S. at 397; Standard of Review, § C.

This was particularly egregious here because the two claims at issue are so closely related. At trial, Dr. Bernstein was impeached on two grounds – that he reached his conclusions without reviewing the Britton and Little documents, and that his conclusions were supposedly undermined by entries in the St. Francis Hospital records. NTT 565-77, 581-85, 590-93, 595-97, 600. The state court ruled that Petitioner was not prejudiced by counsel's failure to provide Dr. Bernstein with the Britton and Little documents because Dr. Bernstein was also impeached with the St. Francis Hospital records, without acknowledging Petitioner's claim that effective counsel would have shown that the latter means of impeachment was illusory because the St. Francis

Hospital records themselves conclusively support Dr. Bernstein's finding that Petitioner had been an alcoholic since age 14. *See* Claim VII, *infra*. While the state court relied on the idea that the St. Francis Hospital records impeachment was more extensive that the impeachment with the Britton and Little documents, it ignored Petitioner's claim that effective counsel would have precluded or countered both methods of impeachment.

Second, the state court unreasonably relied on a quantitative analysis of the impeachment, i.e. the idea that Dr. Bernstein was more extensively cross-examined about the St. Francis records than about the Britton and Little documents. See *Mitchell-2* at 1279 (the "prosecutor cross-examined Dr. Bernstein extensively regarding inconsistencies in his expert opinion and [Petitioner's] records from his stays at St. Francis Hospital"); *id.* at 1281 (the "prosecutor's primary focus" was to "discredit Dr. Bernstein's opinions based on the [St. Francis records]"); *id.* at 1282 (Dr. Bernstein's credibility "was called into question primarily based on discrepancies between his opinion and the medical forms he reviewed from St. Francis Hospital."). This analysis was unreasonable both as to the facts and as to the law.

As to the facts, the PCRA witnesses who were present at trial all agreed that the cross-examination concerning the Britton and Little documents was devastating to Dr. Bernstein's credibility. *See* NTP 43 (Harper); NTP 119 (Cribbins); NTP 187 (Dr. Bernstein). Moreover, it is evident from the record that the trial prosecutor agreed, as he repeatedly emphasized this aspect of the impeachment in closing argument. *See* NTT 655-61 (prosecutor's arguments, discussed above, that Dr. Bernstein should be discredited because of materials he did not have). It was unreasonable to ignore or discount the observations of the participants and the conduct of the prosecutor – a particularly good indicator of the importance of the issue. *See, e.g., Buck v. Davis*, 137 S. Ct. 759, 776 (2017) (expert's testimony dealt with "key point at issue," as shown

by the "summations for both sides"); *Banks*, 540 U.S. at 700 (the prosecutor's argument "left no doubt about the importance the State attached to [the witness's] testimony"); *Kyles*, 514 U.S. at 444 (the "likely damage" of potential impeachment "is best understood by taking the word of the prosecutor . . . during closing arguments"); *Dennis*, 834 F.3d at 294 (but for failure to disclose evidence, prosecutor "would not have, at closing, been able to point out the inconsistencies between [witnesses'] testimonies").

As to the law, the state court's quantitative analysis was an unreasonable application of *Strickland*. As part of *Strickland* prejudice analysis, the reviewing court must "evaluate" and "reweigh[]" the evidence at trial and that developed in post-conviction. *Williams*, 529 U.S. at 397-98. In doing so, it is inadequate for the reviewing court simply to look at the number of transcript pages involved as a measure of prejudice. As the Supreme Court recently emphasized, the "impact of [prejudicial] evidence cannot be measured simply by how much air time it received at trial or how many pages it occupies in the record. Some toxins can be deadly in small doses." *Buck*, 137 S. Ct. at 777.

Here, the state court focused on which aspect of the cross-examination was most extensive, while ignoring the important question – which aspect of the impeachment was most damaging to Dr. Bernstein's credibility and the defense. The answer to that question is that impeachment with the materials Dr. Bernstein did not have was the most damaging -- it went to the heart of Dr. Bernstein's opinion about Petitioner's ability to premeditate and form specific intent on the night of the murder, and "vitiated" his testimony. NTP 43. The state court's page-counting approach to prejudice was an unreasonable application of *Strickland*.

### b. Penalty phase

With respect to penalty phase prejudice, the state court addressed only the prejudice resulting from the damage to Dr. Bernstein's credibility, and essentially repeated its ruling as to guilt phase that Dr. Bernstein's credibility was more thoroughly impeached with the St. Francis records than with the Britton and Little documents. *Mitchell-2* at 1283. That ruling is unreasonable for the reasons set forth above.

In addition, however, the state court ignored the other aspects of Petitioner's showing as to penalty phase prejudice. In particular, Petitioner presented testimony that but for counsel's failure to provide the Britton and Little documents to Dr. Bernstein, Dr. Bernstein would have joined attorney Cribbins in advocating that the defense focus its efforts on the penalty phase, and that attorney Harper would have agreed with that shift in focus if pressed by Dr. Bernstein. NTP 200 (Dr. Bernstein); 116-17 (Ms. Cribbins); 55 (Mr. Harper). Furthermore, Dr. Bernstein testified that if the focus had been on penalty phase he would have recommended neuropsychological testing, and would have testified to any deficits found by such testing as supporting mitigating factors at sentencing. NTP 203-04. When neuropsychological testing was performed, it supported essentially unchallenged testimony that Mr. Mitchell suffers from brain damage, a mood disorder, and a personality disorder. NTP 293 (Dr. Crown); 227 (Dr. Dudley); 564-65, 573, 585, 619-20 (Commonwealth expert Dr. Wright).

The state court simply did not address this powerful showing of penalty phase prejudice, which should therefore be reviewed de novo by this Court. *See* Standard of Review, § B. If reviewed under § 2254(d), the state court decision was an unreasonable application of *Strickland*. *See Saranchak*, 802 F.3d at 600 (state court's "failure to discuss the vast majority of the relevant

evidence presented at the PCRA hearing further buttresses our conclusion that its analysis was unreasonable.").

In analyzing *Strickland* prejudice, a reviewing court must consider how counsel's tactical and strategic choices were affected by counsel's professionally unreasonable omissions. For example, in *Rompilla*, after three experts told counsel that they found "'nothing useful' to Rompilla's case," *Rompilla*, 545 U.S. at 382, trial counsel presented family members who testified that Rompilla was a loving father who could potentially be rehabilitated. *Id.* at 378. Counsel's failure to review Rompilla's court file from a prior conviction the prosecution was using as an aggravating factor was deficient performance, requiring the Supreme Court to decide if Rompilla was prejudiced at penalty phase. *Id.* at 390.

In analyzing prejudice, the Court found that but for counsel's deficient performance counsel would have uncovered a "range of mitigation leads that no other source had opened up," *id.*, including information about mental health disorders and a traumatic childhood that "would unquestionably have [caused counsel to go] further to build a mitigation case." *Id.* at 391. This would further have led counsel to obtain neuropsychological testing that would have shown brain damage, as well as further records about family dysfunction. *Id.* at 392-93.

In short, but for counsel's omission about the prior conviction file, counsel would have adopted a different penalty phase strategy and presented a

> mitigation case that bears no relation to the few naked pleas for mercy actually put before the jury . . . . It goes without saying that the undiscovered mitigating evidence, taken as a whole, might well have influenced the jury's appraisal of [Rompilla's] culpability . . . .

*Id.* at 393 (quotation marks and citations omitted) (brackets in *Rompilla*). *See also Wiggins*, 539 U.S. at 536 ("counsel were not in a position to make a reasonable strategic choice as to whether to focus on Wiggins' direct responsibility, the sordid details of his life history, or both"; finding

prejudice where there was reasonable probability of different result had the jury been confronted with the life history mitigating evidence).

The state court simply failed to undertake such an analysis. Its decision was based on an unreasonable application of *Strickland*, as demonstrated in *Rompilla* and *Wiggins*. As shown above, Petitioner's right to the effective assistance of counsel was violated; this Court should grant him a new trial or at least a new sentencing proceeding.

## VII. TRIAL COUNSEL INEFFECTIVELY FAILED TO PRESENT EVIDENCE IN THEIR POSSESSION WHICH IRREFUTABLY ESTABLISHED THAT WAYNE MITCHELL HAD STRUGGLED SINCE CHILDHOOD WITH SEVERE ALCOHOLISM; PETITIONER WAS PREJUDICED BY COUNSEL'S DEFICIENT PERFORMANCE AT BOTH THE GUILT AND PENALTY PHASES.

### A. Information Requested by the Court

This claim is based on the Sixth and Fourteenth Amendments to the United States Constitution.

The claim has been exhausted in state court. *Mitchell-2* at 1283-86.

Federal review is not barred by *Teague v. Lane*, 489 U.S. 288 (1989). Petitioner does not rely on a "new" constitutional rule of criminal procedure announced after the date his conviction became final. *See Id.* at 310. Rather, his claim is based on the long-settled standard of ineffective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668 (1984).

### B. The Merits of the Claim

Wayne Mitchell was raised in a family stricken by alcoholism on both the maternal and paternal sides. He began using alcohol as a child. He drank so excessively that by age 14 he had already developed alcohol-related liver disease and was diagnosed as alcohol dependent, *i.e.* an alcoholic. He was hospitalized and treated for several weeks at St. Francis Medical Center adolescent chemical dependency unit, generating voluminous hospital records. Mr. Mitchell's

alcoholism was at a level of severity rarely seen among adolescents. NTP 390-91 (liver damage at age 14 is so rare "even among th[e] relatively rare group" of adolescents with alcohol dependence, that it indicates that the disorder is at a "high level of severity"). The existence of Mr. Mitchell's disease and its severity are well-documented historical facts, acknowledged by experts for both parties during the state post-conviction proceedings. Amended Pet., ECF No. 12, ¶¶ 47-51.

Due to trial counsel's unfamiliarity with the voluminous medical records, on which the prosecution capitalized, the jury was given the false impression that Mr. Mitchell had at most a minor drinking problem indicative of juvenile delinquency. Amended Pet., ECF No. 12, ¶¶ 265-277. Counsel's errors and omissions constituted deficient performance that prejudiced Petitioner at both phases.

### 1.    Deficient performance

The defense at trial was that due to alcohol abuse and other insults to the brain, Mr. Mitchell was unable to form the specific intent to kill, and therefore was guilty of at most third degree murder. NTT 42, 629-34; NTP 31. The mitigation case also relied heavily on evidence of Mr. Mitchell's impaired capacity. NTT 798-839, 863-67. At both trial and penalty phases, counsel relied on expert psychiatric testimony regarding Mr. Mitchell's impaired capacity from Dr. Bernstein. NTT 529-608, 798-824.

The records of Mr. Mitchell's 1992 hospitalizations in the adolescent alcohol dependency unit at St. Francis Hospital, *see* A001-444, were critically important evidence of Mr. Mitchell's impairments. The records – discussed at length in Amended Pet., ECF No. 12, ¶¶ 245-56 -- provide objective, neutral and compelling evidence of the family history of alcohol abuse and dependence, and the fact that Mr. Mitchell was alcohol dependent by age 14, to the degree that

he suffered damage to his liver. Given the sheer volume of records involved, however, it was also possible to cherry pick individual items from the records to make Mr. Mitchell's impairments look less severe – and that is exactly what the prosecution did during its cross-examination of Dr. Bernstein. *See, e.g.*, NTT 569-76, 580-84.

Because of the importance of these records to the entire defense case, it was incumbent on counsel to study this critical evidence, provide it to his expert in a timely manner, and consult with the expert in order to present the medical evidence persuasively. Yet the record is clear that counsel did none of these things. *See* NTP 188, 210-11 (testimony of Dr. Bernstein that trial counsel never met with him or discussed St. Francis records with him).

Counsel did not obtain a complete set of the St. Francis records until the eve of trial. A508. Without adequate knowledge of the records and close consultation with the expert, counsel presented Dr. Bernstein's testimony "in an unprepared and ill-informed manner." *Hooper v. Mullin*, 314 F.3d 1162, 1171 (10th Cir. 2002); *see* ABA Guideline 11.4.1 (Preparation for both guilt and penalty phases "should begin immediately upon counsel's entry into the case and should be pursued expeditiously"); Guideline 11.8.3 (same); Commentary to ABA Guideline 1.1 ("Substantial pretrial investigation is a necessary base for intelligent assessment of possibly conflicting options as to the defense").

As a result, the prosecutor used the records selectively to destroy their value to the defense. Amended Pet., ECF No. 12, ¶¶ 269-70. Although Dr. Bernstein noted several times that the prosecutor was taking records out of context, *see* NTT 569, 576-76, 582, counsel was utterly unprepared to use the records on redirect to rehabilitate Dr. Bernstein, and failed to do so. *See* NTT 600-05. Counsel's failure to prepare was deficient performance. *Williams*, 529 U.S. at 395 (counsel deficient for failing to begin to prepare for penalty phase until a week before that

phase); *Bond*, 539 F.3d at 288-89 (counsel deficient for failing to prepare for penalty phase until after conviction); *Hooper*, 314 F.3d at 1171 (counsel deficient for failing to prepare expert witness, failing to anticipate rebuttal, and presenting expert testimony "in an unprepared, uninformed and disastrous manner"); *Fisher v. Gibson*, 282 F.3d 1283, 1296 (10th Cir. 2002) (counsel's "decision not to undertake substantial pretrial investigation and instead to 'investigate' the case *during* the trial was not only uninformed, it was patently unreasonable.") (emphasis original).

Counsel's handling of the fetal alcohol exposure issue was also constitutionally deficient for similar reasons. Counsel made the extraordinary promise in opening statement, despite having no evidence to support it, that Mr. Mitchell suffered from fetal alcohol syndrome. NTT 43. Although counsel had evidence of fetal alcohol exposure, he had none whatsoever of fetal alcohol syndrome. Amended Pet., ECF No. 12 at 62 n.8. This unfilled promise by itself was deficient performance. *McAleese v. Mazurkiewicz*, 1 F.3d 159, 166 (3d Cir. 1993). Not surprisingly, the prosecution capitalized on the unfulfilled promise to cast doubt on Ms. Mitchell's credibility. Amended Pet., ¶ 280. Although counsel could not take back the false opening statement, he could have minimized the damage by using the available documentation to show that Mrs. Mitchell had testified truthfully. *Id.* at ¶ 281. His failure to do so was constitutionally deficient performance.

## 2. Prejudice

The deficient performance deprived the jury of the overwhelming credible evidence that Wayne Mitchell suffered since childhood from a rare and uncommonly severe mental disease. But for counsel's omissions, the jury would have rejected the prosecution's false assertions that Mr. Mitchell's and his family's alcoholism were exaggerated and irrelevant to Mr. Mitchell's

state of mind at the time of the homicide, and that the evidence was concocted to enable Mr. Mitchell to avoid responsibility. Because it is reasonably likely that a jury that heard this evidence would have acquitted Mr. Mitchell of first degree murder, he was prejudiced. The prejudice is particularly clear when the prejudice flowing from counsel's deficient performance with respect to the St. Francis records is considered together with the prejudice from counsel's failure to provide the Britton and Little documents to counsel, Claim VI, *supra* -- as it should be, *see Williams*, 529 U.S. at 397; Standard of Review, § C. Dr. Bernstein's credibility was attacked in two ways – effective counsel would have prevented or neutralized both of them.

Petitioner was also prejudiced at the penalty phase. Had the jury not been misled by the prosecution's distortions of Mr. Mitchell's medical history, it "might well have influenced the jury's appraisal of his moral culpability." *Williams*, 529 U.S. at 398. The jury would have had "an entirely different view of [his] life and childhood which would have both aided in understanding the seriousness and origin of his mental illness . . . ." *Jermyn v. Horn*, 266 F.3d 257, 311 (3d Cir. 2001).

### C.     The State Court Opinions.

The state courts did not address the deficient performance prong of *Strickland*. Accordingly, this Court's review of that prong is *de novo*. *Rompilla*, 545 U.S. at 390. The state courts also failed to address the fetal alcohol exposure sub-claim in any meaningful way, so review of that sub-claim is also *de novo*.

The state court rejected the adolescent alcoholism sub-claim for failure to establish prejudice. *Mitchell-2* at 1283-86. Even if the state court's analysis of prejudice can be deemed an adjudication of the merits of the federal claim, it was nevertheless "contrary to" or an unreasonable application of *Strickland* for purposes of § 2254(d)(1). As explained in Claim

58

VI.C.2, *supra*, the state court ignored the close connection between this claim and claim VI, thereby failing to assess *Strickland* prejudice cumulatively as required under well-established federal law. Standard of Review, § C (citing *Williams*, 529 U.S. at 397).

Indeed, the state court's rulings as to the two claims are inconsistent and antithetical. As to Claim VI, the state court ruled that Petitioner was not prejudiced by counsel's failure to provide the Britton and Little documents to counsel, because Dr. Bernstein's "credibility was called into question on cross-examination primarily based on discrepancies between his opinion and the medical [records] he reviewed from St. Francis Hospital." *Mitchell-2* at 1283. Turning to the claim that counsel was ineffective for failing to use the St. Francis medical records *to show that they in fact supported Dr. Bernstein's opinion*, as effective counsel would have done, the state court asserted that Petitioner was not prejudiced because "the jury was presented with ample evidence of Appellant's alcoholism . . . ." *Id.* at 1286. The state cannot both be right that Dr. Bernstein's credibility was shredded by use of the St. Francis records, *and* that it would not have made any difference for counsel to use the records both to show that that attack on his credibility was founded on misrepresentation of the records, and that the St. Francis records actually supported his opinion. In fact, it is patently unreasonable to suggest that both propositions are true.

The state court also overlooked critical facts, rendering its determination of the facts unreasonable under § 2254(d)(2). *Grant*, 709 F.3d at 233. The state court found lack of prejudice on the ground that the defense presented "ample evidence" of adolescent alcoholism. The state court wrote: "Appellant is under the mistaken notion that if only the jury had been presented with more details of his alcoholism, it would have accepted his diminished capacity defense and/or would not have returned a sentence of death." *Mitchell-2* at 1286. But what was

lacking was quality of the evidence, not its quantity. Just because counsel put an expert on the stand and elicited some evidence on the matter does make counsel's omissions non-prejudicial when his expert's credibility was destroyed due to counsel's ineptitude. *See Hinton*, 134 S. Ct. at 1089 (the defense expert's testimony would have been beneficial to the defense "*if the jury had believed it*") (emphasis in original).

For the reasons stated here as well as those set forth in the Amended Petition, Mr. Mitchell should be granted a new trial, or at least a new capital sentencing proceeding.

## VIII. TRIAL COUNSEL'S FAILURE TO TIMELY PREPARE AND TO INVESTIGATE, DEVELOP AND PRESENT CREDIBLE AND PERSUASIVE MITIGATING EVIDENCE DEPRIVED PETITIONER OF HIS CONSTITUTIONAL RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL.

### A. Information Requested by the Court

Petitioner relies upon the Sixth, Eighth and Fourteenth Amendments to the United States Constitution as bases for relief.

This claim has been exhausted in the state courts. *See Mitchell-2* at 1286-88.

Federal review of this claim is not barred by the doctrine of *Teague v. Lane*, 489 U.S. 288 (1989). Petitioner does not rely on a "new" constitutional rule of criminal procedure announced after the date his conviction became final. *See id.* at 310. Specifically with regard to Petitioner's ineffectiveness claims, subsequent decisions applying *Strickland* do not constitute "new" law for purposes of *Teague*. *See Wiggins*, 539 U.S. at 521 ("We established the legal principles that govern claims of ineffective assistance of counsel in *Strickland*"); *id.* at 522 (Court "made no new law" in *Williams v. Taylor*, but instead "applied the same 'clearly established' precedent of *Strickland* we apply today").

## B.     The Merits of the Claim.

### 1.     Deficient performance

Guilt phase counsel Harper and penalty phase counsel Cribbins did not work together as a team.  Amended Pet., ECF No. 12, ¶¶ 290-92.  As a result, attorney Cribbins was totally and solely responsible for investigating, developing and presenting mitigating evidence in support of a life sentence.

Attorney Cribbins was well aware of the importance of mental health mitigation at penalty phase; indeed, she believed that the defense should not have presented Dr. Bernstein at the guilt phase of trial, but rather "that the psychiatric evidence should be held back for the penalty phase," NTP 116-17, in part because of the need to start fresh at penalty phase after the jury has rejected any guilt phase defenses.  NTP 119.  Attorney Harper, however, insisted on presenting Dr. Bernstein at guilt phase in support of the diminished capacity defense.  NTP 29, 31 (testimony of attorney Harper).

Despite her awareness of the importance of the mental health mitigation presentation, attorney Cribbins did virtually nothing to ensure that she would be able to make a persuasive presentation of such evidence.  She made no attempt to hire a separate penalty phase expert, who could have concentrated on developing and presenting mitigation, as opposed to diminished capacity.  NTP 117.  She did not ask Dr. Bernstein to conduct a full mitigation work-up.  NTP 184.  And she relied on attorney Harper to obtain and send relevant records and materials to Dr. Bernstein.  NTP 106, 109, 111.

Attorney Cribbins' failure to carry out her independent responsibility to develop and prepare the mental health mitigation was deficient performance.  She knew it would be best to have a separate penalty phase expert, but she did nothing to obtain one.  She knew that Dr. Bernstein had indicated he needed more information to make an Axis II (personality disorder)

diagnosis, NTP 112, and she knew that Behavior Clinic experts had diagnosed a personality disorder, *see* A487, 498. She also knew that Dr. Bernstein had generally requested additional information in his report. A476. Yet she did nothing to obtain and provide such information to Dr. Bernstein. Even records she did obtain, such as the St. Francis records, were obtained too late for her to be prepared to use them. NTP 113-14.

It is well established that counsel's failure to timely obtain and provide records to a mental health expert – particularly records directly requested by the expert – constitutes deficient performance. *See, e.g., Rompilla*, 545 U.S. at 392 (medical experts were unable to find mitigating evidence because counsel failed to provide adequate records); *Bond*, 539 F.3d at 288 (finding deficient performance where counsel "failed to give their consulting expert sufficient information to evaluate Bond accurately"); *Jacobs*, 395 F.3d at 103, 106 (counsel's failure to provide expert "with the necessary information to conduct a proper evaluation" was deficient performance); *Bean v. Calderon*, 163 F.3d 1073, 1078 (9th Cir. 1998) (finding deficient performance where counsel failed to provide information requested by expert); *Bloom*, 132 F.3d at 1278 ("[W]hen the defense's only expert requests relevant information which is readily available, counsel inexplicably does not attempt to provide it, and counsel then presents the expert's flawed testimony . . ., counsel's performance is deficient.").

Because attorney Cribbins did not ask Dr. Bernstein (or another expert) to conduct a full mitigation work-up, she did not learn that Dr. Bernstein would have recommended neuropsychological testing for purposes of presenting mental health mitigation. NTP 202-03. Counsel's failure to have meaningful consultations with Dr. Bernstein or another expert with regard to the penalty phase presentation was deficient performance. *Bloom*, 163 F.3d at 1078-79 (failure to timely obtain neuropsychological testing and adequately prepare experts was deficient

performance); *Jacobs v. Horn*, 129 F. Supp. 2d 390, 405 (M.D. Pa. 2001) (finding deficient performance where counsel failed to obtain a mental health mitigation evaluation), *subsequent history*, 395 F.3d 92 (3d Cir. 2005).

What should have been the final blow to counsel's plan to present Dr. Bernstein at both the guilt and penalty phases took place when the guilt phase cross-examination, in counsel's estimation, "made [Dr. Bernstein] look like a fool," leaving a "huge hole" in the penalty phase defense. NTP 120. Instead of trying to come up with a new plan, attorney Cribbins proceeded to present Dr. Bernstein as the sole penalty phase expert witness, knowing that his credibility had already been destroyed. Again, this was deficient performance. *Hinton*, 134 S. Ct. at 1088 (counsel's "failure to request additional funding to replace an expert [counsel] knew to be inadequate . . . constituted deficient performance"); *Showers v. Beard*, 634 F.3d 625, 631-32 (3d Cir. 2011) (unreasonable for counsel to rely on expert whose credibility was suspect); *Skaggs v. Parker*, 235 F.3d 261, 269-70 (6th Cir. 2000) (deficient performance to present mental health expert who counsel believed was a terrible witness).

### 2. Prejudice

The penalty phase presentation at trial was meager. Family members testified that Mr. Mitchell had a drinking problem, as did both of his parents. Church members gave good character evidence, and there was a stipulation that Mr. Mitchell had no criminal record prior to September 1, 1997. Potentially the most powerful evidence came from Dr. Bernstein, who testified about alcohol hallucinations, possible effects of a head injury, the effects of growing up in a household with alcoholic parents, and Mr. Mitchell's alcohol abuse and depression. Given the credibility problems with Dr. Bernstein's testimony, extensively discussed in part 1 above and in Claims VI and VII, it is perhaps not surprising that no juror found a single mitigating

factor, even though much of the evidence about Mr. Mitchell's youth, background, and lack of a prior record was essentially uncontested.

Petitioner was prejudiced by counsel's failure to reasonably investigate and present credible life history and mental health mitigating evidence. A professionally reasonable defense lawyer would have developed and presented the mitigating evidence Petitioner submitted during his post-conviction proceedings. Instead of the meager mitigation case that was presented, the jury would have been given compelling mitigating evidence to consider, including evidence about Petitioner's childhood, which was marred by alcoholism, abuse, neglect and abandonment. The jury would also have heard significant, credible evidence of Mr. Mitchell's mental health mitigation. Had the jury heard evidence of Mr. Mitchell's deplorable childhood and mental health difficulties, "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

The evidence presented at the PCRA hearing was extensive, and the Commonwealth's own expert agreed with most of it. To decide whether Mr. Mitchell was prejudiced by counsel's deficient performance, this Court must "consider 'the totality of the available mitigation evidence – both that adduced at trial, and the evidence adduced in the [post-conviction] proceeding' – and 'reweig[h] it against the evidence in aggravation." *Porter*, 558 U.S. at 41 (quoting *Williams*, 529 U.S. at 397-98) (first bracket supplied; second bracket in *Porter*). Had the jury heard the totality of the available mitigating evidence, "there is a reasonable probability that at least one juror would have struck a different balance." *Wiggins*, 539 U.S. at 537.

In Amended Pet., ECF No. 12, ¶¶ 310-29, Petitioner set forth the available mitigating evidence. Trial counsel could have shown that the marriage of Petitioner's parents was devastated by their alcohol dependence, which also resulted in abuse and neglect of Mr.

Mitchell. As a child, Mr. Mitchell suffered severely from his parents' neglect, from his father's departure, and from his mother's growing involvement with Rev. Johnson and Rev. Johnson's church and family. In short, as the *Commonwealth's* psychiatrist (Dr. Wright) found, there was evidence of "abuse and neglect and abandonment" in Mr. Mitchell's background, as well as evidence of "pretty severe alcoholism across the family and in the home." NTP 621. Thus, there is no dispute that Mr. Mitchell had "the kind of troubled history" that is "relevant to assessing a defendant's moral culpability" at capital sentencing. *Wiggins*, 539 U.S. at 535.

Given that Petitioner's "childhood was marked by abuse and neglect," one does "not need to be a psychiatrist or a seer to know that . . . such a background provides a fertile soil in which to develop mental problems. *Bouchillon v. Collins*, 907 F.2d 589, 590 (5th Cir. 1990). This case is no exception. The defense experts (Drs. Dudley, Clark and Crown) and the *Commonwealth's* expert (Dr. Wright) all agreed that the type of childhood trauma suffered by Petitioner typically causes lasting mental and emotional problems, and that it caused such problems for Petitioner. Indeed, Dr. Wright testified that Mr. Mitchell was drinking daily at age 12 and had liver damage resulting from alcohol use at age 14. NTP 610. Dr. Wright further testified that Mr. Mitchell suffers from a personality disorder, that such disorders are debilitating, and that "childhood abuse does increase the risk of developing a personality disorder." NTP 573, 619-20, 623.

This mitigating evidence is *undisputed* – the Commonwealth expert agreed with the defense experts that Petitioner's life history is one of trauma and mental disturbance. Moreover, the Commonwealth expert agreed with the defense experts that Petitioner's mental disturbance is

not transitory, but lasting. Thus, it is *undisputed* that Petitioner suffered from *mitigating mental impairments* at the time of the offense.[9]

That means there is not just a wealth of mitigating evidence here – there is a wealth of *well-documented, undisputed* mitigating evidence that Petitioner suffered a traumatic life of abuse and mistreatment; that he has a history of personal relationships that are intense, unstable, and involve frantic attempts to avoid real or perceived abandonment; and that he suffers from mental and emotional impairments, including alcohol dependence; borderline personality disorder; a depressive disorder; and organic brain damage. Furthermore, he was only 19 years old at the time of the offenses and had no prior criminal record. This evidence would have supported mitigating factors under 42 Pa. C.S. § 9711(e)(2) (substantially impaired capacity), (3) (extreme mental or emotional disturbance), (4) (age), and (8) (any other evidence concerning the defendant's character or record).

Moreover, because the records documenting Petitioner's mitigating life history were generated long before trial by "disinterested" sources with "no particular reason to be favorably disposed toward" Petitioner, they "would quite naturally be given much greater weight by the jury." *Skipper v. South Carolina*, 476 U.S. 1, 7-8 (1986); *see also Green v. Rundle*, 434 F.2d 1112, 1115 (3d Cir. 1970) ("records kept in the ordinary course of business by a disinterested third party" are highly persuasive; counsel ineffective for failing to obtain records that

---

[9] *See, e.g., Eddings v. Oklahoma*, 455 U.S. 104, 107, 110 (1982) (death sentence unconstitutional where sentence fails to give mitigating effect to defendant's personality disorder); *Frey v. Fulcomer*, 974 F.2d 348, 355 (3d Cir. 1992) ("In sparing [co-defendant's] life [at capital sentencing], the trial court found . . . mitigating circumstances" of personality disorders); *Jacobs v. Horn*, 129 F. Supp. 2d 390, 402 (M.D. Pa. 2001) (capital counsel ineffective for failing to present mitigating evidence of personality disorder), *subsequent history*, 395 F.3d 92 (3d Cir. 2005) (vacating conviction).

corroborated testimony of defense witnesses). Similarly, the jury would likely have afforded significant weight to mitigating evidence that the *prosecution* expert agrees exists.

Given the strength of the *undisputed* mitigating evidence, prejudice is established even if the Court ignores additional mitigating evidence presented by the defense experts but disputed by the Commonwealth experts. Nevertheless, the disputed expert testimony provides additional mitigating evidence of brain damage to which the jury could have given further mitigating effect.[10]

The jury reasonably could have credited the opinion of Dr. Crown that Petitioner suffers from brain damage over the opinion of Dr. Wright that he does not. The brain damage finding of Dr. Crown is based upon an extensive battery of neuropsychological tests administered by Dr. Crown; Dr. Crown's observations during his face-to-face evaluation of Petitioner; and numerous red flags for brain damage in Petitioner's history. While Dr. Wright disagreed, he acknowledged that the testing he performed was much more limited than that conducted by Dr. Crown. NTP 588. When this additional, "contested" mitigating evidence is taken into account, prejudice is even more plain.

The mitigating evidence that trial counsel failed to investigate, develop and present undermines confidence in the death sentence in this case. There is a reasonable probability that at least one juror would have voted for life. Petitioner was prejudiced.

---

[10] *E.g.*, *Porter*, 558 U.S. at 43 (prejudice from counsel's failure to present disputed evidence "of a brain abnormality and cognitive defects"); *Outten*, 464 F.3d at 421 (counsel ineffective for failing to present mitigating evidence including "*possible* neurological damage"); *Bond*, 539 F.3d at 283-85 (counsel ineffective for failing to present evidence of brain damage, where Commonwealth expert disputed brain damage finding).

## C.    The State Court Opinions.

To the extent that the state courts adjudicated this claim, their decisions are "contrary to" and an "unreasonable application of" clearly established Supreme Court law and are unreasonable in light of the state court record.  28 U.S.C. § 2254(d).

### 1.    Deficient representation.

The Pennsylvania Supreme Court apparently denied relief primarily if not exclusively on the ground that Petitioner had failed to establish prejudice.  *See Mitchell-2* at 1287 (citing *Commonwealth v. Philistin*, 53 A.3d 1, 28 (Pa. 2012) (stating prejudice standard)).  The PCRA court apparently ruled that Petitioner had failed to establish either deficient performance or prejudice, based on its characterization of the post-conviction evidence as "cumulative" of the evidence presented at trial.  PCRA Op.-1 at 83-84.  Whether this Court "looks through" to the PCRA court decision for purposes of AEDPA analysis, *see Collins v. Secretary,* 742 F.3d at 545-46, or assumes that the state high court relied on similar grounds, *see Mitchell-2* at 1288, that is the only basis given by the state courts for rejecting deficient performance.  Such a ruling was at best unreasonable.

Under clearly established Supreme Court law, the idea that the post-conviction evidence was cumulative (it was not, as we show in part 2 below), is relevant only to prejudice, not to deficient performance.  Going back to *Strickland* itself, deficient performance analysis centers on whether trial counsel committed errors that were "professionally unreasonable," *Strickland*, 466 U.S. at 691.  The reviewing court must "evaluate the conduct from counsel's perspective at the time," *id.* at 689, and the focus is typically on "whether the investigation supporting counsel's decision[s] . . . *was itself reasonable.*" *Wiggins*, 539 U.S. at 523.  *See also Williams*, 529 U.S. at 396 (finding deficient performance: "Whether or not [counsel's] omissions were . . . prejudicial, they clearly demonstrate that counsel did not fulfill their obligation to conduct a thorough

investigation of the defendant's background."). Because deficient performance focuses on the reasonableness of counsel's conduct, evaluated from counsel's perspective at the time of trial, the question whether effective counsel would have obtained and presented substantially different evidence is not part of deficient performance analysis.[11]

Moreover, to the extent that the state courts believed that counsel's performance can only be deficient if counsel's failures were total or affected every aspect of their representation, such a belief is also contrary to or an unreasonable application of clearly established Supreme Court law. *See, e.g., Hinton*, 134 S. Ct. at 1088-89 (counsel realized that he needed a competent ballistics expert to rebut the state experts, and hired an expert; counsel's "failure to request additional funding in order to replace an expert he knew to be inadequate . . . constituted deficient performance"); *Rompilla*, 545 U.S. at 383 (although counsel consulted three mental health mitigation experts, counsel's "failure to examine Rompilla's prior conviction file fell below the level of reasonable performance").

Here, Petitioner's claim is that counsel (as in *Hinton*) knew that counsel's expert had been thoroughly discredited on cross-examination at guilt phase, but made no attempt to obtain another expert; that counsel failed to seek a full mitigation work-up from her expert, which would have included neuropsychological testing; failed to fully investigate and develop Petitioner's life history; made no attempt to pursue known evidence that Petitioner suffered from a personality disorder; and failed to timely obtain and provide records to her expert. Even if it were true (it is not), the assertion that the post-conviction evidence was "cumulative" of the trial

---

[11] The question whether the post-conviction evidence is "cumulative" of the trial evidence is relevant to prejudice analysis. *See, e.g., Schriro v. Landrigan*, 550 U.S. 465, 480-81 (2007) ("poor quality" of post-conviction evidence prevented petitioner from showing prejudice); *Strickland*, 466 U.S. at 700 (no prejudice where post-conviction evidence "would barely have altered the sentencing profile . . . ."). In part 2, we show that the state court prejudice analysis is unreasonable.

evidence fails to answer the question whether counsel's performance was deficient in those respects. To the extent the state courts ruled on the deficient performance prong, their decisions were based on an unreasonable application of *Strickland* and its progeny.

## 2. Prejudice

The Pennsylvania Supreme Court addressed the prejudice prong of *Strickland* in piecemeal fashion, addressing separately whether Petitioner was prejudiced by counsel's failure to obtain neuropsychological testing, counsel's failure to obtain additional mental health testimony, counsel's failure to present evidence that Petitioner suffers from a personality disorder, and counsel's failure to present additional evidence concerning Petitioner's life history. *Mitchell-2* at 1287-88 & n.26. This piecemeal approach to prejudice analysis is an unreasonable application of *Strickland* and its progeny, which require an assessment of whether there is a reasonable probability that all of the trial and post-conviction evidence together would have resulted in a different outcome. *See Sears v. Upton*, 130 S. Ct. 3259, 3266-67 (quoting *Porter*, 558 U.S. at 41); *Williams*, 529 U.S. at 397-98 (state court ruling unreasonable because it "failed to evaluate the totality of the available mitigation evidence – both that adduced at trial, and the evidence adduced in the [post-conviction] proceeding [– and] reweigh[] it against the evidence in aggravation."). Moreover, the individual pieces of the state court's analysis were also unreasonable.

The state court rejected the argument that Petitioner was prejudiced by counsel's failure to obtain neuropsychological testing, because (1) Petitioner did not establish beyond question that he suffered from brain damage in 1997; and (2) Dr. Bernstein presented testimony at trial that Petitioner had "suffered brain injury, which impaired his cognitive abilities." *Mitchell-2* at 1287.

As to the former point, Petitioner did present significant evidence that his brain injury predated the trial, including (a) Dr. Bernstein's trial testimony to that effect; (b) Dr. Moran's report of his pretrial evaluation was consistent with brain damage, NTP 305; (c) Petitioner's history of early alcohol abuse and head injuries was of a type capable of causing brain damage; and (d) there was no known indication of any injury occurring between trial and Dr. Crown's evaluation (a time during which Mr. Mitchell was incarcerated without access to alcohol and when any serious head injury would have been reported). NTP 303-06. It is true that Dr. Wright testified that the brain damage *could* have developed after trial, but it was nevertheless unreasonable for the state court to "discount entirely the effect that [Dr. Crown's] testimony might have had on the jury . . . ." *Porter*, 558 U.S. at 43.

As to the state court's latter point, it was unreasonable particularly given that Petitioner's claim is that penalty phase counsel was deficient for failing to seek a separate penalty phase expert, particularly after Dr. Bernstein's testimony was devastatingly impeached. The state court's belief that Petitioner could not be prejudiced by the failure to present a credible expert where counsel did present expert testimony on the same topic is inconsistent with *Hinton*. In *Hinton*, the state court had relied on similar reasoning. The Supreme Court rejected the state's argument that this precluded a prejudice finding:

> [T]he State contends . . . that Hinton could not have been prejudiced by his attorney's use of Payne . . . because Payne said all that Hinton could have hoped for from a toolmark expert . . . . It is true that Payne's testimony would have done Hinton a lot of good *if the jury had believed it*. But the jury did not believe Payne.

*Hinton*, 134 S. Ct. at 1089 (emphasis in original). The same analysis holds here.

The state court rejected Petitioner's argument that he was prejudiced by counsel's failure to develop evidence that he suffered from a personality disorder on a basis similar to ground (1) above – that he had supposedly failed to prove he suffered from a personality disorder at the time

of the murder. *Mitchell-2* at 1288 n.26. This ruling is unreasonable for the same reason as the brain damage ruling – even if there was some question about the diagnosis, it was unreasonable for the state court to discount entirely the effect it could have had on the sentencing jury. Moreover, it is also unreasonable in light of the state court record.

The state court called the personality disorder diagnosis into question on two grounds – Dr. Dudley testified that a person's personality is not entirely "fixed" until they enter their adult years, NTP 241, and pretrial reports did not diagnose a *borderline* personality disorder. *Mitchell-2* at 1288 n.26. Those grounds are themselves taken out of context. Dr. Dudley clearly stated his opinion that Mr. Mitchell suffered from a personality disorder at the time of the offense, NTP 265-66, when he was just short of twenty years old. A twenty-year-old is an adult; Dr. Dudley explained that a personality disorder is not diagnosed "in children," but is diagnosed when – like Mr. Mitchell at the time of the offense – "you're entering your adult years." NTP 241. *See also* NTP 574 (testimony of Commonwealth expert Dr. Wright that person must be over 18 for diagnosis of personality disorder). And while Dr. Moran's pretrial report did not diagnose *borderline* personality disorder, it did diagnose a personality disorder, *see* A498 (rebutting the state court's theory that Mr. Mitchell was too young for such a diagnosis), and he reported symptoms and testing that were consistent with and supported Dr. Dudley's borderline personality diagnosis. NTP 248-51.

Moreover, the fact that Mr. Mitchell suffers from a personality disorder – whether or not characterized as a borderline personality disorder – was *undisputed*. Not only did Dr. Moran's pretrial evaluation support that finding, it was also supported by the *Commonwealth's* expert, Dr. Wright, who diagnosed Mr. Mitchell as suffering from a personality disorder with antisocial, narcissistic and borderline features. NTP 573. To the extent, then, that the state court concluded

Petitioner had failed to show he suffered from a personality disorder at the time of the offense, its ruling was unreasonable in light of the state court record. 28 U.S.C. § 2254(d)(2). To the extent it discounted the evidence of personality disorder because of disagreement as to the precise label to be given the disorder, that was an unreasonable application of Supreme Court law. *See Porter*, 558 U.S. at 43 (unreasonable for state court to "discount entirely the effect that [Dr. Dudley's] testimony might have had on the jury").

The state court rejected any prejudicial effect from the rest of the post-conviction evidence on the ground that it was "merely cumulative of mitigation evidence offered by Appellant during the penalty-phase." *Mitchell-2* at 1288. This was also an unreasonable application of Supreme Court law.

The Supreme Court has "never held that counsel's effort to present *some* mitigation evidence should foreclose an inquiry into whether a facially deficient investigation might have prejudice the defendant." *Sears v. Upton*, 130 S. Ct. at 3266. Counsel's investigation having been shown to be deficient, it was incumbent on the state court to reweigh against the evidence in aggravation "the totality of the available mitigation evidence – both that adduced at trial, and the evidence adduced in the [post-conviction] proceeding . . . ." *Williams*, 529 U.S. at 397-98. The state court manifestly failed to do this. The trial evidence about Petitioner's history was far less extensive, detailed and documented than that presented post-conviction. Moreover, the trial evidence did not address Petitioner's personality disorder, and all of Dr. Bernstein's testimony was weakened by the assault on his credibility that trial counsel did nothing to prevent or to remedy once it had taken place. Under these circumstances, it was manifestly unreasonable to dismiss all of the post-conviction evidence as "cumulative" merely because it overlapped to some extent with the trial evidence.

Petitioner has shown that his Sixth Amendment rights were violated, and that the state court decisions denying relief were at best unreasonable. Accordingly, this Court should grant him habeas relief as to his death sentence.

IX. **THE TRIAL COURT VIOLATED DUE PROCESS AND THE EIGHTH AMENDMENT BY EXCLUDING TESTIMONY BY BEHAVIOR CLINIC EXPERTS AND USE OF THOSE EXPERTS' REPORTS BY THE DEFENSE; TRIAL COUNSEL'S FAILURES TO USE THE REPORTS AND TO OBJECT TO THE TRIAL COURT'S RULING WERE DEFICIENT PERFORMANCE THAT PREJUDICED PETITIONER AT CAPITAL SENTENCING.**

A.    **Information Requested by the Court**

Petitioner relies upon the Sixth, Eighth and Fourteenth Amendments to the United States Constitution as bases for relief.

This claim has been exhausted in the state courts. *See Mitchell-2* at 1288-91.

Federal review of this claim is not barred by the doctrine of *Teague v. Lane*, 489 U.S. 288 (1989). Petitioner does not rely on a "new" constitutional rule of criminal procedure announced after the date his conviction became final. *See id.* at 310.

B.    **The Merits of the Claims.**

Three mental health experts employed by the Allegheny County Court's Behavior Clinic interviewed and evaluated Mr. Mitchell both days before and days after the murder. The trial court ruled that these experts could not testify at trial, and that the defense mental health expert could not review or rely on the Behavior Clinic reports. NTT 303, 306, 311-12. These rulings violated Petitioner's right to due process and his rights under the Eighth Amendment. Trial counsel ineffectively failed to object to these rulings, and to use the Behavior Clinic expert reports and testimony at penalty phase.

### 1. The due process and Eighth Amendment violation.

The right of an accused to present witnesses is a fundamental element of due process of law. *Washington v. Texas*, 388 U.S. 14, 19 (1967). Particularly at the penalty phase of a capital case, it violates due process to exclude relevant, reliable evidence on the basis of the mechanistic application of evidentiary or other rules. *Green v. Georgia*, 442 U.S. 95, 97 (1979).

The trial court's ruling, based on a local rule or practice that the Behavior Clinic experts could not testify at trial, violated Petitioner's due process rights. The findings of the Behavior Clinic experts were particularly important in this case because they were made close in time to the offense. Moreover, the Eighth Amendment required that the sentencing jury be permitted to consider the Behavior Clinic evidence. The sentencing jury in capital cases must be permitted to consider any relevant mitigating factor. *See, e.g., Lockett v. Ohio*, 438 U.S. 586 (1978); *Eddings v. Oklahoma*, 455 U.S. 104 (1982). The Behavior Clinic evidence was unquestionably relevant; the jury should have been permitted to consider it.

### 2. The Sixth Amendment violation.

#### a. Deficient performance

Trial counsel Harper operated on two assumptions with respect to the Behavior Clinic evidence: (1) that the experts could not testify and their reports were not admissible, *see* NTP 24-29; and (2) that the reports might be harmful to the defense at the guilt phase of the trial. *See* NTT 300-06, 311; *Mitchell-2* at 1289 (finding that counsel chose to have all of the experts and reports excluded rather than allow the Commonwealth to call two of them). Counsel, however, never tested either assumption – counsel never explored the existence or legality of a rule excluding the experts and reports, and counsel never inquired of his expert whether access to the reports would be helpful or harmful at either phase of the trial. Counsel's failure to test his assumptions was deficient performance.

It is deficient performance to make strategic decisions based on a mistaken understanding of the law. *Hinton*, 134 S. Ct. at 1089; *Kimmelman*, 477 U.S. at 385 (counsel's misunderstanding of discovery procedure rendered counsel's performance deficient). Under *Hinton* and *Kimmelman*, counsel's performance was deficient. At no point in the proceedings was it shown that any court rule or order prohibited introduction of testimony or reports from Behavior Clinic experts, nor did counsel make any attempt to determine if any such rule was consistent with due process and the Eighth Amendment.

It is also deficient performance to make strategic decisions without having first conducted an adequate investigation of the facts. *E.g.*, *Rompilla*, 545 U.S. at 389 (unreasonable for counsel not to review file of prior conviction); *Wiggins*, 539 U.S. at 536 (in absence of investigation, "counsel were not in a position to make a reasonable strategic choice"). Here, counsel did not conduct an adequate investigation of the facts.

In particular, counsel never met with Dr. Bernstein, NTP 188, and never discussed with him whether the Behavior Clinic reports would be helpful or harmful. Had he done so, he would have learned that Dr. Bernstein thought the Behavior Clinic reports, particularly Dr. Moran's, would have been helpful to the defense at guilt phase because they reached conclusions similar to his. NTP 197-98.

Moreover, even assuming that guilt phase counsel Harper made a reasonable decision to permit the exclusion of the Behavior Clinic evidence (he did not), penalty phase counsel Cribbins had no reasonable basis for not raising the issue at penalty phase. Again, Dr. Bernstein thought the Behavior Clinic reports would have been helpful at penalty phase, NTP 197-99, 204-05, and attorney Cribbins had no reason for failing to request that the trial court reconsider its

ruling on the issue at the start of the penalty phase. Counsel's failure to request that the Behavior Clinic reports and expert testimony be admitted at penalty phase was deficient performance.

### b. Prejudice

As a result of trial counsel's inaction, the jury sentenced Mr. Mitchell to death without hearing or considering any of the mental health evidence developed by the Behavior Clinic doctors and contained in their reports. Petitioner was left with his sole expert's credibility badly tarnished at the penalty phase. *See* Claim VI, *supra.*

Had penalty phase counsel called Drs. Stile, Martone, and/or Moran as witnesses, or at least presented their independent reports to the jury through Dr. Bernstein, the jury would have heard and considered significant mitigating psychiatric and psychological evidence coming directly from independent and untarnished expert witnesses. This would have included Dr. Stile's diagnoses of personality disorder and polysubstance dependence, A487; Dr. Martone's finding of traits consistent with personality disorder, A488-91; Dr. Moran's diagnosis of a personality disorder, A498; and Dr. Martone's report concerning Mr. Mitchell's expressions of remorse, A489.

All of these findings were consistent with and supportive of Dr. Dudley's diagnoses and findings. NTP 227, 248-51. Moreover, these records were particularly important because they reflected Mr. Mitchell's mental state and functioning near the time of the offenses. NTP 248 (Dr. Dudley); 590 (Dr. Wright). If Dr. Bernstein had received the Behavior Clinic records before trial, they would have been helpful because they support remorse, alcohol dependence and personality disorders as mitigating factors. NTP 197-99, 204-05.

Had the jury known that Dr. Bernstein's conclusions were supported by *neutral, disinterested* experts who evaluated Mr. Mitchell within days both before and after the homicide, *see* Amended Pet., ECF No. 12, ¶¶ 335-37, and heard their consistent findings of a personality

disorder and Mr. Mitchell's remorse, it is reasonably likely that at least one juror would have voted for a life sentence. Accordingly, Petitioner was prejudiced. *Wiggins*, 539 U.S. at 537.

## C.    The State Court Opinions

The Pennsylvania Supreme Court ruled that the due process and Eighth Amendment claim was waived by counsel's failure to object. *Mitchell-2* at 1288. Upon Petitioner's showing that trial counsel was constitutionally ineffective, review of the underlying claim is *de novo*.

The state high court ruled that counsel's performance was not deficient because both counsel made "reasonable, strategic decisions" that they were better off excluding all of the Behavior Clinic experts and reports. *Mitchell-2* at 1289. That ruling was an unreasonable application of *Strickland* and its progeny, and unreasonable in light of the state court record. 28 U.S.C. § 2254(d).

The state court found that counsel made a decision, and then simply asserted that counsel's decision was reasonable, without inquiring into the fundamental question "whether the investigation supporting counsel's decision . . . *was itself reasonable*." *Wiggins*, 539 U.S. at 523 (emphasis original). As shown above, counsel's failure even to discuss this critical issue with Dr. Bernstein was an unreasonable failure to investigate. The state court's failure even to consider this point was an unreasonable application of *Wiggins*.

The state court also failed to consider a critically important aspect of guilt phase counsel's representation. In his testimony, attorney Harper repeatedly made clear, in remarkably candid fashion, that his decisions in this case – including the decisions he made with respect to the diminished capacity defense and Dr. Bernstein – were driven at least as much by his desire to protect himself (what he referred to as "CYA") – as they were by his desire to provide effective representation for Mr. Mitchell. For example, he testified as follows:

At a certain point a trial attorney makes a determination that he's got to protect himself as well as do his job, and had I not put in a diminished capacity, I would be sitting here answering to that question about why I did not put in the possibility of diminished capacity. *That was classic CYA in terms of putting it in.*

NTP 31.

The fact that trial counsel described his own "strategic decision" as "classic CYA" has at a minimum to give a reviewing court pause with regard to counsel's motivations and the purportedly "strategic" basis for his decisions. Yet the state court never mentioned this prominent aspect of counsel's testimony. This was unreasonable given the state court record.

The state court's assertion that the reports of Drs. Martone and Stile "contained potentially damning information for the defense," *Mitchell-2* at 1289-90, was also unreasonable. In support of it, the state court cited findings by those experts that Petitioner was competent, was not suffering delusions or hallucinations, and was otherwise not psychotic. *Id.* at 1290 n.28. But those findings were far from "damning" for the defense.

Dr. Bernstein did not testify that Mr. Mitchell was currently psychotic, or that he was psychotic upon evaluation. Rather, Dr. Bernstein testified that Mr. Mitchell suffered from alcohol dependence and hallucinations caused by alcohol on the night of the offense. NTT 556-57. The cited reports did not contradict the defense. At most, Dr. Martone's report concerning Mr. Mitchell's expressions of remorse could have been seen as inconsistent with the diminished capacity defense, but equally could have been helpful at penalty phase. It was unreasonable for the state court to suggest that the reports of Drs. Martone and Stile were "damning."

To the extent that attorney Harper decided to avoid the Behavior Clinic experts because they would be harmful at guilt phase – even though they would be helpful at penalty phase – this only highlights attorney Harper's at best conflicted motivation. Attorney Harper failed to provide the critical Britton and Little documents to Dr. Bernstein and failed to meet with Dr.

Bernstein or review the St. Francis records with him, setting up a situation in which Dr. Bernstein would be useless to penalty phase counsel – with whom attorney Harper never spoke. Attorney Harper knew this was not in Mr. Mitchell's best interests, but he did it anyway because "*I was not going to leave myself naked . . . .*" NTP 29. It was utterly unreasonable for the state courts never even to address this testimony.

While the state high court did not address prejudice, the PCRA court stated that Petitioner was not prejudiced by counsel's failures because "Dr. Bernstein testified consistent with the testimony of Dr. Dudley and Dr. Crown at the PCRA hearing . . . ." PCRA Op.-1 at 91. This ruling was also unreasonable, for reasons discussed in Claims VI through VIII, *supra*, including (1) while Dr. Bernstein's testimony was consistent with the PCRA experts in many respects, his finding of brain damage was not based on any testing, and he did not attempt to diagnose a personality disorder; and (2) Dr. Bernstein's credibility was heavily impeached as a result of counsel's deficient performance. Moreover, with respect to this claim in particular, the PCRA court completely ignored that the testimony and reports of the Behavior Clinic experts would have provided neutral, contemporaneous support for the conclusions of Dr. Bernstein, which the prosecution attacked as those of a hired gun who was unaware of critically important facts. The PCRA court's ruling was unreasonable in light of the state court record.

## X. TRIAL AND APPELLATE COUNSEL WERE INEFFECTIVE FOR FAILING TO PROPERLY RAISE AND LITIGATE THE INVALID USE OF CONVICTIONS FROM THE GUILT PHASE OF THE TRIAL TO REBUT THE EXISTENCE OF THE (E)(1) MITIGATING FACTOR, AND FOR FAILING TO RAISE AND LITIGATE THE TRIAL COURT'S FAILURE TO INSTRUCT THE JURY TO FIND LACK OF A RECORD AS A MITIGATING CIRCUMSTANCE UNDER THE "CATCH-ALL" MITIGATING FACTOR.

### A.  Information requested by the Court

Petitioner relies upon the Sixth, Eighth and Fourteenth Amendments to the United States Constitution as bases for relief.

This claim has been exhausted in state courts. *See* Initial Brief of Appellant at 78-81, *Commonwealth v. Mitchell*, No. 677 CAP, (Pa. Jan. 17, 2014); *Mitchell-2* at 1290-91.

Federal review of this claim is not barred by the doctrine of *Teague v. Lane*, 489 U.S. 288 (1989). Petitioner does not rely on a "new" constitutional rule of criminal procedure announced after the date his conviction became final. *See id.* at 310.

## B.    The Merits of the Claim

Prior to penalty phase, defense counsel and the prosecution stipulated that Mr. Mitchell had "no prior criminal history." NTT 728-29. Nevertheless, based on *Commonwealth v. Wharton*, 665 A.2d 458 (Pa. 1995), the prosecutor used Mr. Mitchell's contemporaneous criminal convictions to rebut the 42 Pa.C.S. § 9711(e)(1) mitigating circumstance that the "defendant has no significant history of prior criminal convictions."

Defense counsel did not ask the court to instruct the jury that it was bound to find Mr. Mitchell's stipulated "no prior criminal history" as a mitigating factor under 42 Pa.C.S. § 9711(e)(8). Pursuant to § 9711(e)(8), "mitigating circumstances shall include . . . [a]ny other evidence of mitigating concerning the character and record of the defendant and the circumstances of his offense." *Id.* Defense counsel's failure to request this instruction constitutes deficient performance under *Strickland*.

The stipulation between the parties as to Mr. Mitchell's lack of "prior criminal history" required the jury to find that he had proven the § 9711(e)(8) mitigating circumstance. *See, e.g., Commonwealth v. Rizzuto*, 777 A.2d 1069, 1088 (Pa. 2001) (jury's failure to find mitigating circumstance established by stipulation required vacation of death sentence). The trial court instructed the jury that a clean record can constitute mitigation under § 9711(e)(8), but did not instruct them to find the § 9711(e)(8) mitigating circumstance as a matter of law. NTT 920-21.

Trial counsel's failure to ask for this instruction, which would have been granted under Pennsylvania law, was deficient performance. *See Hinton*, 134 S. Ct. at 1089 ("[a]n attorney's ignorance of a point of law that is fundamental to his case . . . is a quintessential example of unreasonable performance under *Strickland*.").

Mr. Mitchell was prejudiced by counsel's failure to request the instruction. The jury here found no mitigating circumstances, and thus was required to sentence Mr. Mitchell to death without any weighing of aggravating and mitigating circumstances and without any opportunity to exercise mercy. 42 Pa. C.S. § 9711(c)(1)(iv) ("The verdict must be a sentence of death if the jury unanimously finds at least one aggravating circumstance specified in subsection (d) and no mitigating circumstance[.]").

Had counsel requested this instruction, the jury would have found one mitigating circumstance and would not have been legally required to enter a death sentence. *Id.* ("The verdict must be a death sentence if . . . the jury unanimously finds one or more aggravating circumstances which outweigh any mitigating circumstance. The verdict must be a sentence of life imprisonment in all other cases."). The jury would have also had the power to exercise mercy. *See Commonwealth v. Zook*, 615 A.2d 1, 13 (Pa. 1992).

As then-Chief Justice Castille explained, with respect to the § 9711(e)(1) mitigating circumstance, in Mr. Mitchell's direct appeal:

> Because the jury did not find this mitigating circumstance (nor did it find any other, and thus it did not engage in the weighing process), I would hold that the error was not harmless, and here, [Mr. Mitchell] is entitled to a new sentencing hearing.

*Mitchell-1* at 474 (Castille, C.J., dissenting).

Had trial counsel properly requested that the court instruct the jury to find the § 9711(e)(8) mitigating circumstance based on the stipulation, the instruction would have forced

the jurors to weigh the aggravation against the mitigation. Had they done so, there is a reasonable probability that at least one juror would have voted for life, establishing prejudice. *Wiggins*, 539 U.S. at 536-37.

Additionally, the jury's failure to find and weigh the stipulated mitigation rendered the death sentence arbitrary and capricious, in violation of Mr. Mitchell's Eighth Amendment rights. *See, e.g., Eddings v. Oklahoma*, 455 U.S. 104, 114-15 (1982) (Eighth Amendment violated when sentence failed to weigh uncontroverted mitigating evidence; capital sentencers "may determine the weight to be given relevant mitigating evidence. But they may not give it no weight by excluding such evidence from their consideration."); *Parker v. Dugger*, 498 U.S. 308, 321 (1991) (death sentence violates Eighth Amendment when established mitigating evidence is ignored); *Magwood v. Smith*, 791 F.2d 1428, 1449 (11th Cir. 1986) ("To find that mitigating circumstances do not exist where such mitigating circumstances clearly exist returns us to the state of affairs which were found by the Supreme Court in *Furman v. Georgia* to be prohibited by the Constitution.").[12]

### C.     The State Court Opinion

The Pennsylvania Supreme Court failed to address, or even mention, this aspect of Petitioner's claim. *Compare* Initial Brief of Appellant at 78-83, *Commonwealth v. Mitchell*, No. 677 CAP (Pa. Jan. 17, 2014), *with Mitchell-2* at 1290-91. The state court addressed whether the Commonwealth could use contemporaneous convictions to rebut the § 9711(e)(1) mitigating circumstance that "defendant has no significant history of prior criminal convictions" but failed to address the aspect of the claim related to the § 9711 (e)(8) mitigating circumstance.

---

[12] Petitioner acknowledges there is contrary authority in the Third Circuit. *See Copenhefer v. Horn*, 696 F.3d 377, 385-88 (3d Cir. 2012); *but see id.* at 393-402 (McKee, J., dissenting).

Accordingly, this Court's review of the claim regarding the (e)(8) factor is *de novo*. This Court should grant Petitioner sentencing relief for the reasons set forth in Part B, above.

**XI. PETITIONER'S DEATH SENTENCE SHOULD BE VACATED BECAUSE THE PENALTY PHASE JURY INSTRUCTION VIOLATED THE EIGHTH AMENDMENT AND TRIAL COUNSEL UNREASONABLY FAILED TO OBJECT TO THE COURT'S IMPROPER INSTRUCTION REGARDING THE DEFINITION, WEIGHT AND VALUE OF MITIGATING EVIDENCE IN THE CASE.**

The Sixth, Eighth, and Fourteenth Amendments forbid the imposition of capital punishment where the defendant is prevented from introducing, or the jury is prevented from considering, any evidence that could mitigate punishment. In Mr. Mitchell's case the trial court issued erroneous instructions that limited the range of mitigating evidence the jury could consider. The instructional error deprived Mr. Mitchell of his right to be evaluated as a human being worthy of compassion and mercy. Trial counsel performed deficiently when she failed to adequately object to these instructions, and Mr. Mitchell was prejudiced.

**A.    Information Requested by this Court**

Petitioner relies on the Sixth, Eighth and Fourteenth Amendments to the United States Constitution as bases for relief.

This claim has been exhausted in state courts. *See Mitchel-2* at 1291-92. The state court found the substantive claim waived, and ruled that the ineffective assistance of counsel claim lacked merit. *Id.* at 1292.

Federal review of this claim is not barred by the doctrine of *Teague v. Lane*, 489 U.S. 288 (1989). Petitioner does not rely on a "new" constitutional rule of criminal procedure announced after the date his conviction became final. *See id.* at 310.

## B. The Merits of the Claim

### 1. Petitioner's jury received improper instructions on mitigating circumstances

The Eighth Amendment mandates individualized capital sentencing based upon a reasoned moral response to the personal culpability and the unique personal circumstances of the defendant. *See, e.g., Lockett*; *Eddings*; *Summer v. Shuman*, 483 U.S. 66 (1987). The Eighth Amendment thus does not limit mitigating factors to factors relating to the crime. Rather, it requires a state to permit consideration of any evidence "the sentencer could reasonably find . . . warrants a sentence less than death." *McKoy v. North Carolina*, 494 U.S. 433, 441 (1990); *see also Skipper*, 476 U.S. at 4 (mitigating evidence includes any evidence that "might serve as a basis for a sentence less than death"). And there is no requirement that a defendant prove any nexus between the offense and the mitigating evidence presented. *See Tennard v. Dretke*, 542 U.S. 274, 287 (2004) (substantive nexus requirement linking mitigation to the offense "has no basis in our precedents and, indeed, is inconsistent with the standard we have adopted for relevance in the capital sentencing context.").

Here, these principles were violated when the trial court instructed the jury that mitigating circumstances are things that "make the first degree murder case . . . less terrible." NTT 768; *id.* at 917. Whether the "case" is terrible or not is not the same inquiry as whether the defendant is morally culpable. Without further clarification, the trial court's emphasis on the "case" directed the jury's attention to the circumstances of the offense at the expense of the constitutionally mandated consideration of those aspects of Mr. Mitchell's personal background and history that make him a unique individual, and that would otherwise justify sparing his life. At the same time, the focus on how "terrible" the killing was distorted the consideration of

mitigating evidence by granting primacy to the role of fear and emotion in the decision-making process at the expense of a reasonable moral response to the defendant.

### 2. Counsel was ineffective

Trial counsel did not object to the faulty instruction. Counsel failed to properly object or litigate claims relating to this instruction, and lacked any strategic basis to do so, as Mr. Mitchell stood only to gain from having the jury properly understand the full range of mitigation it could consider. *See also* NTP 142 (counsel acknowledged she had no reasonable basis for failing to object to the instruction). Courts have consistently found that counsel's failure to ensure that the jury was properly instructed is objectively unreasonable and constitutionally deficient, particularly where, as here, the constitutionally erroneous instructions went to the heart of the jury's sentencing determination. *See, e.g., Breakiron v. Horn*, 642 F.3d 126, 137-41 (3d Cir. 2011) (counsel ineffective for failing to seek lesser-included-offense instruction that was supported by the evidence and would have negated an aggravating circumstance if found by the jury); *Everett v. Beard*, 290 F.3d 500, 514 (3d Cir. 2002) ("[C]ounsel must not neglect to suggest instructions that represent the law that would be favorable to his or her client."); *Carpenter v. Vaughn*, 296 F.3d 138, 158-59 (3d Cir. 2002) (counsel ineffective for failing to ensure that jury receive an accurate instruction on parole ineligibility).

Mr. Mitchell's case in mitigation rested on demonstrating to the jury that there were details about him as an individual – as opposed to specifics of the crime – that warranted a life sentence. The trial court's erroneous instructions deprived the jury of its opportunity to fully consider that evidence. Counsel's failure to properly object to and/or litigate the instructional errors prevented the errors from being corrected. But for trial counsel's deficient performance, there is a reasonable probability that at least one juror would have voted to impose a life sentence.

### C.     State Court Opinion

The state court's denial of Petitioner's ineffective assistance claim does not warrant AEDPA deference because the state court did not adjudicate the constitutional arguments on the merits.     Specifically, the state court failed to consider, let alone adjudicate, the federal constitutional arguments presented and instead rested its decision entirely on state-law standards. The Court, citing to its own jurisprudence, simply said "this Court has repeatedly upheld the instruction as constitutionally adequate, even after it was excised from the suggested [Pennsylvania] standard instructions." *Mitchell-3* at 1292 (citing *Commonwealth v. Simpson*, 66 A.3d 253, 378-79 (2013); *Commonwealth v. Spotz*, 18 A.3d 244, 282-83 (2011)).    The cited cases also failed to consider federal constitutional principles in upholding the improper instruction.

Because the state court failed to mention any of the federal constitutional principles implicated by this claim, the decision is not an adjudication on the merits of Mr. Mitchell's federal constitutional claim, and this Court's review is *de novo. Jacobs*, 395 F.3d at 100.

## XII.   PETITIONER IS ENTITLED TO RELIEF FROM HIS CONVICTION AND SENTENCE BECAUSE OF THE PREJUDICIAL EFFECTS OF THE CUMULATIVE ERRORS IN THIS CASE.

### A.     Information Requested by the Court

Petitioner relies upon the Sixth, Eighth and Fourteenth Amendments to the United States Constitution as bases for relief.

This claim has been exhausted in state courts. *See Mitchell-2* at 1292.

Federal review of this claim is not barred by the doctrine of *Teague v. Lane*, 489 U.S. 288 (1989).   Petitioner does not rely on a "new" constitutional rule of criminal procedure announced after the date his conviction became final. *See id.* at 310.

**B.     The Merits of the Claim**

Constitutional claims of error are to be considered cumulatively as well as individually, and cumulative error or prejudice may provide a basis for relief whether or not individual errors are sufficiently prejudicial to warrant relief. *E.g., Kyles*, 514 U.S. at 437-38; *Taylor v. Kentucky*, 436 U.S. 478, 488 (1978); *see also Williams*, 529 U.S. at 397-98 (considering cumulative prejudicial effect of unpresented mitigating evidence, evaluated in light of "the totality of the available mitigation evidence – both that adduced at trial, and the evidence adduced in the habeas proceeding"). Here, the cumulative effect of the errors described above prejudiced petitioner.

**C.     The State Court Opinion**

The Pennsylvania Supreme Court failed to address, or even mention, the constitutional dimension of Petitioner's claim, and instead summarily denied the claim on state law grounds. Accordingly, this Court's review of these federal constitutional claims is *de novo*.

To the extent that the state court adjudicated the merits of Petitioner's federal claims, its ruling is based on an unreasonable application of clearly established federal law and an unreasonable determination of the facts. The state court addressed only those claims which it denied for lack of prejudice, and asserted that those claims were "so disparate that there is no cumulative prejudice warranting relief." *Mitchell-2* at 1292. To the extent that this can be considered an adjudication on the merits of the federal constitutional claim, it is unreasonable.

As shown above, there is a strong constitutional underpinning for cumulative prejudice analysis, and this Circuit has repeatedly applied such analysis, without looking to the irrelevant factor of whether the claims are "disparate." *See, e.g., Johnson v. Folino*, 705 F.3d 117, 129 (3d Cir. 2013) ([i]ndividual items of suppressed evidence may not be material on their own, but may, in the aggregate, 'undermine[] confidence in the outcome of the trial'") (quoting *United States v. Bagley*, 473 U.S. 667, 678 (1985)); *Munchinski v. Wilson*, 694 F.3d 308, 313, 327 n. 13 (3d Cir.

2011) (affirming habeas relief on the basis of *Brady* violations, noting that the state court "failed to appreciate the aggregate impact of the withheld evidence."); *Albrecht v. Horn*, 485 F.3d 103, 139 ("We recognize that errors that individually do not warrant habeas relief may do so when combined."); *Berryman v. Morton*, 100 F.3d 1089 (3d Cir. 1996) (the cumulative effect of each instance of counsel's deficient performance was sufficiently prejudicial to require relief.).

The state court's failure to apply a cumulative error analysis because it believed that the claims were too disparate is an unreasonable application of *Strickland* and its progeny. Moreover, to the extent that "disparateness" has any relevance, several of Petitioner's claims are actually closely related and intertwined. *See, e.g.*, Claims VI-VIII, *supra*. Because the state court opinion was an unreasonable application of clearly established federal law, this Court's review is *de novo*.

# CONCLUSION

For all of the reasons set forth herein and in the Amended Petition, Petitioner respectfully requests that this Court grant him discovery and an evidentiary hearing, and that it vacate his convictions and sentences, including his sentence of death.

Respectfully Submitted,

/s/ Matthew Lawry
MATTHEW LAWRY
MICHAEL GONZALES
Assistant Federal Defenders
Federal Community Defender Office
for the Eastern District of Pennsylvania
601 Walnut Street, Suite 545 West
Philadelphia, PA 19106

ANNA AHRONHEIM
Assistant Federal Defender
Federal Public Defender for the
Western District of Pennsylvania
Capital Habeas Unit
1001 Liberty Avenue, Suite 1500
Pittsburgh, PA 15222

**CERTIFICATE OF SERVICE**

I, Matthew Lawry, Assistant Federal Defender, Federal Community Defender Office for the Eastern District of Pennsylvania, hereby certify that on April 12, 2017, I caused a copy of the foregoing Amended Petition for Writ of Habeas Corpus to be filed and served electronically through Eastern District Clerk's Office Electronic Case Filing and served by United States mail, first class, postage prepaid, on:

> Ronald Wabby, Esquire
> Office of the Allegheny County District Attorney
> 436 Grant Street
> Pittsburgh, PA 15219

/s/ Matthew Lawry
Matthew Lawry
Assistant Federal Defender