IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

_____

WAYNE MITCHELL,                          :
                                         :
                    Petitioner,          :        CIVIL ACTION NO. 2:15-1465
                                         :
            v.                           :
                                         :
JOHN E. WETZEL, Secretary,  Pennsylvania :
Department of Corrections; ROBERT        :        **THIS IS A CAPITAL CASE**.
GILMORE, Superintendent of the State     :
Correctional Institution at Greene;      :
STEPHEN A. ZAPPALA, JR., District        :
Attorney of Allegheny County; and MARK   :
GARMAN, Superintendent of the State      :
Correctional Institution at Rockview,    :
                                         :
                    Respondents.         :
_____

**REPLY IN SUPPORT OF
AMENDED PETITION FOR WRIT OF HABEAS CORPUS
BY A PRISONER IN STATE CUSTODY**

MATTHEW LAWRY                    KIRK HENDERSON
MICHAEL GONZALES                 Assistant Federal Defender
Assistant Federal Defenders      Capital Habeas Corpus Unit
Capital Habeas Corpus Unit       Office of the Federal Public Defender
Federal Community Defender Office 1450 Liberty Center
for the Eastern District of Pennsylvania  1001 Liberty Avenue
Suite 545 West                   Pittsburgh, PA  15222-3714
601 Walnut Street
Philadelphia, PA 19106

## PRELIMINARY STATEMENT

The transcripts from trial and penalty phase are consecutively numbered and cited as "NTT."  Transcripts from the post-conviction proceedings are consecutively numbered and cited as "NTP."  Transcripts from hearings on pretrial motions and jury selection were bound together and are cited as "NTJS."  Transcripts from other proceedings are cited as "NT" followed by the date and page number.  Documents in the Appendix are cited as "A" followed by the page number.

The Pennsylvania Supreme Court has issued three opinions in Petitioner's case: the first on direct appeal, *Commonwealth v. Mitchell*, 902 A.2d 430 (Pa. 2006) ("*Mitchell-1*"); the second after the initial post-conviction proceedings, *Commonwealth v. Mitchell*, 105 A.3d 1257 (Pa. 2014) ("*Mitchell-2*"); and the third following the second post-conviction proceedings. *Commonwealth v. Mitchell*, 141 A.3d 1277 (Pa. 2016) ("*Mitchell-3*").

The trial court issued two opinions regarding the post-conviction petitions: *Commonwealth v. Mitchell*, CC Nos. 199711609 et al. (Allegheny Ct. Com. Pl. July 31, 2013) ("PCRA Op.-1"); and *id.* (Allegheny Ct. Com. Pl. Dec. 10, 2015) ("PCRA Op.-2").

All other citations are either self-explanatory or will be explained.

All emphasis in this Memorandum is supplied unless otherwise indicated.

i

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ........................................................................... i

I.   PETITIONER'S WAIVER OF HIS *MIRANDA* RIGHTS WAS NOT KNOWING,
     VOLUNTARY, OR INTELLIGENT; TRIAL COUNSEL'S FAILURE TO PRESENT
     ANY EVIDENCE TO SUPPORT HIS SUPPRESSION MOTION PRE-TRIAL, OR
     TO RAISE REASONABLE DOUBT AS TO THE RELIABILITY OF THE
     CONFESSION AT TRIAL, CONSTITUTES INEFFECTIVE ASSISTANCE. ............... 1

     A.  The Merits of the Claim. ................................................................. 1

         1.  The Commonwealth's legal arguments. ................................................. 1

         2.  Ineffectiveness with respect to the motion to suppress. ........................... 2

         3.  Failure to challenge the reliability of the confession. ............................ 6

     B.  The State Court Opinions. ............................................................... 7

II.  PETITIONER WAS DEPRIVED OF HIS SIXTH AND FOURTEENTH
     AMENDMENT RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL
     WHEN HE PLED GUILTY, IN RELIANCE ON HIS ATTORNEY'S
     UNREASONABLE ADVICE, TO FELONIES THAT MADE HIM ELIGIBLE
     FOR THE DEATH PENALTY. ...................................................................... 7

III. PETITIONER'S SIXTH, EIGHTH AND FOURTEENTH AMENDMENT RIGHTS
     WERE VIOLATED WHERE TRIAL COUNSEL FAILED TO INVESTIGATE,
     DEVELOP, AND PRESENT EVIDENCE UNDERMINING THE CREDIBILITY
     OF A KEY GOVERNMENT WITNESS, SHELIA BRITTON. .................................... 11

IV.  THE COMMONWEALTH VIOLATED ITS DUE PROCESS OBLIGATIONS
     WHEN IT SUPPRESSED IMPEACHING AND EXCULPATORY EVIDENCE
     REGARDING A KEY COMMONWEALTH WITNESS, SHELIA BRITTON. ............ 17

V.   PETITIONER'S CONVICTION AND DEATH SENTENCE ARE BASED ON
     UNRELIABLE EVIDENCE, IN VIOLATION OF DUE PROCESS. ........................... 19

     A.  This Claim is Exhausted and is not Defaulted. ........................................ 19

     B.  The Merits of the Claim. ................................................................. 20

     C.  The State Court Opinion. ................................................................ 21

VI.  PETITIONER WAS DEPRIVED OF HIS RIGHT TO THE EFFECTIVE
     ASSISTANCE OF COUNSEL AT BOTH GUILT AND PENALTY PHASES
     WHERE TRIAL COUNSEL INEFFECTIVELY FAILED TO PROVIDE
     CRITICAL EVIDENCE TO THE DEFENSE PSYCHIATRIC EXPERT. ...................... 23

VII. TRIAL COUNSEL INEFFECTIVELY FAILED TO PRESENT EVIDENCE IN
     THEIR POSSESSION WHICH IRREFUTABLY ESTABLISHED THAT WAYNE
     MITCHELL HAD STRUGGLED SINCE CHILDHOOD WITH SEVERE
     ALCOHOLISM; PETITIONER WAS PREJUDICED BY COUNSEL'S
     DEFICIENT PERFORMANCE AT BOTH THE GUILT AND PENALTY PHASES... 26

VIII. TRIAL COUNSEL'S FAILURE TO TIMELY PREPARE AND TO INVESTIGATE, DEVELOP AND PRESENT CREDIBLE AND PERSUASIVE MITIGATING EVIDENCE DEPRIVED PETITIONER OF HIS CONSTITUTIONAL RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL.................................................................. 29

    A.  Merits of the Claim. ............................................................................... 29

        1. Evidence of brain damage. ..................................................... 30

        2. Evidence of family background. ............................................. 32

        3. Evidence of alcohol dependence. ........................................... 33

        4. Evidence of personality disorder. .......................................... 33

    B.  The State Court Opinion. ........................................................................ 35

IX.  THE TRIAL COURT VIOLATED DUE PROCESS AND THE EIGHTH AMENDMENT BY EXCLUDING TESTIMONY BY BEHAVIOR CLINIC EXPERTS AND USE OF THOSE EXPERTS' REPORTS BY THE DEFENSE; TRIAL COUNSEL'S FAILURES TO USE THE REPORTS AND TO OBJECT TO THE TRIAL COURT'S RULING WERE DEFICIENT PERFORMANCE THAT PREJUDICED PETITIONER AT CAPITAL SENTENCING. .......................... 36

    A.  This Claim is Exhausted and is not Defaulted. ........................................ 36

    B.  Merits of the Claim. ............................................................................... 36

    C.  The State Court Opinion. ........................................................................ 38

X.  TRIAL AND APPELLATE COUNSEL WERE INEFFECTIVE FOR FAILING TO PROPERLY RAISE AND LITIGATE THE INVALID USE OF CONVICTIONS FROM THE GUILT PHASE OF THE TRIAL TO REBUT THE EXISTENCE OF THE (E)(1) MITIGATING FACTOR, AND FOR FAILING TO RAISE AND LITIGATE THE TRIAL COURT'S FAILURE TO  INSTRUCT THE JURY TO FIND LACK OF A RECORD AS A MITIGATING CIRCUMSTANCE UNDER THE "CATCH-ALL" MITIGATING FACTOR.............................................................................................. 38

CONCLUSION.................................................................................................................... 40

**ARGUMENT**

I.   **PETITIONER'S WAIVER OF HIS *MIRANDA* RIGHTS WAS NOT KNOWING, VOLUNTARY, OR INTELLIGENT; TRIAL COUNSEL'S FAILURE TO PRESENT ANY EVIDENCE TO SUPPORT HIS SUPPRESSION MOTION PRE-TRIAL, OR TO RAISE REASONABLE DOUBT AS TO THE RELIABILITY OF THE CONFESSION AT TRIAL, CONSTITUTES INEFFECTIVE ASSISTANCE.**

The Commonwealth agrees that this claim is exhausted and not defaulted.  Com. Answer 46.  The Commonwealth does not assert any defense based on retroactivity.  Thus, the merits of this claim are properly before the Court.

A.   **The Merits of the Claim.**

Petitioner has shown in his prior submissions that trial counsel was ineffective for failing to present any of the ample available evidence showing that Mr. Mitchell's waiver of his *Miranda* rights was not knowing, voluntary, or intelligent.   Had trial counsel marshalled and presented this evidence at the suppression hearing, there is a reasonable probability that the statement would have been suppressed, establishing prejudice.  *See* Pet. Mem. 3-8.

1.   **The Commonwealth's legal arguments.**

The Commonwealth contends that the restriction on federal habeas review of Fourth Amendment claims announced in *Stone v. Powell*, 428 U.S. 465 (1976), precludes this claim altogether.  Com. Answer 46-47.  The Commonwealth errs.

This is not a Fourth Amendment claim.  The Fourth Amendment prohibits unreasonable searches and seizures.  Here, Petitioner asserts that his Sixth Amendment right to the effective assistance of trial counsel was violated when trial counsel failed to litigate his Fifth Amendment claim competently.  The restrictions on federal habeas review of Fourth Amendment claims announced in *Stone* do not extend to Sixth Amendment claims of ineffective assistance of counsel, even where the principal allegation actually is that trial counsel failed to seek suppression of evidence allegedly obtained in violation of the Fourth Amendment.  *Kimmelman*

1

*v. Morrison*, 477 U.S. 365, 368 (1986).  Nor do the restrictions announced in *Stone* apply to substantive Fifth Amendment claims.  *Withrow v. Williams*, 507 U.S. 680, 688-95 (1993).

Next, the Commonwealth, citing to the testimony of the suppression hearing's only witness, Detective Logan, argues that Mr. Mitchell cannot obtain relief because the trial record does not reveal any evidence that he did not understand his decision to waive his *Miranda* rights. *See* Com. Answer 50.  This argument misses the mark.

Petitioner does not claim that the trial court erred in denying suppression of his statement. At the suppression hearing, trial counsel presented no evidence to support the contention that Mr. Mitchell's waiver was not knowing and intelligent.  *See Mitchell-1*, 902 A.2d at 452.  As a result, the Commonwealth's evidence and arguments were left uncontested.  Counsel's ineffective failure to investigate and litigate Petitioner's Fifth Amendment rights is the focus of Petitioner's Sixth Amendment claim here.  The pertinent issues of deficient performance and prejudice cannot be determined based on the trial record alone, and the one-sidedness of the suppression proceedings renders unreliable the trial court's conclusion that Petitioner fully understood his decision to waive his *Miranda* rights.  *See Strickland v. Washington*, 466 U.S. 668, 685-86 (1984) (adversarial testing by defense counsel is one of the crucial assurances that the result of the proceeding is reliable); *United States v. Cronic*, 466 U.S. 648, 659 (1984) (if counsel entirely fails to subject the prosecution's case to meaningful adversarial testing then the truth testing process itself is presumptively unreliable).

## 2.    Ineffectiveness with respect to the motion to suppress.

On the ineffectiveness claim, the Commonwealth makes no discernible argument regarding deficient performance.  Counsel's performance was deficient for the reasons set forth in Petitioner's prior submissions.  *See* Amended Pet. 13-18; Pet. Mem. 4.  In its response, the Commonwealth focuses on attacking the credibility or probative value of the witnesses presented

by Petitioner during the post-conviction proceedings.  Com. Answer 52-59.  The Commonwealth, however, ignores much of the substantial evidence Petitioner presented to show that he was prejudiced by counsel's deficient performance.

As set forth in his prior submissions, Petitioner presented evidence of his mental and physical condition, through experts and a variety of witnesses who encountered him at various points throughout the material time frame surrounding his interrogation, in order to establish that his cognitive impairments and alcohol withdrawal rendered him incapable of waiving his *Miranda* rights.  Petitioner presented unrebutted evidence that he had a history of binge drinking followed by withdrawal.  Pet. Mem. 5.  Petitioner showed that there was substantial evidence, including from his father, Wayne Mitchell, Sr., and his uncle, Curtis Mitchell, that Petitioner drank extremely heavily the day before the offense.  *Id.* at 5-6.  The Commonwealth contends that this sworn testimony is rebutted by Petitioner's statement that he only had two drinks on the day of the offense.  Com Answer 57.  It does not explain why that unsworn and allegedly inadmissible statement should be credited over the sworn testimony of two witnesses, whose testimony is also consistent with Petitioner's history and the other witnesses discussed herein.

The Commonwealth also attempts to discredit the testimony of witnesses Brian Dallas and Rosalyn Guy-McCorkle, Esquire, who saw Petitioner close in time to the interrogation.  The Commonwealth materially understates attorney Guy-McCorkle's testimony.  The Commonwealth argues that attorney Guy-McCorkle merely testified that on September 10 Mr. Mitchell "seemed tired and was not talking much," and that on September 11, 1997, in the jail, "he seemed confused and was talking but appeared to be speaking to someone else."  Com. Answer 58 (citing NTT 456, 458-59).

As the trial and post-conviction records show, Ms. Guy-McCorkle in fact offered considerably more information that is not addressed in the Commonwealth's answer.  For example, when she interacted with Mr. Mitchell at the September 9, 1997 court proceeding, he was incoherent, speaking in illogical sentences, and unaware of what was happening except that he was getting out of jail in order to get chemical dependency treatment.  NTT 452-53.  This uncontradicted evidence about Mr. Mitchell's condition after a week in jail, without alcohol, is ignored by the Commonwealth.  Moreover, attorney Guy-McCorkle's observation that Petitioner was tired and virtually silent at the September 10, 1997 court proceedings, NTT 456, is evidence of his condition after a day and night of binge drinking and very little sleep.  And she saw him yet again in the county jail on September 11, the day after his interrogation.  At that time, Ms. Guy-McCorkle tried to discuss with him the new murder charges he was facing, but he appeared not to understand what she was talking about: "He seemed delusional.  It seemed like he had a fixation on me, and he wasn't helping me to help him, and at times I thought I was talking to him but he was talking to someone else."  NTP 98.  This was Mr. Mitchell's condition after roughly 36 hours without alcohol.

Attorney Guy-McCorkle is a uniquely valuable witness.  She is an officer of the court who, during her representation of Mr. Mitchell, made professional observations of his mental state at times material for determining how his alcohol dependence, binge drinking, and withdrawal impacted his ability to adequately waive his *Miranda* rights.  Trial counsel never informed Ms. Guy-McCorkle that she was going to be a witness for the defense.  Nor did he interview her in preparation for trial and/or pre-trial motions.  And she was subpoenaed, not by the defense, but by the Commonwealth (who ended up not calling her as a witness).  *See* NTP 96-97.  In post-conviction, she explained that she would have shared all of this information with

4

trial counsel – for example for presentation at the suppression hearing – had she ever been contacted.  NTP 102-03.  The Commonwealth does not address any of this evidence.

The Commonwealth treats Brian Dallas's testimony in similar fashion to Ms. Guy-McCorkle's.  Com. Answer 58.  Such minimization of his testimony is inappropriate.  Rarely is there a lay person who has had direct contact with an adult criminal defendant in the interview room following a custodial police interrogation.  Brian Dallas is exactly that lay witness.  His testimony is supported by contemporaneous police documentation, yet he was never contacted by trial counsel.  Nor was his post-conviction testimony impeached in any significant way.[1]  Mr. Dallas spent several minutes alone with Mr. Mitchell in the police interrogation room and testified that Mr. Mitchell's eyes were "bloodshot, red";  he was "dazed" and "out of it," "in a state of shock"; and "sobbing . . . crying . . . weeping."  He testified that he walked around the table and hugged Mr. Mitchell before he left, noticing the smell of alcohol.  NTP 542-45.

Like the state courts, the Commonwealth fails to evaluate Mr. Dallas's testimony cumulatively with all of the other evidence, as required by *Strickland*.  *See* Pet. Mem. 10.  It is reasonably likely that a court that heard attorney Guy-McCorkle and Mr. Dallas's timely observations, when viewed together and cumulatively with all of the evidence proffered in post-conviction as required by *Strickland*, would have granted the suppression motion.[2]

---

[1] Mr. Dallas also provided unrebutted testimony describing Mr. Mitchell's binge drinking during and after his brief enrollment in college in 1995.  NTP 537-40.

[2] This evidence included findings that Mr. Mitchell suffers from brain damage, has a history of binge drinking and withdrawal, and likely was in a state of withdrawal at the time of his interrogation, given the testimony of his uncle and father concerning his alcohol consumption the night before.  *See* NTP 290, 296, 306 (testimony of Dr. Crown); NTP 390-91, 399-401 (testimony of Dr. Clark).  The Commonwealth argues that this evidence is rebutted by the testimony of Detective Logan and Dr. Wright.  Com. Answer 52-56.  That testimony, however, does nothing to counter the evidence of Mr. Mitchell's history of binge drinking followed by withdrawal, or of his heavy drinking the night before the interrogation.  Moreover, Dr. Wright's

### 3.      Failure to challenge the reliability of the confession.

Petitioner also asserts in this claim that trial counsel was ineffective for failing to challenge the reliability of the confession, both to the suppression court and to the jury at trial. In part, such a challenge would have been based on the fact that the physical evidence did not support Mr. Mitchell's statement that he raped the decedent anally.  *See* NTP 493-94 (testimony of Dr. Wetli).  Trial counsel failed to introduce relevant parts of the forensic medical examination, including a negative rectal swab, that are inconsistent with Mr. Mitchell's statement.

The Commonwealth argues that since the negative rectal swab does not invalidate the *entire* confession, the confession would not have been suppressed and Petitioner is not prejudiced.  Com. Answer 60.  The Commonwealth's analysis is incomplete and wrong.[3]

Assuming arguendo that the negative swab would not have resulted in exclusion of the confession, the Commonwealth does not address the impact this evidence would have had on the jury's verdicts on the rape and IDSI charges.  *See Lego v. Twomey,* 404 U.S. 477, 486 (1972) (juries at liberty to disregard confessions that are insufficiently corroborated or otherwise deemed unworthy of belief); NTT 710-13 (trial court instructs jury that if it finds statement voluntary, it should consider facts and circumstances surrounding making of statement and other evidence in case in deciding truthfulness and probative value of statement).

---

attempt to rebut Dr. Crown's brain damage finding relies on speculation.  *See* § VIII.A.1, *infra*. And the evidence of withdrawal consists not just of Dr. Clark's testimony, but also the evidence of Mr. Mitchell's history, drinking on the night before, and the pertinent observations of Ms. Guy-McCorkle and Mr. Dallas.

[3] The Commonwealth also suggests that Dr. Wetli's testimony is rebutted by the trial testimony of Dr. Sutkin, and that it is "evident" that the court would not have credited Dr. Wetli or a similar expert.  Com. Answer 60-61.  Petitioner has already shown that Dr. Sutkin's testimony is irrelevant to the issue here.  Pet. Mem. 12.  Petitioner was prejudiced both before the court and the jury by counsel's failure to attack the reliability of the confession.

Petitioner was prejudiced both at the guilt phase and at capital sentencing by counsel's failure to challenge the voluntariness and reliability of his statement, which was critical evidence supporting the first degree murder conviction, and virtually the only evidence supporting the rape and IDSI convictions, which also supported an aggravating circumstance and were used to rebut the mitigating circumstance of no significant history of prior criminal convictions.

### B.     The State Court Opinions.

The Commonwealth quotes a portion of the state court's direct appeal opinion, in which the state court affirmed the denial of the suppression motion.  Com. Answer 62-63 (quoting *Mitchell-1*, 902 A.2d at 452).  As discussed above, the direct appeal opinion addressed a claim not presented here, and therefore is irrelevant to AEDPA review.

The Commonwealth then quotes a portion of the Pennsylvania Supreme Court's decision denying post-conviction relief and, without further analysis, declares that the decision is "not clearly contrary to federal law as determined by the Supreme Court of the United States" and was "not an unreasonable application of clearly established federal law as determined by the Supreme Court of the United States."  Com. Answer 65.  For the reasons set forth in Pet. Mem. 9-12, the state court decision is at best unreasonable.

## II.     PETITIONER WAS DEPRIVED OF HIS SIXTH AND FOURTEENTH AMENDMENT RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL WHEN HE PLED GUILTY, IN RELIANCE ON HIS ATTORNEY'S UNREASONABLE ADVICE, TO FELONIES THAT MADE HIM ELIGIBLE FOR THE DEATH PENALTY.

The Commonwealth agrees that this claim is exhausted and not defaulted.  Com. Answer 66.  The Commonwealth does not assert any defense based on retroactivity.  Thus, the merits of this claim are properly before the Court.

As set forth in Petitioner's prior submissions, attorney Harper advised Mr. Mitchell to plead guilty to the September 10 rape charge (1) without investigating potential alternative

defenses; (2) without advising Mr. Mitchell of the negative consequences of the plea; (3) based on a misunderstanding of the facts; and (4) without making any attempt to carry out the purported goal of the plea, i.e., to prevent or minimize evidence before the jury concerning the rape charge. Pet. Mem. 13-16. Based on that showing, Petitioner alleges that his plea was induced by objectively unreasonable advice, and that but for that advice he would not have pled guilty, depriving him of his right to the effective assistance of counsel. *Id.* (citing *Hill v. Lockhart*, 474 U.S. 52 (1985); *Lafler v. Cooper*, 566 U.S. 156 (2012)).

The Commonwealth responds with a laundry list of contentions that are barely relevant to the claim at issue.

1.      The Commonwealth appears to contend that Mr. Mitchell's plea was voluntary and knowing. Com. Answer 66-68. That question, however, is not at issue with regard to this ineffective assistance claim. *See* Pet. Mem. 17-18 (citing *Lafler*).

2.      The Commonwealth argues that Mr. Mitchell did not face the death penalty "solely" because of the rape conviction, in that there was also an aggravating factor based on the fact that Mr. Mitchell was subject to a PFA order. Com. Answer 69. The rape conviction, however, established a death-qualifying aggravating factor and was used to rebut the mitigating factor of no significant prior history of felony convictions. Pet. Mem. 13. Counsel's failure to advise Mr. Mitchell of these consequences of the guilty plea was deficient performance; the Commonwealth shows nothing to the contrary.[4]

3.      The Commonwealth attacks Petitioner's characterization of the evidence of rape as "weak." Com. Answer 69. Significantly, however, attorney Harper himself characterized the evidence that way both pretrial, NTJS 65-66, and in his post-conviction testimony. NTP 42.

---

[4] Because this is not a sufficiency claim, the Commonwealth's discussion of such claims, Com. Answer 69, is irrelevant.

4.      The Commonwealth discusses at some length its view of the strength of the evidence for rape and against a voluntary manslaughter defense.  Com. Answer 70-74.  There are several responses to these arguments.

First, the most pertinent question concerns trial counsel's view of the evidence.  As discussed above, trial counsel viewed the evidence of the September 10 rape as weak.  Moreover, he also believed there was a potential voluntary manslaughter defense, NTP 57-58, but simply "didn't have the guts" to present it.  *Id.* at 61-62.[5]

Second, in arguing that Mr. Mitchell's statement to the police provides sufficient evidence of rape, the Commonwealth completely ignores that the statement's details regarding the sexual assault are not corroborated by the evidence from the autopsy and forensic investigation.  For example, the Commonwealth omits from its lengthy and graphic recitation of Mr. Mitchell's statement his assertion that he ejaculated in the decedent's anus.  That statement was inconsistent with the physical evidence: the rectal swab taken during the autopsy was negative for sperm and seminal fluid.  *See* NTP 493-94 (testimony of Dr. Wetli); PCRA Ex. 35 (reports from Allegheny County Coroner's Office).

Third, the argument that the evidence of rape was sufficient misses the mark.  For purposes of an ineffectiveness claim, sufficiency of the evidence is not at issue.[6]  The question here is whether counsel reasonably investigated the rape charge and reasonably advised Mr.

---

[5] The Commonwealth is correct that Shelia Britton's statement to the police, and subsequent testimony, about phone calls from Mr. Mitchell would have been damaging to a defense of voluntary manslaughter.  This only emphasizes, however, the importance that professionally reasonable counsel would have placed on interviewing Ms. Britton before making strategic decisions about what defense to pursue.  *See* Claim III, *infra*.

[6] The fact that the evidence the Commonwealth cites all comes from Mr. Mitchell's own statement only emphasizes the importance that professionally reasonable counsel would have placed on developing evidence to support the motion to suppress that statement.  *See* Claim I, *supra*.

Mitchell concerning it, rather than whether the evidence would meet a minimum standard of sufficiency.[7]

5.      The Commonwealth posits two different strategic reasons for counsel's decision to plead guilty to the September 10 rape – to curry favor with the jury by accepting responsibility, *see* Com. Answer 66-67, and to minimize the graphic evidence regarding the September 10 rape.  Com. Answer 76.  In general, these arguments miss the mark because Petitioner has never contended that counsel had no reason at all for advising him to plead guilty to the September 10 rape.  Rather, Petitioner's contention – virtually unaddressed by the Commonwealth – is that counsel failed to investigate and prepare before making that decision, and then failed to reasonably advise Petitioner concerning the consequences of such a plea.  Pet. Mem. 13-16.

The first, "curry favor" strategy, was not endorsed by counsel in his post-conviction testimony, but rather was suggested by the trial court.  NT 2/7/00, 3-4.  The point of *Strickland* analysis, however, is to determine what counsel's perspective was at the time.  *Strickland*, 466 U.S. at 689.  The facts do not suggest counsel was following such a strategy.  Attorney Harper counseled Petitioner to plead guilty to the September 10 rape charges, but not the September 1 charges, even though Mr. Mitchell gave statements admitting both.  This undermined any

---

[7] Even if sufficiency were relevant, the cases cited by the Commonwealth in support of its argument – *Commonwealth v. Perrin*, 398 A.2d 1007 (Pa. 1979), and *Commonwealth v. Keaton*, 729 A.2d 529 (Pa. 1999) – are irrelevant.  In *Perrin*, there was no confession.  Rather, the objective forensic evidence, including a tear to the victim's rectum consistent with sexual intercourse, established the basis for the charges.  *Perrin*, 398 A.2d at 1010.  And in *Keaton*, where there was a confession, its unusual details regarding sexual asphyxiation and the tying of the victim's pant leg around her neck were corroborated by the physical evidence, where the victim was found in the exact position described.  *Keaton*, 729 A.2d at 542.  Here, the physical evidence did not establish rape or IDSI, and the confession was materially inconsistent with the physical evidence.

purported attempt to curry favor by arguing that Petitioner accepted responsibility and was remorseful.  Counsel had no explanation for the discrepancy.  NTP 45-46.

Attorney Harper did testify that he was trying to minimize the graphic evidence of rape. NTP 46.  As discussed in Pet. Mem. 13-14, however, he never tried to quash the rape charge, which would have kept out the evidence.  Rather, he relied on nothing more than a vain hope that the evidence would not come in.  There is no support in law or practice for the notion that the facts of an underlying felony would not be introduced at a trial where the prosecution seeks to prove second degree murder.  Regardless, trial counsel was *directly informed* before trial, by both the prosecution and the trial court, that the details of the rape would be presented to the jury despite the guilty plea.  *See* Com. Answer 68 (quoting NTJS 781-82).

Since trial counsel did nothing to support the motion to suppress the statement or to quash the rape charge, it was a foregone conclusion that the jury would be hearing all of those details.  Pleading guilty to these charges did not prevent the prosecution from presenting the underlying facts.  It only prevented Petitioner from defending them.

The Commonwealth quotes a portion of the Pennsylvania Supreme Court's decision denying post-conviction relief and, without further analysis, asserts that the decision was not unreasonable.  Com. Answer 76-77.  For the reasons set forth in Pet. Mem. 17-19, the state court decision is at best unreasonable.

### III.   PETITIONER'S SIXTH, EIGHTH AND FOURTEENTH AMENDMENT RIGHTS WERE VIOLATED WHERE TRIAL COUNSEL FAILED TO INVESTIGATE, DEVELOP, AND PRESENT EVIDENCE UNDERMINING THE CREDIBILITY OF A KEY GOVERNMENT WITNESS, SHELIA BRITTON.

The Commonwealth agrees that this claim is exhausted and not defaulted.  Com. Answer at 77.  The Commonwealth does not assert any defense based on retroactivity.  Thus, the merits of this claim are properly before the Court.

In his prior submissions, Petitioner showed that his trial counsel was ineffective for failing to interview the Commonwealth's star witness, Shelia Britton.  *See* Pet. Mem. 19-25. Trial counsel never sought to find out why Ms. Britton waited ten months before reporting to the police highly incriminating telephone calls that she later claimed Mr. Mitchell made to her, both shortly before Ms. Little's killing and then again shortly after the offense.  Petitioner alleged that had counsel asked Ms. Britton, he would have learned that she only remembered those purported phone calls the night after the killing, in her dreams; that she initially told police that she had no information regarding the killing; and that those dreams led her to receive mental health treatment for almost a year before going to the police.  Pet. Mem. 22; *see also* Ex. 1 (attached) (screenshot from Vista Behavioral Health Associates Inc., showing that Ms. Britton was referred to this mental health center on September 11, 1997, the morning after her dream).[8]

The Commonwealth first argues that trial counsel was not ineffective because the "decision of what theory of the case to pursue, during cross-examination, is a strategic decision." Com. Answer 78.  The decision of what theory of the case to pursue, however, is only as reasonable as the investigation supporting that decision.  *Strickland*, 466 U.S. at 690-91 ("strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.").

Here, counsel did not investigate Ms. Britton.  He admitted that he had no good reason for failing to do so, and that this was "error on his part."  *Mitchell-2*, 105 A.3d at 1276. Accordingly, his "decision" not to present a theory that he had no knowledge of – that Ms.

---

[8] The information in this screenshot is consistent with Carol Wright's declaration regarding her interview of Ms. Britton.  Wright Decl., A517-19.  Specifically, Ms. Wright reported that Ms. Britton told her that after remembering the phone calls in her dreams, "the following morning she called a mental health facility and made an appointment with a psychiatric social worker. She discussed what she remembered with the social worker."  A518-19.

Britton dreamt the phone calls – was inherently unreasonable.  *See, e.g.*, *Porter v. McCollum*, 558 U.S. 30, 40 (2009) (counsel may not "ignore[] pertinent avenues for investigation of which he should have been aware"); *Wiggins v. Smith*, 539 U.S. 510, 525 (2003) ("any reasonably competent attorney would have realized that this information was necessary to make an informed choice among possible defenses"); *Blystone v. Horn*, 664 F.3d 397, 420 (3d Cir. 2011) ("if counsel has failed to conduct a reasonable investigation to *prepare* . . ., then he cannot possibly be said to have made a reasonable decision as to what to *present* . . . .").

The Commonwealth next argues that had trial counsel impeached Ms. Britton with the information concerning her dreams, he would not also have been able to bring out favorable testimony from Ms. Britton regarding Mr. Mitchell's drug and alcohol addictions, his father's alcohol addiction, and that he sounded drunk on the night of the killing.  Com. Answer 79-80. The Commonwealth errs, because the two areas of inquiry are not mutually exclusive.

It is well understood that there are two "basic approaches" to cross-examination: eliciting favorable testimony from the witness, and conducting a "destructive" cross-examination that aims to discredit the witness or her testimony.  Thomas L. Mauet, *Fundamentals of Trial Techniques* 240 (1980).  As Mr. Mauet explains, those approaches are not mutually exclusive: "While you may utilize only one of the approaches with some witnesses, you should always consider *eliciting favorable testimony from the witness before you attempt a destructive cross-examination*."  *Id.*  Thus, if trial counsel had known that Ms. Britton first "remembered" Mr. Mitchell's alleged phone calls in her dreams, counsel could first have brought out favorable information about Mr. Mitchell's alcohol and drug addictions and his father's alcoholism, and then cross-examined Ms. Britton about her memory of the phone calls.

Moreover, even if this Court finds the two avenues of cross-examination are mutually exclusive, which it should not, that Ms. Britton dreamt of Mr. Mitchell's phone calls is actual impeachment evidence, whereas the general cross-examination related to Mr. Mitchell's drug and alcohol history did not impeach Ms. Britton.  *See Dennis v. Sec'y, Pa. Dep't of Corr.*, 834 F.3d 263, 299-300 (3d Cir. 2016) (en banc) (contrasting "limited questioning" focused on the witness's hesitation in identification with "actual impeachment").  Indeed, trial counsel testified at the PCRA hearing that had he known about Ms. Britton's dreams, it would have been the centerpiece of his cross-examination.  *See* NTP 17, 20-21, 51 (testimony of attorney Harper).

The Commonwealth next argues that counsel's failure to discover and present evidence of Ms. Britton's dreams did not prejudice Mr. Mitchell at the guilt phase because incriminating letters that he wrote Ms. Britton from prison were the most damaging evidence against him. Com. Answer 80.  The Commonwealth misses the point.  The letters suggest consciousness of guilt and could support malice (an element of third degree murder).  They do not support specific intent to kill.  The contested issue at trial was specific intent.  *See* Pet. Mem. 22-23, 30-32, 43-44 (discussing issues at trial, prosecution argument for specific intent, and defense evidence).  Ms. Britton's testimony about the phone calls directly supported the Commonwealth's case for specific intent, as the prosecution argued in closing.  *See* NTT 659-61, 666, 668-69, 671, 675 (prosecution argument for specific intent and against defense theory of diminished capacity).[9] But for counsel's failure to interview Ms. Britton and learn how she "remembered" the telephone calls, there is a reasonable probability that the jury would have rejected the Commonwealth's proof of specific intent and convicted of a lesser offense than first degree murder.

_____

[9] To this day, the Commonwealth relies on the phone calls as demonstrating specific intent.  *See* Com. Answer 72-73.

14

Moreover, even if this Court finds that trial counsel's failure to discover and present the evidence of Ms. Britton's dream memories would not have prejudiced Mr. Mitchell at the guilt phase, which it should not, there is a reasonable probability that the information relating to Ms. Britton's dreams would have caused the jury to accept Mr. Mitchell's penalty phase defense and sentence him to life imprisonment.  Pet. Mem. 24.  The Commonwealth does not respond to this argument.

The Commonwealth next argues that "[t]here is no reason to believe that had [Ms. Britton] been contacted and interviewed by defense counsel prior to trial, Ms. Britton would have provided him with the information at issue."  Com. Answer 83.  But there is reason to believe that Ms. Britton would have told counsel about her dreams – she told PCRA counsel and the state court that she would have.  *See* NTP 82 (testimony of Shelia Britton); A519 (Carol Wright Decl.).  In fact, each and every time Ms. Britton was asked why it took her ten months to go to the police with this information, she answered that she didn't remember the phone calls the next day, that she only remembered them in her sleep the next night, and that those dreams led her to counseling and after months of counseling she went to the police.  *See* A519; A544-45 (Oct. 2012 police report of Shelia Britton interview); NTP 82.

The Commonwealth points out that in her testimony Ms. Britton reaffirmed that she believed the alleged phone calls happened.  Com. Answer 85.  Regardless of whether Ms. Britton believed that the phone calls took place, the impeachment value of the evidence is that it reveals that after the killing, and after the purported phone calls, Ms. Britton did not remember those phone calls.  She only remembered them while dreaming the next night, and sought mental health treatment because of those dreams.  This information calls into question the accuracy and veracity of Ms. Britton's account of the purported calls. *See Wilson v. Beard*, 589 F.3d 651, 665

(3d Cir. 2009) (explaining petitioner was prejudiced where trial counsel failed to impeach a witness with, *inter alia*, history of mental health treatment); *Berryman v. Morton*, 100 F.3d 1098, 1098 (3d Cir. 1996) (finding prejudice where trial counsel failed to impeach witness with prior inconsistent statement).[10]

The Commonwealth also argues that Mr. Mitchell cannot establish prejudice as it relates to the specific intent element because of his abusive history with the decedent.  Com. Answer 85. Mr. Mitchell's defense at trial did not challenge his history with the decedent; instead, it focused on his voluntary intoxication on the night of the killing and offered that as a defense to first-degree murder.  The phone-calls were the lynchpin of the Commonwealth's rebuttal of Mr. Mitchell's voluntary intoxication defense.  Moreover, as explained in Petitioner's prior submissions, *see* Amended Pet. 37-38; Pet. Mem. 24 – and not rebutted by the Commonwealth – the purported phone calls were used to impeach the defense expert at the penalty phase, undermining what would otherwise have been a compelling penalty phase defense.  *See* NTP 118-20 (attorney Cribbons's testimony that as a result her "penalty phase defense ha[d] a huge hole in it").  As explained in Claim VI, *infra*, but for the impeachment of Dr. Bernstein Mr. Mitchell could have presenting a compelling case for a life sentence.  That penalty phase presentation depended on the jury believing their mental health expert, who was thoroughly impeached during the guilt phase with Ms. Britton's testimony regarding the phone calls.  If trial

---

[10] It is well understood that various factors, including experiencing a traumatic event, can cause people to confabulate false memories, which they thereafter firmly believe to be true.  *See, e.g.*, Ronald Kellogg, *Fundamentals of Cognitive Psychology* 179 (2007) (discussing confabulation of false memory as one of the possible responses to trauma); Harry N. McLean, *Once Upon a Time: A True Story of Memory, Murder, and the Law* 240 (1993) ("The experts in this field don't deny there are both true traumatic memories and false traumatic memories.  What they don't agree on is how to tell one from the other, or whether that is even possible.").

counsel had used the evidence of Ms. Britton's dream memories, there is a reasonable probability the jury would have sentenced Mr. Mitchell to life.

With respect to AEDPA analysis, the Commonwealth simply quotes a portion of the Pennsylvania Supreme Court's decision and asserts, without further analysis, that the state court's decision was not unreasonable.  Com. Answer 86-88.  For the reasons set forth in Pet. Mem. 24-26, the state court decision was at best unreasonable.

## IV.    THE COMMONWEALTH VIOLATED ITS DUE PROCESS OBLIGATIONS WHEN IT SUPPRESSED IMPEACHING AND EXCULPATORY EVIDENCE REGARDING A KEY COMMONWEALTH WITNESS, SHELIA BRITTON.

The Commonwealth agrees that this claim is exhausted and not defaulted.  Com. Answer 89.  The Commonwealth does not assert any defense based on retroactivity.  Thus, the merits of this claim are properly before the Court.

Petitioner has shown that the Commonwealth violated its obligations under *Brady v. Maryland*, 373 U.S. 83 (1963), by failing to turn over to the defense information that Shelia Britton spoke with police on the morning after Ms. Little's killing, and told them that she did not have any information related to the killing.  Pet. Mem. 26-34.

The Commonwealth argues that there is no evidence, aside from Ms. Britton's statements and testimony, to show that she spoke with police officers on the morning after the killing.  Com. Answer 91-92.  This argument fails, for several reasons.

First, Ms. Britton has consistently stated and testified that she did speak to police officers at the scene on the morning of the offense.  Even in the absence of additional evidence – but see the discussion below – the preponderance of the evidence favors her account.  The Commonwealth is ill placed to attack Ms. Britton's credibility.  As discussed in Claim III, *supra*, it relied heavily on her testimony at trial, and it continues to do so today.  *See* Com. Answer 84-85 (quoting Ms. Britton's post-conviction testimony that the phone calls took place).

17

Second, the fact that no piece of paper recording Ms. Britton's conversation with the officers has surfaced does not rebut this claim. The Commonwealth has neither attempted to refute Ms. Britton's statements and testimony that officers were present at the fire station next to the crime scene talking to people from the neighborhood, nor has it produced a single piece of paper reflecting *any* conversations between police and anybody from the neighborhood on that day. Given that there is no reason to think that the police did not have such conversations, the possibilities are: (a) the police did not record a single note concerning such conversations; (b) the police lost all such notes; (c) the police buried any notes in the homicide files, and nobody has tried very hard to find them; or (d) the Commonwealth knows about such notes but declines to produce them. Petitioner submits that both (a) and (d) are very unlikely, while (b) and (c) are quite likely. But none of these scenarios is inconsistent with Ms. Britton's account.[11]

Third, Ms. Britton's statements and testimony are corroborated by a record from Vista Behavioral Health Associates Inc. showing, consistent with her PCRA testimony, that she sought mental health treatment because she heard Mr. Mitchell's voice in her dreams the day after she initially told police that she knew nothing. *See* Ex. 1.

The Commonwealth points out that the trial prosecutor testified that he had an open file policy, and disclosed everything he was aware of with respect to Ms. Britton. Com. Answer 92. In addition to arguing that there was nothing to disclose, the Commonwealth may be suggesting that if the trial prosecutor was not aware of the evidence, there was no *Brady* violation. Such an argument would be without merit. Clearly established federal law holds that the failure to disclose favorable, material evidence violates *Brady* regardless of whether the prosecutor

---

[11] Similarly, the trial prosecutor's testimony that he was unaware of any prior contact between Ms. Britton and the police, *see* Com. Answer 91-92 (quoting NTP 166-67), does not establish that no such contact took place.

personally knows about the evidence. *Kyles v. Whitley*, 514 U.S. 419, 437-38 (1995) (*Brady* rule encompasses evidence "known only to police investigators and not to the prosecutor"; as a result, the "prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in this case, including the police."); *accord Dennis*, 834 F.3d at 284, 288.

With respect to AEDPA analysis, the Commonwealth simply quotes a portion of the Pennsylvania Supreme Court's decision and asserts, without further analysis, that the state court's decision was not unreasonable. Com. Answer 93-94. For the reasons set forth in Pet. Mem. 34, the state court decision was at best unreasonable.

## V.   PETITIONER'S CONVICTION AND DEATH SENTENCE ARE BASED ON UNRELIABLE EVIDENCE, IN VIOLATION OF DUE PROCESS.

### A.   This Claim is Exhausted and is not Defaulted.

Petitioner alleges that his conviction and death sentence are based on unreliable evidence, namely Shelia Britton's testimony regarding Mr. Mitchell's alleged phone calls on the night of the killing. Pet. Mem. 35-42. Petitioner claims that the resulting conviction and death sentence violate the due process clause of the Fifth and Fourteenth Amendments, and the heightened reliability requirement of the Eighth Amendment. *Id.* at 35-36.

The Commonwealth first argues that this claim is exhausted as to the Fifth and Fourteenth Amendment claim, but is unexhausted as to the Eighth Amendment claim. Com. Answer 95. The Eighth Amendment claim, however, like the Fifth and Fourteenth Amendment claim, was exhausted in state court.

In order to exhaust state remedies, a petitioner must "fairly present" his claims in state court. *Picard v. Connor*, 404 U.S. 270, 275 (1971). This means that the claim in federal court must be the "substantial equivalent of that presented to the state courts." *Evans v. Court of Common Pleas*, 959 F.2d 1227, 1231 (3d Cir. 1992). The exhaustion requirement is satisfied

when its purpose is fulfilled -- the state courts must simply be given "an opportunity to pass upon and correct alleged constitutional violations." *Id.* at 1230. Here, Petitioner gave the state courts the opportunity to pass upon the Eighth Amendment claim. *See Mitchell-3*, 141 A.3d at 1283 (listing as one of the questions for review: "Did the PCRA court err when it determined that the [p]etition was without merit where the after-discovered evidence entitled Mr. Mitchell to a new trial based on . . . Mr. Mitchell's Fifth, Eighth, and Fourteenth Amendment rights to due process and a verdict based on reliable evidence.").

The Commonwealth next argues that the entire claim is procedurally defaulted, that Mr. Mitchell cannot establish "cause and prejudice" or a fundamental miscarriage of justice, and therefore he cannot obtain review from this Court. Com. Answer 95. It is true that the state court ruled that the petition raising this claim was untimely. *Mitchell*-3, 141 A.3d at 1285. But Mr. Mitchell has already shown that the state court's procedural rule was not adequate, and that because the state court's procedural rule was inadequate, he is entitled to merits review in this Court. Pet. Mem. 38-41. The Commonwealth fails to address this argument in its Answer. *See* Com. Answer 94-97.[12]

## B.    The Merits of the Claim.

The Commonwealth repeats the guilt phase arguments it made with respect to Claims III and IV. Com. Answer 97-100. Thus, Mr. Mitchell relies on his rebuttal arguments in Claims III and IV, *supra*. The Commonwealth does not address Mr. Mitchell's argument that had this evidence been presented at trial, the jury would have likely accepted the defense penalty phase presentation and sentenced Mr. Mitchell to life imprisonment. Pet. Mem. 38.

---

[12] Petitioner also argued that, if necessary, he can show a fundamental miscarriage of justice that would overcome any default. Pet. Mem. 42. The Commonwealth discusses the standard for a miscarriage of justice, Com. Answer 95-96, but does not directly respond to Petitioner's showing that he satisfies that standard.

### C.     The State Court Opinion.

Finally, the Commonwealth argues that in deciding this claim, this Court should review Mr. Mitchell's initial PCRA court opinion under 28 U.S.C. § 2254(d) and (e).  Com. Answer 100-101.[13]  The Commonwealth errs for several reasons.

First, this Court does not review under § 2254(d) where the state court did not adjudicate the merits of the claim.  *Cone v. Bell*, 556 U.S. 449, 472 (2009); *see* Pet. Mem. 1-2.  As explained above, the Pennsylvania Supreme Court found this claim to be procedurally defaulted, *Mitchell-3*, 141 A.3d at 1285, and thus did not rule on the merits.  Accordingly, review of this claim is de novo.

Second, if there were to be any review under § 2254(d), it would not be of the initial PCRA court decision cited by the Commonwealth.  That PCRA court decision was superseded by *Mitchell-2*, which is the last reasoned decision regarding the claims presented in the initial PCRA proceedings.  *Simmons v. Beard*, 590 F.3d 223, 231-32 (3d Cir. 2009) (reviewing state supreme court decision under § 2254(d), rather than PCRA court decision).  More fundamentally, neither the PCRA court nor *Mitchell-2* reviewed or adjudicated the claim presented here as Claim V.  Thus, the last reasoned decision on Claim V was the decision in *Mitchell-3*, which rejected the claim on procedural grounds, not on the merits.

Third, while the § 2254(e) presumption of correctness does apply to "factual determinations of both state trial and appellate courts," *Lewis*, 581 F.3d at 111, it "applies only to state court determinations of historical facts."  *McGhee v. Yukins*, 229 F.3d 506, 513 (6th Cir.

---

[13] The Commonwealth says that this Court must "apply the presumption of correctness regarding factual and legal conclusions reached by the state courts" under 28 U.S.C. § 2254 (d) and (e). Com. Answer 100.  This erroneously conflates the § 2254(e)(1) "presumption of correctness," which applies only to state court fact determinations, *see Lewis v. Horn*, 581 F.3d 92, 111 (3d Cir. 2009), with contrary to/reasonableness review under § 2254(d), which applies only to state court adjudications of the merits of a claim.  *Simmons v. Beard*, 590 F.3d 223, 232 (3d Cir. 2009).

2000).  It does not apply to state court legal conclusions or applications of the law to the facts.

*See Williams v. Taylor*, 529 U.S. 362, 409 (2000) (O'Connor, J., concurring) (§ 2254(d) applies

when petitioner shows that state court "unreasonably applie[d] the law of this Court to the facts

of the petitioner's case"); *accord Blystone*, 664 F.3d at 417.  Accordingly, § 2254(e)(1) does not

apply to the PCRA court's ruling about prejudice, PCRA Op.-1 at 53 (quoted in Com. Answer

100), because that ruling was a legal conclusion regarding prejudice rather than a finding of fact.

*See McGhee*, 229 F.3d at 513 (prejudice question "is a mixed question of fact and law to which

the [§ 2254(e)(1)] presumption does not apply.").  Thus, the PCRA ruling cited by the

Commonwealth is neither entitled to deferential review nor to a presumption of correctness.

Should this Court nevertheless (erroneously) treat the PCRA court's ruling cited by the

Commonwealth as making findings of fact, Mr. Mitchell can rebut those findings by clear and

convincing evidence.  The PCRA court ruled that: (1) there was no evidence presented that

undermined Ms. Britton's credibility or testimony regarding the phone calls; and (2) the only

evidence at the hearing regarding the substance of her testimony about those phone calls "was

that her recollections and her testimony were true and she reaffirmed it."  Com. Answer 100

(quoting PCRA Op.-1 at 53).

Those rulings are clearly rebutted by the record.  The fact that Ms. Britton "remembered"

the phone calls in a dream inherently calls the credibility of her account of those calls into

question.[14]  Armed with Ms. Britton's post-trial statements, trial counsel would have been able to

discredit her testimony, as trial counsel testified.  *See* NTP 17, 20-21, 51.  The mental health

---

[14] For somewhat similar reasons, even courts that allow hypnotically-induced or refreshed
testimony acknowledge that it creates serious credibility concerns.  *See, e.g.*, *Rock v. Arkansas*,
483 U.S. 44, 60-61 (discussing credibility concerns raised by post-hypnosis testimony); *United
States v. D.W.B.*, 74 M.J. 630, 643-44 (N-M. Ct. Crim. App. 2015) (affirming exclusion of
hypnotically induced testimony under totality of circumstances approach).

experts also agreed that the post-trial statements cast great doubt on Ms. Britton's trial testimony. Dr. Bernstein testified that if he had had the post-trial statements, he would have found Ms. Britton's trial testimony about the phone conversations highly questionable.  NTP 194-95.  The Commonwealth's expert, Dr. Bruce Wright, agreed.  NTP 637.  Specifically, Dr. Wright testified that Ms. Britton's October 3, 2012 statement "kind of says it was a dream" when she "remembered" the phone conversations.  *Id.* at 637, 642.

Given this evidence and the inherent problems with the credibility of "memories" that were only accessed after the subject dreamed them, and only reported after months of additional therapy, Petitioner has rebutted any presumption of correctness that might attach to the PCRA court's ruling.

## VI. PETITIONER WAS DEPRIVED OF HIS RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL AT BOTH GUILT AND PENALTY PHASES WHERE TRIAL COUNSEL INEFFECTIVELY FAILED TO PROVIDE CRITICAL EVIDENCE TO THE DEFENSE PSYCHIATRIC EXPERT.

The Commonwealth agrees that this claim is exhausted and not defaulted.  Com. Answer at 101.  The Commonwealth does not assert any defense based on retroactivity.  Thus, the merits of this claim are properly before the Court.

As to the merits, the Commonwealth makes no discernible attempt to defend trial counsel's failure to provide Dr. Bernstein with the materials referred to in Pet. Mem. as the "Britton and Little documents."  *See* Pet. Mem. 43-44.  As shown in Pet. Mem. 43-45, and as found by the PCRA court, *see* PCRA Op.-1, 62, counsel's performance was deficient.

With respect to prejudice, the Commonwealth appears to argue (a) that Dr. Bernstein's trial testimony in general supported the diminished capacity defense; (b) that when confronted with the Britton and Little documents on cross-examination, Dr. Bernstein indicated that they did not change his opinion; and (c) that the focus of the cross-examination was on purported conflict

23

between Dr. Bernstein's conclusions and the St. Francis Hospital records, as opposed to the Britton and Little documents.  Com. Answer 102-07.  None of these arguments defeat Mr. Mitchell's showing of prejudice.[15]

First, the fact that Dr. Bernstein's testimony – if believed by the jurors – was favorable to the defense does not mean that counsel's professionally deficient failure to provide Dr. Bernstein with the Britton and Little documents did not prejudice Mr. Mitchell.  As always, the prejudice question is whether, but for counsel's deficient performance, there is a reasonable probability that the outcome would have been different.  *Strickland*, 466 U.S. at 694.  Specifically, if, but for counsel's deficient performance, there is a reasonable probability that an expert's testimony "would have instilled in the jury a reasonable doubt . . ., then [the petitioner] was prejudiced by his lawyer's deficient performance and is entitled to a new trial."  *Hinton v. Alabama*, 134 S. Ct. 1081, 1089-90 (2014).  To determine whether Mr. Mitchell was prejudiced by counsel's deficient performance, it is necessary to assess the likely effect on the outcome of counsel's failure to provide the Britton and Little documents to Dr. Bernstein.

Second, the fact that -- when confronted to his surprise with the Britton and Little documents -- Dr. Bernstein maintained that those documents did not change his opinion also does not defeat Mr. Mitchell's showing of prejudice.  In the post-conviction proceedings, every witness who had been present at trial testified that impeachment with the Britton and Little documents was devastating to Dr. Bernstein's credibility.  *See* Pet. Mem. 45-46 (citing testimony of trial counsel Harper; penalty phase counsel Cribbins; and Dr. Bernstein).  Moreover, in his closing argument, the prosecutor focused on this aspect of the impeachment of Dr. Bernstein.

---

[15] None of the Commonwealth's arguments specifically address Mr. Mitchell's showing of prejudice with respect to capital sentencing.  For the reasons set forth in Pet. Mem. 47-48, Mr. Mitchell was prejudiced at penalty phase.

*See* NTT 655 (after criticizing Dr. Bernstein's failure to review the Britton and Little documents, prosecutor says, "That is not an evaluation.  That is not an opinion . . . that is worthy of your consideration and belief."); *id.* at 656-67 (prosecutor argues that if Dr. Bernstein was making an honest evaluation, "Why didn't he look at Robin Little's journal?"); *id.* at 659 (after describing Britton's police report, asks, "Where is that factored into Dr. Bernstein's opinion?"); *id.* at 660-61 (argues that "any bona fide psychiatric opinion would take into account" the Britton and Little documents).[16]

Third, the testimony of the post-conviction witnesses and the trial prosecutor's closing argument belie the Commonwealth's contention that impeachment of Dr. Bernstein with the Britton and Little documents was unimportant.  All of the persons who were in the best position to judge the effect of the cross-examination of Dr. Bernstein have made clear, either through testimony (attorneys Harper and Cribbins, Dr. Bernstein) or through conduct (the trial prosecutor's closing argument) that they considered the impeachment with the Britton and Little documents to be devastating to Dr. Bernstein.

It was counsel's deficient performance that exposed Dr. Bernstein to such withering impeachment.  For the reasons set forth in Pet. Mem. 45-48, it is reasonably likely that but for counsel's deficient performance the outcome would have been different, either at the guilt/innocence phase or at the penalty phase of trial.

---

[16] In determining whether a petitioner was prejudiced by counsel's omissions, it is appropriate to consider the way in which the prosecutor argued the case.  After all, the trial prosecutor presumably emphasized those aspects of the evidence that were most supportive of the prosecution case and that most strongly rebutted the defense case.  *See Kyles*, 514 U.S. at 444 (in deciding materiality under *Brady*, which is same standard as prejudice under *Strickland*, the "likely damage . . . is best understood by taking the word of the prosecutor"); *Dennis*, 834 F.3d at 293-94 (same).

With respect to AEDPA analysis, the Commonwealth simply quotes a portion of the Pennsylvania Supreme Court's decision and asserts, without further analysis, that the state court's decision was not unreasonable. Com. Answer 107-10. For the reasons set forth in Pet. Mem. 48-54, the state court decision was at best unreasonable.

## VII.  TRIAL COUNSEL INEFFECTIVELY FAILED TO PRESENT EVIDENCE IN THEIR POSSESSION WHICH IRREFUTABLY ESTABLISHED THAT WAYNE MITCHELL HAD STRUGGLED SINCE CHILDHOOD WITH SEVERE ALCOHOLISM; PETITIONER WAS PREJUDICED BY COUNSEL'S DEFICIENT PERFORMANCE AT BOTH THE GUILT AND PENALTY PHASES.

The Commonwealth agrees that this claim is exhausted and not defaulted. Com. Answer 110. The Commonwealth does not assert any defense based on retroactivity. Thus, the merits of this claim are properly before the Court.

The Commonwealth makes no meaningful defense of counsel's performance. With respect to prejudice at the guilt phase of the case, the Commonwealth summarizes Dr. Bernstein's testimony and asserts that Petitioner was not prejudiced because the proffered evidence is supposedly "largely cumulative of the testimony presented" at trial. Com. Answer 116. The Commonwealth errs.

As shown throughout, counsel's lack of preparation was abysmal. One aspect of counsel's failure to prepare was counsel's failure to obtain the St. Francis records and provide them to Dr. Bernstein until the eve of trial. A508. Counsel also completely failed to discuss the St. Francis records with Dr. Bernstein. NTP 188, 210-11. The St. Francis records were voluminous, *see* A001-444, which meant counsel needed time to consider their significance and prepare with his expert to present the relevant evidence and defend against cross-examination, and to rebut any impeachment. The St. Francis records were important for at least three reasons: (a) they document the family history of alcohol abuse and dependence, and prove that Mr.

Mitchell was alcohol dependent by age 14; (b) as such, they support Dr. Bernstein's opinion that Mr. Mitchell's long term alcohol abuse contributed to impair his capacity to form specific intent, NTT 548-51, 556-57; and (c) some individual items could be picked from the voluminous records to make Mr. Mitchell's impairments look less severe – which is what the prosecution did during its cross-examination of Dr. Bernstein.  *See, e.g.*, NTT 569-76, 580-84.

Counsel's failure to prepare to counter the use of selected items from the St. Francis records to impeach Dr. Bernstein amounted to deficient performance.  The state court ruled that Dr. Bernstein's "credibility was called into question on cross-examination primarily based on discrepancies between his opinion and the medical forms he reviewed from St. Francis Hospital."  *Mitchell-2*, 105 A.3d at 1283.[17]  The Commonwealth nevertheless argues that the impeachment of Dr. Bernstein's credibility does not matter, for prejudice purposes, because his testimony covered the same topic as the post-conviction evidence presented by Petitioner, which therefore was "largely cumulative."  Com. Answer 116.

It is inaccurate to describe the post-conviction evidence as cumulative.  At trial, the Commonwealth hotly contested whether the St. Francis records supported Dr. Bernstein's finding that Mr. Mitchell suffered from serious and debilitating alcoholism by the time he was fourteen.  *See, e.g.*, NTT 569-70 (cross-examination with notes suggesting Mr. Mitchell was violent at fourteen and had conduct disorder); NTT 574-75 (cross-examination with entries suggesting Mr. Mitchell was drinking modest amounts at fourteen); *Mitchell-1*, 902 A.2d at 447-48 (discussing impeachment of Dr. Bernstein with St. Francis records).  Given that it was contested at trial whether Mr. Mitchell suffered from alcoholism by age fourteen, the post-

---

[17] In Claim VI, *supra*, we show that the St. Francis records were not necessarily the primary focus of the impeachment, but there is no question that the Commonwealth did impeach Dr. Bernstein with the St. Francis records – even though those records as a whole support Dr. Bernstein.

conviction evidence proving that fact was not cumulative of the trial evidence.  As the Seventh

Circuit recently explained:

> Evidence is cumulative when it goes to prove what has already been established
> by other evidence. . . .  Evidence that provides corroborating support to one side's
> sole witness on a central and hotly contested factual issue cannot reasonably be
> described as cumulative.

*Mosley v. Atchison*, 689 F.3d 838, 848 (7th Cir. 2012) (citations and internal quotation marks

omitted).

Moreover, as discussed in Claim VI, *supra*, the Commonwealth's argument is virtually

identical to one that the Supreme Court rejected in *Hinton*.  There, the state argued that there was

no prejudice because the unqualified expert presented by counsel "said all that Hinton could have

hoped for from a toolmark expert: that the bullets used in the crimes could not have been fired

from the Hinton revolver."  *Hinton*, 134 S. Ct. at 1089.  But the Supreme Court emphatically

rejected the state's argument:

> It is true that [the expert's] testimony would have done Hinton a lot of good *if the
> jury had believed it*.  But the jury did not believe [the expert].  And if there is a
> reasonable probability that Hinton's attorney would have [presented evidence
> that] would have instilled in the jury a reasonable doubt as to Hinton's guilt had
> the attorney [performed reasonably], then Hinton was prejudiced by his lawyer's
> deficient performance and is entitled to a new trial.

*Id.* at 1089-90 (emphasis original).

Here, Mr. Mitchell showed that, had counsel performed reasonably, counsel could have

conclusively proved that Mr. Mitchell was an alcoholic from a very young age, whose drinking

had caused serious liver damage by the time he was 14 years old.  At trial, the Commonwealth

contested the defense's attempt to prove that fact, and succeeded in using some of the records

that should have proved that fact to discredit Dr. Bernstein, and with him the entire defense case.

In these circumstances, Mr. Mitchell was prejudiced.

The Commonwealth makes almost the same prejudice argument with respect to the penalty phase.  Com. Answer 114-16.  To establish penalty phase prejudice, Petitioner need only show that but for counsel's deficient performance it is reasonably likely that one juror would have voted for a life sentence.  *See Wiggins*, 539 U.S. at 537.  For the reasons set forth above and in Pet's Mem. 57-58, Petitioner readily meets that low burden.

With respect to AEDPA analysis, the Commonwealth simply quotes a portion of the Pennsylvania Supreme Court's decision and asserts, without further analysis, that the state court's decision was not unreasonable.  Com. Answer 116-17.  For the reasons set forth in Pet. Mem. 58-60, the state court decision was at best unreasonable.

## VIII. TRIAL COUNSEL'S FAILURE TO TIMELY PREPARE AND TO INVESTIGATE, DEVELOP AND PRESENT CREDIBLE AND PERSUASIVE MITIGATING EVIDENCE DEPRIVED PETITIONER OF HIS CONSTITUTIONAL RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL.

The Commonwealth agrees that this claim is exhausted and not defaulted.  Com. Answer 118.  The Commonwealth does not assert any defense based on retroactivity.  Thus, the merits of this claim are properly before the Court.

### A.    Merits of the Claim.

The Commonwealth's argument focuses on the assertion that the post-conviction evidence was supposedly cumulative of the mitigation presented at trial, and therefore that Petitioner was not prejudiced.  The Commonwealth makes no attempt to refute Petitioner's showing that penalty phase counsel's performance was deficient, in that she failed to hire a separate penalty phase expert after trial counsel decided to present Dr. Bernstein at trial; did not ask Dr. Bernstein to conduct a full mitigation work-up; and relied on trial counsel to send relevant records and materials to Dr. Bernstein, even though she knew Dr. Bernstein needed more information for purposes of mitigation, including to make an Axis II diagnosis.  Nor did

counsel arrange for a neuropsychological evaluation, or take any action to ensure presentation of credible mental health expert testimony at penalty phase after Dr. Bernstein's credibility was destroyed at trial.  Pet. Mem. 61-63.  Petitioner's showing of deficient performance is thus unrebutted.

Regarding prejudice, the Commonwealth's arguments fail for reasons similar to those discussed with respect to Claims VI and VII, *supra*.  At bottom, the Commonwealth's argument is that there is no prejudice because family members provided some mitigating information about Mr. Mitchell's life history, and because Dr. Bernstein testified about the mitigating effects of that history, Mr. Mitchell's problems with alcohol, and possible brain damage.  The Supreme Court, however, has "never limited the prejudice inquiry under *Strickland* to cases in which there was only 'little or no mitigation evidence' presented."  *Sears v. Upton*, 130 S. Ct. 3259, 3266 (2010).

Below, we discuss specific mitigation that penalty phase counsel was unable to present because of her deficient performance.  Here, we note that Dr. Bernstein's credibility was destroyed at trial, and penalty phase counsel knew that his credibility had been destroyed, yet counsel neither did anything to rehabilitate him nor obtained another expert.  The assertion that because Dr. Bernstein gave potentially favorable testimony about a topic, Petitioner was not prejudiced, is inconsistent with, inter alia, the Supreme Court's decision in *Hinton*, 134 S. Ct. at 1089.  *See* Claim VII, *supra*; Pet. Mem. 71.

### 1.    Evidence of brain damage.

The Commonwealth contends that Petitioner was not prejudiced by counsel's failure to obtain neuropsychological testing "[b]ecause petitioner cannot establish through the testimony offered that he was suffering from organic brain damage at the time of the incident . . . ."  Com. Answer 122.  The Commonwealth errs.

Mr. Mitchell presented testimony from a neuropsychologist, Dr. Barry Crown, that he suffers now, and suffered at the time of the offense, from organic brain damage.  NTP 290, 293, 297-99, 305-06.  The Commonwealth's expert, Dr. Wright, testified that Dr. Moran's testing showed that Mr. Mitchell did not show cognitive impairment in 1997, and suggested that Mr. Mitchell could have incurred head injuries or other forms of trauma that resulted in brain damage between 1997 and 2012, when Dr. Crown found brain damage.  NTP 602-03.  It is true that there is a conflict between the experts on this point.  Neither legally nor factually, however, does this conflict prevent Petitioner from establishing prejudice.

Legally, in order to show prejudice Petitioner is not required to "establish" to some degree of proof that he suffered from brain damage in 1997.  Prejudice requires a showing that it is reasonably likely that at least one juror would have voted for a life sentence if the post-conviction testimony had been presented at trial.  *Wiggins*, 539 U.S. at 537; *see* Pet. Mem. 64.  Even though mental health evidence is contested by the Commonwealth, it still may satisfy this standard.  *See Porter*, 558 U.S. at 43 (finding prejudice from defense expert's testimony "regarding the existence of a brain abnormality and cognitive defects," even though "the State's experts identified perceived problems with the tests that [the defense expert] used and the conclusions he drew from them"); *see also* Pet. Mem. 67 & n.10.

Factually, there was a substantial amount of evidence presented that Mr. Mitchell already suffered from brain damage in 1997.  First, Dr. Bernstein so testified at trial based on his evaluation and Mr. Mitchell's history.  NTT 800-06.  Second, Dr. Crown testified that Dr. Moran's report of his pretrial evaluation was in fact consistent with brain damage.  NTP 305.  Third, Mr. Mitchell's history of early alcohol abuse and head injuries was of a type capable of causing brain damage.  NTP 293-94, 303-04.  Fourth, there was no known indication of any

injury occurring between trial and Dr. Crown's evaluation (a time during which Mr. Mitchell was incarcerated without access to alcohol and when any serious head injury would have been reported).  NTP 303-06.  In the face of this evidence, and with no actual evidence of any head injuries after 1997, Dr. Wright's testimony about a possible post-1997 injury was no more than speculation.

### 2.     Evidence of family background.

Penalty phase counsel presented some evidence of Mr. Mitchell's family background, primarily from his mother.  The trial prosecutor characterized this as evidence that Mr. Mitchell "had less than perfect and not a good home life . . . ."  NTT 887.  In post-conviction, Petitioner presented evidence from numerous witnesses, corroborated by mental health records, that Mr. Mitchell's parents and most of his relatives on both sides of his family were heavy drinkers if not alcoholics; that he was neglected and abused by his parents; and subsequently was abandoned by them.  *See* Amended Pet. 70-71.  Dr. Dudley testified that as a result Mr. Mitchell developed serious attachment difficulties in his childhood years, consistent with his subsequent diagnosis of borderline personality disorder.  NTP 236-37.

The Commonwealth now argues that this evidence is cumulative of testimony from Mr. Mitchell's mother "that he was raised in a dysfunctional home by alcoholic parents who frequently fought with each other," from which "it is likely the jury presumed neglect."  Com. Answer 125.  The Commonwealth's argument fails.

As discussed above, evidence is cumulative "when it goes to prove what has already been established by other evidence."  *Mosley*, 689 F.3d at 848.  The post-conviction evidence proved actual neglect and abandonment of Mr. Mitchell by his parents, which was sufficiently damaging to him to result in attachment difficulties and to contribute to a personality disorder (as well as to his alcoholism).  The penalty phase evidence did not prove any of this.  It came from a single

witness (Mr. Mitchell's mother) who had an obvious bias because she did not want her son to be sentenced to death.  Moreover, it only hinted at neglect.  The Commonwealth's suggestion that the jury presumed or inferred neglect is entirely speculative, because the jury did not find neglect – or any other mitigating circumstance – to have been proven by a preponderance of the evidence.  Because the jury did not find any of the evidence presented at trial to have established any family history mitigation, the post-conviction evidence is not cumulative.

### 3.     Evidence of alcohol dependence.

The Commonwealth does not separately respond to Petitioner's assertion that he was prejudiced by counsel's failure to present convincing, documented evidence of his alcohol dependence.  Pet. Mem. 72.  To the extent that the Commonwealth relies on its answer with respect to Claims VI and VII, Petitioner was prejudiced for the reasons set forth therein.  In addition, this Court must consider the prejudice from counsel's failures with respect to the evidence of alcohol dependence together with the prejudice from counsel's other failures.  *See Williams*, 529 U.S. at 397-98 (court reviewing prejudice must "evaluate the totality of the available mitigation evidence – both that adduced at trial, and the evidence adduced in the [post-conviction] proceeding [– and] reweigh[] it against the evidence in aggravation."); *accord Sears*, 130 S. Ct. at 3266-67 (quoting *Porter*, 558 U.S. at 41); *see Daniel v. Comm'r, Ala. Dep't of Corr.*, 822 F.3d 1248, 1277-78 (11th Cir. 2016) (unreasonable for state court to analyze separately prejudice from each deficient performance allegation).

### 4.     Evidence of personality disorder.

The Commonwealth argues that it is unlikely that evidence of a personality disorder would have altered the outcome.  Com. Answer 126-27.  The Commonwealth's analysis is faulty, for several reasons.

First, as discussed above, prejudice analysis must consider the "totality of the available mitigation evidence."  By itself, a personality disorder might not tip the balance.  Together with the other evidence that counsel either failed to present at all or failed to present in a professionally reasonable manner, however, the personality disorder – which can be traced to the neglect and abandonment of Mr. Mitchell by his parents – could well have resulted in a life sentence.

Second, the existence of a personality disorder is not now in question.[18]  Commonwealth expert Dr. Wright agreed with Dr. Dudley that Mr. Mitchell suffers from a personality disorder, that such disorders are debilitating, and that "childhood abuse does increase the risk of developing a personality disorder."  NTP 573, 619-20, 623.

Third, Petitioner certainly presented evidence from which a jury could find that he suffered at the time of the offense from a borderline personality disorder.  That disorder and its causes and consequences constitute powerful mitigation, as Dr. Dudley explained:

> [C]linicians would consider it one of the more severe personality disorders because of the fact that it's characterized by such instability in such major areas of important functioning, and also because when individuals who suffer from this personality disorder are really stressed out, they can deteriorate even further and have transient episodes of disassociation or transient episodes of psychosis . . . .
>
> . . . .
>
> What you see in these individuals is a history much like Mr. Mitchell's of attachment difficulties, neglect, abandonment, instability in parenting figures.  In other words, the opposite of the kinds of things you need to be able to develop healthy relationships during your adult life.

---

[18] The Commonwealth points out that Dr. Dudley agreed that some mental health reports issued close in time to the offense did not diagnose a *borderline* personality disorder.  Com. Answer 126 (citing NTP 278).  But Dr. Moran did diagnose a personality disorder, *see* A498, and Dr. Dudley testified that Dr. Moran reported symptoms and testing that were consistent with and supported Dr. Dudley's borderline personality diagnosis.  NTP 248-51.

So instead individuals with borderline personality disorder have very unstable relationships, they are unstable in the sense of they are always concerned about being left, about being abandoned.  The object of that relationship can be one day thought to be the most wonderful person in the world, and the next day thought to be the most horrible person.  So all of these factors go together are a product of that history to result in these very unstable relationships.

. . . .

Similarly, people who suffer from borderline personality disorder have instability in their sense of self.  What I mean by that is that too is all over the place.  From when they feel empty to times that they feel good, it is just all over.  They can be self-destructive, they could hurt themselves, do negative things for themselves, all of that.

Again, that grows out of the same sort of history that Mr. Mitchell has.  He never had the kind of support and nurture that eventually becomes internalized into one's own positive sense of self-esteem, and so that as a result he has this very unstable sense of himself that vacillates as well.

The people who suffer from borderline personality disorder have what we call the reactivity of mood. . . .  [T]his reactivity, becoming very distressed and depressed in response to events in his life has characterized his life from the time he was a teenager.

There is impulsivity that is often associated with this as well, a characteristic of this disorder.  He has demonstrated that as well.

NTP 242, 244-46.

### B.     The State Court Opinion.

With respect to the state court decision, the Commonwealth simply quotes a portion of the Pennsylvania Supreme Court's decision and asserts, without further analysis, that the state court's decision was not unreasonable.  Com. Answer 127-29.  For the reasons set forth in Pet. Mem. 70-74, the state court decision was at best unreasonable.

IX.   **THE TRIAL COURT VIOLATED DUE PROCESS AND THE EIGHTH AMENDMENT BY EXCLUDING TESTIMONY BY BEHAVIOR CLINIC EXPERTS AND USE OF THOSE EXPERTS' REPORTS BY THE DEFENSE; TRIAL COUNSEL'S FAILURES TO USE THE REPORTS AND TO OBJECT TO THE TRIAL COURT'S RULING WERE DEFICIENT PERFORMANCE THAT PREJUDICED PETITIONER AT CAPITAL SENTENCING.**

A.   **This Claim is Exhausted and is not Defaulted.**

The Commonwealth agrees that the claim is exhausted.  Com. Answer 130.  It argues that the substantive claim is defaulted because it was not raised on direct appeal.  *Id.*  On a showing that counsel was ineffective, there is cause and prejudice for the default.  *Coleman v. Thompson*, 501 U.S. 722, 753-54 (1991).  Thus, the primary claim before the court is the ineffective assistance claim, which is exhausted and not defaulted.

The Commonwealth argues that this is a claim about, or decided by the state court as a matter of, state evidentiary law.  Com. Answer 130.  That is certainly not true as to the ineffective assistance claim, which the Commonwealth itself says was decided on the merits.  *Id.* at 139-40.  Nor is it true as to the substantive due process/Eighth Amendment claim.  It is not clear what the basis in state law of the trial court's ruling was, but Petitioner's substantive claim is *not* that the trial court erred as a matter of state law.  Rather, it is that the trial court's ruling violated the Eighth and Fourteenth Amendments to the Constitution.  *See* Amended Pet. 79-81; Pet. Mem. 75.  To the extent that the state court decided that issue, its ruling was not "independent" of federal law.  Consequently, the claim is properly before this Court.

B.   **Merits of the Claim.**

With respect to the ineffective assistance claim, the Commonwealth argues (1) that counsels' performance was not deficient because they had strategic reasons for not objecting to exclusion of the reports; and (2) that there is no prejudice because the proffered evidence is cumulative.  Com. Answer 134.  Neither argument has merit.

The Commonwealth summarizes its deficient performance argument as follows: "Each of these reports clearly contain[s] information and assessments that could be considered detrimental to petitioner's position during both phases of the trial."  Com. Answer 136.  The reports may have contained some detrimental information, but they certainly also contained helpful evidence, particularly with respect to the penalty phase.  *See* Pet. Mem. 77 (discussing reports as they related to the post-conviction testimony of Drs. Dudley and Fox).

There is no question that both trial and penalty phase counsel had strategic decisions to make about the reports; Petitioner's claim is that neither counsel conducted a reasonable investigation before making those strategic decisions.  The Commonwealth does not address that claim.  For example, Petitioner has shown that trial counsel never discussed the matter with Dr. Bernstein, and that if asked Dr. Bernstein would have advised counsel that the reports would be helpful at both phases of the trial.  Pet. Mem. 76.  Petitioner has also shown that attorney Harper admitted that he made decisions about the guilt phase defense not on the basis of Mr. Mitchell's interests, but on the basis of "CYA."  *Id.* at 76-77.  The Commonwealth ignores this evidence of deficient performance.

Penalty phase counsel similarly failed to consult with Dr. Bernstein or with another mental health expert.  Attorney Cribbins admitted that she had no reasonable basis for failing to ask the trial court to allow use of the reports at penalty phase.  NTP 128-29.  This testimony rebuts the Commonwealth's deficient performance argument.

As to prejudice, the Commonwealth minimizes the mitigating value of the excluded reports, and asserts that they are cumulative of evidence offered at trial.  Com. Answer 137-38.  For reasons that by now should be familiar, the Commonwealth errs.  As discussed in Claim VIII, *supra*, the mitigating value of evidence of personality disorder is significant, the pretrial

37

experts all also found alcohol dependence, and Dr. Martone found remorse.  Dr. Bernstein did

not diagnose a personality disorder, and did not testify as to remorse.  Even to the extent that the

pretrial expert reports overlapped with Dr. Bernstein, they are not "cumulative" of his testimony,

because his credibility was strongly attacked by the prosecution, and because the pretrial experts

were neutral and disinterested, and saw Mr. Mitchell close in time to the offense.  *See* Pet. Mem.

77-78.

> C.      **The State Court Opinion.**

With respect to the state court decision, the Commonwealth simply quotes a portion of

the Pennsylvania Supreme Court's decision and asserts, without further analysis, that the state

court's decision was not unreasonable.  Com. Answer 138-41.  For the reasons set forth in Pet.

Mem. 78-80, the state court decision was at best unreasonable.

**X.      TRIAL AND APPELLATE COUNSEL WERE INEFFECTIVE FOR FAILING TO PROPERLY RAISE AND LITIGATE THE INVALID USE OF CONVICTIONS FROM THE GUILT PHASE OF THE TRIAL TO REBUT THE EXISTENCE OF THE (E)(1) MITIGATING FACTOR, AND FOR FAILING TO RAISE AND LITIGATE THE TRIAL COURT'S FAILURE TO  INSTRUCT THE JURY TO FIND LACK OF A RECORD AS A MITIGATING CIRCUMSTANCE UNDER THE "CATCH-ALL" MITIGATING FACTOR.**

The Commonwealth agrees that this claim is exhausted and not defaulted.  Com. Answer

141.  The Commonwealth does not assert any defense based on retroactivity.  Thus, the merits of

this claim are properly before the Court.

On the merits, the Commonwealth misunderstands Petitioner's claim.  Prior to penalty

phase, defense counsel and the prosecution stipulated that Mr. Mitchell had "no prior criminal

history," NTT 728-29, i.e., no criminal convictions prior to September 1, 1997.  At penalty

phase, the prosecutor was allowed to argue that the September 1 and September 10 rape

convictions rebutted the "no prior criminal history" aggravating factor under 42 Pa. C.S. §

9545(e)(1).  The defense argued that this argument was improper and inconsistent with the

stipulation, but the trial court overruled the objection.  On appeal, the Pennsylvania Supreme

Court affirmed.  *Mitchell-1*, 902 A.2d at 461-62.

The Commonwealth responds as though Petitioner were attempting to relitigate trial

counsel's objection to the prosecutor's argument about § 9545(e)(1).  Com. Answer 142-43.  The

Commonwealth is wrong.  Petitioner's claim here is that penalty phase counsel was ineffective

for failing to ask the trial court to instruct the jury that the stipulation established a mitigating

factor under 42 Pa. C.S. § 9545(e)(8).  *See* Pet. Mem. 81-83.  Because the Commonwealth does

not respond to that claim, Petitioner relies on the allegations, arguments and authority set forth in

his prior submissions.

With respect to AEDPA analysis, the Commonwealth simply quotes portions of the

Pennsylvania Supreme Court's decisions on direct review and PCRA appeal and asserts, without

further analysis, that the state court's decisions were not unreasonable.  Com. Answer 143-46.

As discussed above, the state court did not address Petitioner's current claim on direct appeal.

For the reasons set forth in Pet. Mem. 83-84, the state court also failed to address Petitioners'

current claim on PCRA appeal.  Accordingly, this Court's review of the merits of the claim is de

novo.[19]

---

[19] With respect to Claims XI and XII, Petitioner relies on the arguments and authorities set forth
in Pet. Mem. 84-89.

## CONCLUSION

For all of the reasons set forth herein and in his prior submissions, Petitioner respectfully requests that this Court vacate his convictions and sentences, including his sentence of death.

Respectfully Submitted,

/s/ Matthew Lawry_____
MATTHEW LAWRY
MICHAEL GONZALES
Assistant Federal Defenders
Federal Community Defender Office
for the Eastern District of Pennsylvania
601 Walnut Street, Suite 545 West
Philadelphia, PA 19106

KIRK HENDERSON
Assistant Federal Defender
Federal Public Defender for the
Western District of Pennsylvania
Capital Habeas Unit
1001 Liberty Avenue, Suite 1500
Pittsburgh, PA  15222

**CERTIFICATE OF SERVICE**

I, Matthew Lawry, Assistant Federal Defender, Federal Community Defender Office for

the Eastern District of Pennsylvania, hereby certify that on May 3, 2018, I caused a copy of the

foregoing reply to be filed and served electronically through Eastern District Clerk's Office

Electronic Case Filing and served by United States mail, first class, postage prepaid, on:

        Ronald Wabby, Esquire
        Office of the Allegheny County District Attorney
        436 Grant Street
        Pittsburgh, PA 15219


        /s/ Matthew Lawry_____
        Matthew Lawry
        Assistant Federal Defender