**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| WAYNE MITCHELL, | ) | |
| | ) | |
| Petitioner, | ) | Civil Action No. 2:15-1465 |
| | ) | |
| v. | ) | Judge Cathy Bissoon |
| | ) | |
| JOHN E. WETZEL, et al., | ) | |
| | ) | |
| Respondents. | ) | |

## MEMORANDUM AND ORDER

### I. MEMORANDUM

Wayne Mitchell's ("Petitioner's") Amended Petition for a Writ of Habeas Corpus (Doc. 12) will be granted only to the extent that he seeks a new capital sentencing hearing. His guilt-phase claims will be denied.

### A.    Introduction

In September 1997, Petitioner raped his estranged wife, Robin Little, on two separate occasions, nine dates apart. The first rape occurred on September 1, 1997. The next day, Petitioner gave a statement to the police in which he confessed to the crime. The second rape occurred during the early morning hours of September 10, 1997. Petitioner stabbed and choked Robin to death during this attack. Later that same day, he gave a statement to the police in which he confessed that he killed Robin and raped her vaginally and anally, thereby committing, during the commission of the killing, the felonies of rape and involuntary deviate sexual intercourse ("IDSI").

Petitioner pleaded guilty to committing the September 10, 1997, rape and IDSI. Following a trial before the Court of Common Pleas of Allegheny County held in October 1999,

1

a jury convicted him of first-degree murder and of the September 1, 1997, rape.  At the conclusion of the sentencing phase of his trial, the same jury determined that he should be sentenced to death on the first-degree murder conviction.

Before this Court is Petitioner's Amended Petition for a Writ of Habeas Corpus (Doc. 12), which he filed pursuant to 28 U.S.C. § 2254.  He asserts that he is entitled to a new trial or, at a minimum, another sentencing hearing.  After careful consideration of Petitioner's claims, the Court concludes that he has demonstrated his trial counsel performed deficiently when he failed to provide critical evidence to, and prepare the testimony of, the defense's sole expert, Dr. Lawrence Bernstein.  This deficient performance prejudiced Petitioner at his capital sentencing hearing.  Therefore, if the Commonwealth still seeks the death penalty for Petitioner, it must conduct another capital sentencing hearing.

**B.**    **Background**[1]

Petitioner and Robin began dating around 1994, when they were in high school.  (Trial Tr. at 123-26).  At Petitioner's trial, the Commonwealth introduced entries from Robin's journal in which she chronicled their volatile relationship and Petitioner's abusive behavior towards her.  (Id. at 158-67).  In September 1996, Petitioner threatened to kill Robin if she ever left him.  (Id. at 160).  She gave birth to their son in January 1997 and they were married in April 1997, when Petitioner was age 19 and Robin was age 18.  Robin and their son lived with her mother, Debra King, in a home located in an apartment building on Hamilton Avenue in the Homewood

---

[1]    The parties filed electronically the state court record and a few of the transcripts.  Respondents also submitted the transcripts and the common pleas court's file in hard-copy format.  Citations to documents filed electronically, including the common pleas court's post-conviction opinions, are to the document and page number on this Court's electronic case management system.

neighborhood of Pittsburgh. Petitioner moved in with them in the late spring of 1997. (Id. at 122-27).

By July 1997, Robin had ended her relationship with Petitioner, and Petitioner had moved out. Robin and their son relocated to Lancaster, Pennsylvania, to live with her brother. During that time, Robin told her sister-in-law that she was afraid of Petitioner and believed that one day he would kill her. (Id. at 253-55).

In August 1997, Robin and their son moved back to Pittsburgh to live with her mother. On September 1, 1997, Petitioner was working at a nearby gas company and Robin visited him there. They argued because she was seeing another man, and Petitioner dragged her into his foreman's office and raped her. (Id. at 371-72; Doc. 26-2 at 24-33). Robin reported the rape to the police and she went to Magee Women's Hospital for an examination. (Id. at 135-40).

The police arrested Petitioner on September 2, 1997. He waived his rights under Miranda v. Arizona, 384 U.S. 436 (1966) and agreed to give a taped statement to Wilkinsburg Police Detective Doug Yuhouse. Petitioner admitted that he raped Robin and said that he did so because he was in a "rage" due to the fact that she was seeing another man. The audio recording of Petitioner's confession to Det. Yuhouse was played for the jury at his trial. (Trial Tr. at 217-18; see also Doc. 26-2 at 24-33).

The Commonwealth charged Petitioner with rape and related counts. He was arraigned and remained in jail pending a preliminary hearing, which was scheduled for September 9, 1997. Robin filed for a Protection from Abuse ("PFA") order and the court granted a temporary order that prohibited Petitioner from having any contact with her for the next ten days. It scheduled the final PFA hearing for September 10, 1997.

At the September 9, 1997, preliminary hearing, Petitioner waived the charges to court in exchange for a nominal bond with a condition that he seek immediate in-patient treatment for alcohol abuse at St. Francis Hospital. (Id. at 453-55, 466-67, 472). For reasons disputed at trial, Petitioner was not admitted to St. Francis Hospital. Later that afternoon, Robin, afraid and in tears, telephoned her mother and said that Petitioner had called her several times. (Id. at 172-73). Petitioner eventually convinced Robin to permit him to visit. He arrived at her home just after 4:00 p.m. and this visit, during which they argued again because she was seeing another man, lasted around three hours. (Id. at 375-76).

Very early the next day, at approximately 1:00 a.m. on September 10, 1997, Petitioner called Robin, apologized to her and once again convinced her to let him come to her home. (Id. at 378-80). Later that same morning, Petitioner attended the 9:00 a.m. PFA hearing. Robin did not appear and, as a result, the court dismissed the PFA order. Around that same time, Robin's unclothed body was discovered in a vacant lot near her Hamilton Avenue home. She had been stabbed multiple times in the neck and once in her abdomen and had injuries to her neck consistent with strangulation. (Id. at 280-88).

Homicide detectives immediately began searching for Petitioner. At the time, he was living with his mother at her Pittsburgh home located on East Liberty Boulevard. He took the bus there after the PFA hearing, and as soon as he arrived his mother told him that she had just learned that Robin had been murdered. She urged Petitioner to go to the emergency room at St. Francis Hospital, which he did around noon. When he was discharged around 2:00 p.m., detectives with the Pittsburgh Police Department, Dennis Logan and Richard McDonald, were there waiting for him. Petitioner agreed to accompany them to the police station. (Id. at 358-59).

Petitioner again waived his <u>Miranda</u> rights and gave a statement to Det. Logan. He confessed that earlier that morning he vaginally and anally raped Robin while he stabbed and choked her to death. At Petitioner's trial, Det. Logan testified that Petitioner "showed no signs of being intoxicated" when he gave his confession. (<u>Id.</u> at 360). Det. Logan asked Petitioner if he was under the influence of any drugs or alcohol, and Petitioner replied that he was not. According to Det. Logan, Petitioner "appeared to be in control of his emotions and…of his faculties." (<u>Id.</u>) He said that Petitioner "was very alert and very articulate in how he spoke." (<u>Id.</u> at 364).

Det. Logan recounted to the jury what Petitioner stated in his confession, and his notes and report were introduced as trial exhibits. Petitioner admitted once again that he raped Robin on September 1, 1997. (<u>Id.</u> at 371-72). Petitioner then described to Det. Logan the events leading up to, during and following the September 10, 1997, rape and murder. (<u>Id.</u> at 375-94).

Petitioner told Det. Logan that on September 9, 1997, after he left Robin's home around 7:00 p.m., he hung out with friends and "had a couple drinks[.]" (<u>Id.</u> at 377). He returned to his mother's house around 1:00 a.m., called Robin, apologized to her, and asked her to allow him to see her again. (<u>Id.</u> at 378-79). Robin was hesitant, Petitioner told Det. Logan, but he eventually convinced her to let him come over. Petitioner walked from his mother's house to Robin's Hamilton Avenue home. (<u>Id.</u> at 380). When he arrived there around 1:30 a.m., Robin was sitting on the front porch with another man, who fled the scene after Petitioner confronted him. (<u>Id.</u> at 380-81).

Once they were alone, Petitioner told Det. Logan, he punched Robin in the face and stomach. When she tried to run from him, he grabbed her and continued to beat her as he dragged her toward a vacant lot about two doors down from her home. (<u>Id.</u> at 382-83).

According to Petitioner, Robin screamed "He's going to kill me" (id. at 383), and her last words were pleas begging for someone to help her. (Id. at 389).

Petitioner told Det. Logan that as he dragged Robin toward the vacant lot, he saw a knife located on the porch of nearby house. He punched Robin "as hard as he could two or three time in the face and midsection[,]" which disabled her while he grabbed the knife from the porch. (Id. at 383-84). He returned to Robin, stabbed her in the stomach, tore her clothes off, wrapped his hands around her neck and then raped her, first vaginally and then anally. (Id. at 384-86). After doing so, he stabbed Robin multiple times in the neck. (Id. at 386-87).

In his confession to Det. Logan, Petitioner said that after he killed Robin, he took her clothes and left her naked body in the vacant lot. (Id. at 387-88). He did so because "[i]f she wanted to f—k everybody, now everybody could see her f—cking body." (Id. at 387). Petitioner stated that during his walk back to his mother's house, he disposed of Robin's clothing in a sewer on Kelly Street. (Id. at 388-89). Based on this information, the police searched the sewers on Kelly Street and recovered Robin's clothing. (Id. at 77, 84-88).

Several hours later, Petitioner took a bus to the 9:00 a.m. PFA hearing. He told Det. Logan that, as he walked to the bus stop, he disposed of the clothing that he wore during the attack by throwing the clothing through the window of an abandoned house on Dix Way. (Id. at 391). Based on this information, the police searched a vacant home located on Dix Way and recovered Petitioner's clothing. (Id. at 433-38).

Det. Logan asked Petitioner during the interview what factor, if any, alcohol had on him when he killed Robin. (Id. at 393-94). Petitioner replied that he had a "couple of drinks" before he killed Robin but that alcohol "had nothing to do with what he did[.]" (Id. at 394). He said

that he raped, stabbed and strangled Robin to death because he was so angry that she had slept with someone else.  (Id.)

Following his September 10, 1997, confession, the Commonwealth charged Petitioner with one count each of criminal homicide, rape, IDSI and unlawful restraint and notified him that it would seek the death penalty if he was convicted of first-degree murder.  Petitioner retained Leo C. Harper, Jr., Esq. ("trial counsel") to represent him.  Trial counsel moved for the appointment of co-counsel to prepare for and handle capital sentencing.  He requested the appointment of a specific attorney with whom he had worked in the past, but the court instead appointed the Office of the Allegheny County Public Defender, which assigned the case to Kathleen Cribbins, Esq. ("penalty-phase counsel").

Trial counsel later testified at the 2012 state-court hearing on Petitioner's claims for relief under Pennsylvania's Post-Conviction Relief Act ("PCRA") that the first time he spoke to penalty-phase counsel about the case was about a week before the trial.  (PCRA Hr'g Tr. at 9). When asked to describe their working relationship, he responded "There was no relationship." (Id. at 8).  He said they "did not get along at all" (id. at 9) and their relationship was "untenable from the beginning."  (Id. at 31).  Penalty-phase counsel agreed, and she testified at the PCRA hearing that, to extent that she and trial counsel spoke about the case prior to the trial, it was when they saw each other in the courthouse hallway and trial counsel asked her to get him records.  (Id. at 116).

The defense retained Dr. Bernstein, a forensic neuropsychiatrist, as its sole expert. Dr. Bernstein worked primarily with trial counsel, and never met with both trial and penalty-phase counsel together.  (Id. at 182-83).  That was unusual, Dr. Bernstein testified at the PCRA hearing, for the obvious reason that "[a]ny time you do a capital case and there is the possibility

of an individual facing…the imposition of the death penalty, what can happen in the guilt phase can have a profound effect on the penalty phase[.]" (Id.) Therefore, he explained, in his experience "those two advocates work in concert for that and a multitude of other reasons." (Id. at 183). That did not occur in Petitioner's case and, as set forth below, Petitioner's attorneys failed to provide Dr. Bernstein with critical information and prepare his testimony.

Trial counsel proposed to the prosecution that Petitioner would plead guilty to first-degree murder in exchange for a sentence of life imprisonment without the possibility of parole. The prosecution rejected that proposal. (Id. at 14-15, 60). On October 1, 1999, a few days before his trial, Petitioner pleaded guilty to the September 10, 1997, rape and IDSI counts. He proceeded to trial on the criminal homicide count and on counts related to the first rape.

Petitioner presented a diminished capacity defense to first-degree murder, asserting that he was unable to form the specific intent to kill due to the effects of his long-term alcohol abuse and his psychological condition. Diminished capacity is an extremely limited defense under Pennsylvania law. See, e.g., Saranchak v. Beard, 616 F.3d 292, 308 (3d Cir. 2010); Commonwealth v. Taylor, 876 A.2d 916, 926 (Pa. 2005); Commonwealth v. Legg, 711 A.2d 430, 444 (Pa. 1998); Commonwealth v. Zettlemoyer, 454 A.2d 937, 943 (Pa. 1982); Commonwealth v. Weinstein, 451 A.2d 1344, 1347 (Pa. 1982). It "requires a defendant to establish through 'extensive psychiatric testimony [that he] suffered from one or more mental disorders which prevented him from formulating the specific intent to kill.'" Saranchak, 616 F.3d at 308 (quoting Commonwealth v. Cuevas, 832 A.2d 388, 393 (Pa. 2003) (which cited Zettlemoyer, 454 A.2d at 943)) (altered text added by court of appeals). A defendant may offer evidence of his intoxication to support a diminished capacity defense, but "the mere fact of intoxication does not make out a diminished capacity defense. Rather, to warrant that a

8

homicide does not rise to the level of first-degree murder, the evidence must demonstrate that the defendant was intoxicated to such an extent that the defendant was overwhelmed to the point of losing his sensibilities." Commonwealth v. Spotz, 896 A.2d 1191, 1218 (Pa. 2006). "Even 'ample evidence' that a defendant 'used mind-altering drugs at the time of the offense,' standing alone, is insufficient because such drugs must be shown to have intoxicated a defendant 'to such an extent that he was unable to form the requisite intent.'" Saranchak, 616 F.3d at 307-08 (quoting Spotz, 896 A.2d at 1218).

A successful diminished capacity defense will avoid a first-degree murder conviction and the defendant will be convicted of a lesser degree of murder. Because Petitioner killed Robin during the commission of two felonies (rape and IDSI), the most favorable outcome he realistically could hope for was a conviction of second-degree murder and a sentence of life imprisonment. 14 WEST'S PA. PRAC., CRIM. OFFENSES & DEFENSES § 1:117 (6th ed.) (available on Westlaw, update Mar. 2019) (The Pennsylvania Supreme Court "has held that the diminished capacity defense is not available to defend against second-degree murder.") (citing Commonwealth v. Garcia, 479 A.2d 473 (Pa. 1984); Commonwealth v. Russell, 938 A.2d 1082 (Pa. Super. Ct. 2007)).

At the trial, the Commonwealth presented testimony from Robin's mother, her sister-in-law, Det. Yuhouse, Det. Logan, several other officers who were involved in the investigation of the murder, and the doctor (Dr. Gary Sutkin) and nurse who examined Robin at Magee Women's Hospital after the first rape. The chief forensic pathologist from the coroner's office testified about the numerous injuries Robin sustained during the September 10, 1997, attack and said that the cause of death was multiple stab wounds to, and compression of, the neck.

Sheila Britton, who was a former director of the Upward Bound Program at Schenley High School, also testified for the Commonwealth. She knew both Petitioner and Robin, and was particularly close with Petitioner. Britton testified that Petitioner called her at approximately 1:00 a.m. on September 10, 1997. He told Britton that he was going to Robin's home and was going to kill her because she had "disrespected" him. (Trial Tr. at 326-28). Petitioner told Britton he had been drinking, but Britton said that he was speaking coherently and was not slurring his words. (Id. at 326-28). Britton advised Petitioner to go to bed and told him that "whatever the situation was…going after [Robin] wasn't going to resolve it." (Id. at 326).

According to Britton, not long after her telephone conversation with Petitioner had ended, she dialed his number back and his mother, Linda, answered the phone. (Id. at 328). Britton told her that Petitioner had just threatened to kill Robin. (Id. at 329). Petitioner's mother "looked around" for him, said "[s]he couldn't find him[,]" and told Britton that she did not "have time to worry about that right now." (Id.)

Britton testified that Petitioner called her again around 4:00 a.m. that same morning. (Id.) As their conversation progressed, Britton, who had been sleeping when Petitioner called her, began to remember their earlier conversation, realized something was "horribly wrong," and asked him about Robin. (Id. at 330). Petitioner told her "Robin Little is no more." (Id.)

During her testimony, Britton read aloud letters Petitioner wrote to her in March 1998 when he was in jail awaiting his trial. In one, Petitioner wrote:

> For me to explain to you or anyone else my state of mind is totally useless because no matter how hard I try, you will never understand but [sic] all about the little whore being dead. I have two outlooks on that. For all the pain and suffering she put me through, she deserved what she got. And secondly, I feel death was too good for her. She should have been made to suffer through life, and I know she would have suffered. That was planned. But the bottom line is no matter how I look at it, Robin killed herself and her mother helped. There is no way in hell you can expect me to treat someone as bad as she treated me and go

unpunished.  It's against the laws of nature.  I think the word is "justice."  In one of your letters it says you would have to assume responsibility for your actions.  Simply put doesn't that apply to Robin, too?

(Id. at 332-33).  In another letter, he wrote:

You're not a simple-minded person, so I know without me telling you, you already know what really happened with Robin and why.  I am a person of many faces, and I have long realized that all the different struggles inside me make one man.  I cannot be a husband one moment, a dog the next.  I feel that love and hate are but one emotion.  I am well educated, a father.  I love life.  I am full of hate, not afraid of anything, some would say I'm confused, but it's only the scale of Libra.

(Id. at 334).

Petitioner presented four witnesses in support of his diminished capacity defense.  Dr. Bernstein, whose testimony will be set forth in more detailed below, discussed two separate occasions in 1992 when Petitioner, at the age of 14, was admitted for several weeks to St. Francis Hospital for alcohol and behavior related issues.  He opined that Petitioner's long-term alcohol abuse, alcoholic hallucinosis, depression and in utero exposure to alcohol prevented him from forming the specific intent to kill Robin.  (Id. at 556-57).  Petitioner's uncle, Curtis Mitchell, testified that he was with Petitioner the night before the murder from approximately 8:00 p.m. to midnight and that they and another individual shared three six-packs of beer and a fifth of whiskey.  (Id. at 474-76).  Petitioner's mother, Linda, testified that when she woke Petitioner to attend the PFA hearing, he was lying on the living room floor mumbling.  She assumed that he was drunk.  (Id. at 505).  Rosalyn Guy-McCorkle, Esq., who represented Petitioner after he was arrested for the first rape, testified that he seemed incoherent at his September 9, 1997, preliminary hearing.  (Id. at 452-53).  She said that the next day, at the 9:00 a.m. PFA hearing, he looked tired and did not talk that much.  (Id. at 456).  She next saw him when he was in jail on

September 11, 1997, and she said he seemed confused and was not communicative. (Id. at 458-59).

The jury determined that the Commonwealth proved beyond a reasonable doubt that Petitioner acted with the specific intent to kill Robin and convicted him of first-degree murder. It also found him guilty of rape, unlawful restraint and simple assault arising from the crimes he committed on September 1, 1997.

Because the Commonwealth was seeking the death penalty, the jury remained empaneled for a separate sentencing hearing. Under Pennsylvania law, the Commonwealth had the burden of proving at least one statutorily-defined aggravating circumstance accompanied the murder. 42 PA. CONS. STAT. § 9711(c)(1)(iii), (d). The jury could find an aggravating circumstance to be present only if all members agreed that it was. Id. § 9711(c)(1)(iv). Petitioner could introduce, and the jury could consider, mitigating evidence. Id. § 9711(e). The Commonwealth had to prove aggravating circumstances beyond a reasonable doubt, but Petitioner had to prove mitigating circumstances by only a preponderance of the evidence. Id. § 9711(c)(1)(iii). Unlike the finding of aggravating circumstances, each juror was free to regard a particular mitigating circumstance as present despite what other jurors believed. The jury could impose the death penalty only if unanimously found that the statutorily-defined aggravating circumstances proven by the Commonwealth outweighed any mitigating circumstance proven by Petitioner. Id. § 9711(c)(1)(iv). The verdict had to be a sentence of life imprisonment in all other cases. Id.

The Commonwealth pursued the following three statutorily-defined aggravating factors: (1) Petitioner killed Robin while in the perpetration of a felony; (2) when he killed her he was subject to a PFA order restricting his contact with her; and (3) he killed her to prevent her from testifying against him. In support of these aggravating factors, the Commonwealth relied upon

the evidence introduced during the guilt phase of the trial and additional testimony from Det. Logan and Robin's mother.

Petitioner asked the jury to find the following mitigating circumstances: (1) he was under the influence of extreme mental or emotional disturbance when killed Robin; (2) his capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired; (3) his age at the time of the crime (19 years old); (4) he had no significant history of prior criminal convictions; and (5) any other evidence of mitigation concerning his character and his record or the circumstances of the offense. This last mitigating circumstance is commonly referred to as the "catch-all" mitigating factor. The court instructed the jurors that when each of them decided whether the catch-all mitigating factor was present, they should consider evidence of neglect Petitioner may have suffered during his childhood, his chronic alcohol abuse, his involvement in church-related activities and volunteer work, his lack of a criminal record, and evidence of his repeated attempts at treatment and counseling. (Trial Tr. at 920-21).

Dr. Bernstein testified in support of Petitioner's mitigation case. Additionally, Petitioner presented brief testimony from his mother, his Uncle Curtis and four family friends (Robin Harris, Bishop Wilbur Johnson, Dr. Armenia Johnson and Christine Rather). Together, their testimony discussed the history of alcohol abuse in Petitioner's family, his own problems with alcohol, and the positive aspects of his character. Petitioner's final witness, Louis Harrell, was a drug and alcohol therapist with St. Francis Hospital. (Id. at 864). He testified that he began counseling Petitioner in 1989, when he would have been around age 11, "to try to help [him] deal with the drug and alcohol issue." (Id.)

In announcing their verdict, the jurors explained that they unanimously found two aggravating factors: (1) that Petitioner killed Robin during the perpetration of a felony and (2) that he killed her when he was subject to a PFA order. (Id. at 932). No juror found the existence of any mitigating circumstances. (Id.) Therefore, the required verdict was a sentence of death.

On December 8, 1999, the trial court imposed that sentence for the first-degree murder conviction. It also imposed a consecutive aggregate term of 12-27 years for the convictions related to the September 1, 1997, rape. On February 10, 1997, after Petitioner unsuccessfully moved to withdraw his guilty pleas on the charges for the September 10, 1997, rape and IDSI, the court sentenced him to an aggregate term of 8-20 years on those convictions, to be served consecutive to both his death sentence and the sentence for the September 1, 1997, rape.

The trial court appointed new counsel to represent Petitioner in his direct appeal. The Pennsylvania Supreme Court affirmed his convictions and sentences in Commonwealth v. Mitchell, 902 A.2d 430 (Pa. 2006) ("Mitchell I"). The United States Supreme Court denied his petition for a writ of certiorari on January 16, 2007. Mitchell v. Pennsylvania, 549 U.S. 1169 (2007). That is the date his judgment of sentence became final under state law for the purpose of calculating the one-year statute of limitations for filing a PCRA petition. 42 PA. CONS. STAT. § 9545(b)(3).

Petitioner filed a pro se PCRA petition in February 2007. Attorneys with the Federal Community Defender Office ("FCDO") entered their appearance in state court on his behalf and they filed an amended PCRA petition in 2009, which they subsequently amended both before and after the PCRA hearing. That five-day hearing was held in October 2012.

In this first PCRA proceeding, Petitioner raised all of the claims that he now raises to this Court in his Amended Petition for a Writ of Habeas Corpus except for Claim V. In support of his claims, he presented the testimony of the following nineteen witnesses: (1) his four prior attorneys (trial counsel, penalty-phase counsel, Guy-McCorkle and his direct appeal counsel); (2) five individuals who also had testified at the trial (Dr. Bernstein, his mother, Uncle Curtis, Britton and Harrell); (3) six additional family members or acquaintances (his father, an uncle, an aunt, his brother, Brian Dallas (a friend) and Dr. David Hall (a physician for several members of the Mitchell family); and (4) four expert witnesses (Dr. Richard Dudley, who testified as an expert in clinical and forensic psychiatry; Dr. Barry Crown, who testified as an expert in clinical and forensic psychology, neuropsychology, and addictions; Dr. Duncan Clark, who testified as an expert in juvenile psychiatry and alcoholism; and Dr. Charles Wetli, who testified as an expert in forensic pathology). The Commonwealth presented testimony from the following three witnesses: (1) Det. Logan; (2) the former Assistant District Attorney who had prosecuted the case, Edward Borkowski (the "prosecutor") (who by the time of the PCRA hearing was a judge on the court of common pleas); and (3) Dr. Bruce Wright, who testified as an expert in psychiatry.

On January 17, 2013, the PCRA court issued a decision within which it rejected Petitioner's claims. Commonwealth v. Mitchell, CP-02-CR-11609-1997 *et al.* (C.P. Allegheny, Jan. 17, 2013) ("PCRA Op. I") (Doc. 38-1 at 12-33). After Petitioner filed an appeal, the PCRA court issued its Appellate Rule 1925 opinion. Commonwealth v. Mitchell, CP-02-CR-11609-1997 *et al.* (C.P. Allegheny, July 31, 2013) ("PCRA Op. II") (Docs. 38-4 through 38-6). On December 16, 2014, the Pennsylvania Supreme Court affirmed the PCRA court's decision and

denied each of Petitioner's claims. <u>Commonwealth v. Mitchell</u>, 105 A.3d 1257 (Pa. 2014) ("<u>Mitchell II</u>").

In November 2015, Petitioner, through his counsel with the FCDO and the Capital Habeas Unit of the Federal Public Defender's Office for the Western District of Pennsylvania, commenced this case by filing a petition for a writ of habeas corpus. (Doc. 5). This Court stayed this proceeding while Petitioner litigated a second PCRA petition in state court. (Doc. 4).

The PCRA court subsequently dismissed the second PCRA petition on the grounds that it was untimely under the applicable state statute of limitations. (Doc. 40-3 at 6-10, 18). It issued its Appellate Rule 1925 opinion on December 10, 2015. <u>Commonwealth v. Mitchell</u>, CP-02-CR-11609-1997 et al. (C.P. Allegheny, Dec. 10, 2015) ("PCRA Op. III") (Doc. 40-4 at 2-13). On July 19, 2016, the Pennsylvania Supreme Court affirmed the PCRA court's decision in <u>Commonwealth v. Mitchell</u>, 141 A.3d 1277 (Pa. 2016) ("<u>Mitchell III</u>").

After Petitioner's second PCRA proceeding concluded, this Court lifted the stay and Petitioner filed his Amended Petition for a Writ of Habeas Corpus (Doc. 12) and Memorandum of Law in Support (Doc. 19). The Commonwealth[2] filed its Answer (Doc. 24) and the state court record (Docs. 25-28, 29-41). This Court then permitted Petitioner to conduct limited discovery. (Doc. 49). After the period for discovery concluded, he filed his Reply. (Doc. 55).

## C.    <u>Jurisdiction</u>

This Court has jurisdiction under 28 U.S.C. § 2254, which is the federal habeas statute applicable to prisoners in custody pursuant to a state-court judgment. It permits a federal court to grant a state prisoner the writ of habeas corpus "on the ground that he or she is in custody in violation of the Constitution...of the United States." 28 U.S.C. § 2254(a). It is Petitioner's

---

[2]        Going forward, the Court will refer to Respondents as the "Commonwealth."

burden to prove that he is entitled to the writ. Id.; see, e.g., Vickers v. Superintendent Graterford SCI, 858 F.3d 841, 848-49 (3d Cir. 2017). There are other prerequisites that he must satisfy before he can receive habeas relief (most relevant here is the burden imposed upon him by the standard of review set forth at 28 U.S.C. § 2254(d), which is discussed below and which applies to each claim that the Pennsylvania Supreme Court denied on the merits), but, ultimately, Petitioner cannot receive federal habeas relief unless he demonstrated that his constitutional rights were violated at his trial or at his capital sentencing hearing. 28 U.S.C. § 2254(a); see, e.g., Vickers, 858 F.3d at 849.

**D.**     **Standard of Review**

In 1996, Congress made a number of significant amendments to the federal habeas statutes with the enactment of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214. AEDPA "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." Bell v. Cone, 535 U.S. 685, 693 (2002) (citing Williams v. Taylor, 529 U.S. 362, 403-04 (2000)). AEDPA reflects the view that habeas corpus is a "guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." Harrington v. Richter, 562 U.S. 86, 102-03 (2011) (internal quotations and citation omitted).

Because AEDPA applies to this case, this Court conducts an evaluation that is different from that which was conducted by the state courts. Stated differently, this Court has additional considerations that it must make in evaluating Petitioner's claims of federal constitutional error because, as set forth immediately below, AEDPA, as codified at 28 U.S.C. § 2254(e)(1), requires that this Court must presume all findings of fact made by a state court are correct, and it also

requires, as codified at 28 U.S.C. § 2254(d), that this Court apply deference to any claim that was adjudicated on the merits by the Pennsylvania Supreme Court.

## 1. Deference to a State Court's Finding of Fact Under 28 U.S.C. § 2254(e)(1)

A finding of fact made by a state court always has been afforded considerable deference in a federal habeas proceeding. AEDPA continued that deference and mandates that "a determination of a factual issue made by a State court shall be presumed to be correct." 28 U.S.C. § 2254(e)(1). Petitioner has the "burden of rebutting the presumption of correctness by clear and convincing evidence." Id.

## 2. Standard of Review When the State Court Adjudicates a Claim on the Merits

AEDPA also put into place a new standard of review, which is codified at 28 U.S.C. § 2254(d). It applies "to any claim that was adjudicated on the merits in State court proceedings" and prohibits a federal habeas court from granting relief unless the petitioner first established that the state court's "adjudication of the claim":

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). For the purposes of § 2254(d), a claim has been "adjudicated on the merits in State court proceedings" when the state court (here, the Pennsylvania Supreme Court)[3] made a decision that finally resolved the claim based on its substance, not on a procedural, or other,

---

[3] When applying § 2254(d), the Court considers the "last reasoned decision" of the state courts. Simmons v. Beard, 590 F.3d 223, 231-32 (3d Cir. 2009) (quoting Bond v. Beard, 539 F.3d 256, 289-90 (3d Cir. 2008)); Brown v. Superintendent Greene SCI, 834 F.3d 506, 512 (3d Cir. 2016).

ground.  See, e.g., Richter, 562 U.S. at 98-100; Robinson v. Beard, 762 F.3d 316, 324 (3d Cir. 2014).

In Mitchell II, the Pennsylvania Supreme Court adjudicated on the merits each of the claims discussed in this Memorandum except for Claim V, which it denied as untimely in Mitchell III.  Therefore, when this Court evaluates each of Petitioner's claims, except for Claim V, it must apply § 2254(d)'s standard of review.  As for Claim V, Petitioner procedurally defaulted it and, therefore, the Court must deny it for that reason.

Importantly, if, when evaluating a claim, this Court determines that Petitioner has satisfied his burden under either provision of § 2254(d), this Court must then "proceed to review the merits of the claim de novo to evaluate if a constitutional violation occurred."  Vickers, 858 F.3d at 849 (citing Lafler v. Cooper, 566 U.S. 156, 174 (2012)).  That is because "a federal court can only grant the Great Writ if it is 'firmly convinced that a federal constitutional right has been violated[.]'"  Id. (citing Williams, 529 U.S. at 389, and Horn v. Banks, 536 U.S. 266, 272 (2001) ("[w]hile it is of course a necessary prerequisite to federal habeas relief that a prisoner satisfy the AEDPA standard of review…none of our post-AEDPA cases have suggested that a writ of habeas corpus should automatically issue if a prisoner satisfies the AEDPA standard[.]")).

### (a)  Application of 2254(d)(1)

#### (i)  "Clearly established Federal law"

Section 2254(d)(1) applies to questions of law and mixed questions of law and fact.  In applying it, this Court's first task is to ascertain what law falls within the scope of the "clearly established Federal law, as determined by the Supreme Court of the United States[,]" 28 U.S.C. § 2254(d)(1).  It is "'the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision.'"  Dennis v. Sec'y, Pennsylvania Dep't of Corr., 834

F.3d 263, 280 (2016) (en banc) (quoting <u>Lockyer v. Andrade</u>, 538 U.S. 63, 71-72 (2003)).  It

"includes only 'the holdings, as opposed to the dicta, of [the Supreme] Court's decisions.'"

<u>White v. Woodall</u>, 572 U.S. 415, 420 (2014) (quoting <u>Howes v. Fields</u>, 565 U.S. 499, 505

(2012), which quoted <u>Williams</u>, 529 U.S. at 412).[4]

### (ii)  The "contrary to" clause

Once the "clearly established Federal law, as determined by the Supreme Court of the

United States" is ascertained, this Court must determine, if Petitioner makes this argument,

whether the Pennsylvania Supreme Court's adjudication of the claim at issue was "contrary to"

that law.  <u>Williams</u>, 529 U.S. at 404-05 (explaining that § 2254(d)(1)'s "contrary to" and

"unreasonable application of" clauses have independent meaning).  A state-court adjudication is

"contrary to…clearly established Federal law, as determined by the Supreme Court of the United

States" § 2254(d)(1), "if the state court applies a rule that contradicts the governing law set forth

in [Supreme Court] cases," <u>Williams</u>, 529 U.S. at 405, or "if the state court confronts a set of

facts that are materially indistinguishable from a decision of [the Supreme Court] and

nevertheless arrives at a result different from [Supreme Court] precedent," <u>id.</u> at 406.  A "run-of-

the-mill" state-court decision applying the correct legal rule from Supreme Court decisions to the

facts of a particular case does not fit within § 2254(d)(1)'s "contrary to" clause and should be

reviewed under the "unreasonable application" clause.  <u>Id.</u>

---

[4]       The Supreme Court "has repeatedly emphasized" that "circuit precedent does not constitute 'clearly established Federal law, as determined by the Supreme Court.'"  <u>Glebe v. Frost</u>, 135 S. Ct. 429, 431 (2014) (per curiam) (quoting § 2254(d)(1) and citing <u>Lopez v. Smith</u>, 574 U.S. 1 (2014) (per curiam).  <u>See</u>, <u>e.g.</u> <u>Renico v. Lett</u>, 559 U.S. 766, 779 (2010) (state court's failure to apply decision by federal circuit court "cannot independently authorize habeas relief under AEDPA.").

### (iii) The "unreasonable application of" clause

"A state court decision is an 'unreasonable application of federal law' if the state court 'identifies the correct governing legal principle,' but 'unreasonably applies that principle to the facts of the prisoner's case.'" Dennis, 834 F.3d at 281 (quoting Williams, 529 U.S. at 413). To satisfy his burden under this provision of AEDPA's standard of review, Petitioner must do more than convince this Court that the Pennsylvania Supreme Court's decision was incorrect. Id. He must show that it "'was *objectively* unreasonable.'" Id. (quoting Williams, 529 U.S. at 409 (emphasis added by court of appeals). This means that Petitioner must demonstrate that the Pennsylvania Supreme Court's decision "*was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement*." Richter, 562 U.S. at 103 (emphasis added).

> It bears repeating that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable. See Lockyer, supra, at 75, 123 S. Ct. 1166.
>
> If this standard is difficult to meet, that is because it was meant to be. As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal-court relitigation of claims already rejected in state proceedings. Cf. Felker v. Turpin, 518 U.S. 651, 664, 116 S. Ct. 2333, 135 L.Ed.2d 827 (1996) (discussing AEDPA's "modified res judicata rule" under § 2244). It preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents. It goes no further.

Id. at 102.

### (b) Application of § 2254(d)(2)

The standard of review set forth at § 2254(d)(2) applies when Petitioner "challenges the factual basis for" the Pennsylvania Supreme Court's "decision rejecting a claim[.]" Burt v. Titlow, 571 U.S. 12, 18 (2013). "[A] state court decision is based on an 'unreasonable

determination of the facts' if the state court's factual findings are 'objectively unreasonable in light of the evidence presented in the state-court proceeding,' which requires review of whether there was sufficient evidence to support the state court's factual findings." Dennis, 834 F.3d at 281 (quoting § 2254(d)(2) and citing Miller-El v. Cockrell, 537 U.S. 322, 340 (2003)).

"'[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance.'" Titlow, 571 U.S. at 18 (quoting Wood v. Allen, 558 U.S. 290, 301 (2010)); see Rice v. Collins, 546 U.S. 333, 342 (2006) (reversing court of appeals's decision because "[t]he panel majority's attempt to use a set of debatable inferences to set aside the conclusion reached by the state court does not satisfy AEDPA's requirements for granting a writ of habeas corpus."). Thus, "if '[r]easonable minds reviewing the record might disagree' about the finding in question, 'on habeas review that does not suffice to supersede'" the state court's adjudication. Wood, 558 U.S at 301 (quoting Collins, 546 U.S. at 341-42). "[H]owever, '[e]ven in the context of federal habeas, deference does not imply abandonment or abdication of judicial review,' and 'does not by definition preclude relief.'" Brumfield v. Cain, 135 S. Ct. 2269, 2277 (2015) (quoting Miller-El, 537 U.S. at 340); see also Dennis, 834 F.3d at 281.

Since AEDPA's enactment, federal courts have debated how to harmonize §§ 2254(d)(2) and (e)(1). They "express the same fundamental principle of deference to state court findings[,]" and federal habeas courts "have tended to lump the two provisions together as generally indicative of the deference AEDPA requires of state court factual determinations." Lambert v. Blackwell, 387 F.3d 210, 235 (3d Cir. 2004). The Supreme Court has not yet "defined the precise relationship between" these two provisions of AEDPA. Titlow, 571 U.S. at 18. In Lambert, the United States Court of Appeals for the Third Circuit instructed that § 2254(d)(2),

when it applies, provides the "overarching standard" that a petitioner must overcome to receive

habeas relief.  387 F.3d at 235.  Section 2254(e)(1) applies to "specific factual determinations

that were made by the state court, and that are subsidiary to the ultimate decision."  Id.  The court

of appeals declined to adopt a "rigid approach to habeas review of state fact-finding" id. at 236

n.19, and instead provided the following guidance:

> In some circumstances, a federal court may wish to consider subsidiary challenges
> to individual fact-finding in the first instance applying the presumption of
> correctness as instructed by (e)(1).  Then, after deciding these challenges, the
> court will view the record under (d)(2) in light of its subsidiary decisions on the
> individual challenges.  In other instances, a federal court could conclude that even
> if petitioner prevailed on all of his individual factual challenges notwithstanding
> the (e)(1) presumption of their correctness, the remaining record might still
> uphold the state court's decision under the overarching standard of (d)(2).  In that
> event, presumably the (d)(2) inquiry would come first.

Id.

E.     **Legal Analysis**

All of Petitioner's claims discussed herein, except for Claims IV and V, are claims of

ineffective assistance of counsel that the Pennsylvania Supreme Court denied on the merits in

Mitchell II.  It adjudicated them under the standard set forth in Strickland v. Washington, 466

U.S. 668 (1984), which is the "clearly established Federal law, as determined by the Supreme

Court of the United States[,]" for the purposes of AEDPA's standard of review at § 2254(d)(1).

Strickland recognized that a defendant's Sixth Amendment right to the assistance of

counsel for his defense entails the right to be represented by an attorney who meets at least a

minimal standard of competence.  466 U.S. at 685-87.  "[T]he Sixth Amendment does not

guarantee the right to perfect counsel; it promises only the right to effective assistance[.]"

Titlow, 571 U.S. at 24.

Under Strickland, it is Petitioner's burden to establish that his "counsel's representation fell below an objective standard of reasonableness." 466 U.S. at 688. "This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment." Id. at 687. Importantly, counsel cannot be deemed ineffective for failing to raise a meritless claim. See, e.g., Preston v. Superintendent Graterford SCI, 902 F.3d 365, 379 (3d Cir. 2018) (evaluating the merits of the petitioner's underlying Confrontation Clause claim as part of its analysis of Strickland's performance prong).

The Supreme Court emphasized that counsel should be "strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." Strickland, 466 U.S. at 690 (emphasis added). It instructed:

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel's was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.

Id. at 689 (internal citations and quotations omitted); see Richter, 562 U.S. at 104 ("A court considering a claim of ineffective assistance must apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance.") (quoting Strickland, 466 U.S. at 689).

Strickland also requires that Petitioner demonstrate that he was prejudiced by his counsel's alleged deficient performance. This places the burden on him to establish "that there is

a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694.

> [Petitioner] "need not show that counsel's deficient performance 'more likely than not altered the outcome of the case'–rather, he must show only 'a probability sufficient to undermine confidence in the outcome.'" Jacobs v. Horn, 395 F.3d 92, 105 (3d Cir. 2005) (quoting Strickland, 466 U.S. at 693-94). On the other hand, it is not enough "to show that the errors had some conceivable effect on the outcome of the proceeding." [Richter, 562 U.S. at 104] (citing Strickland, 466 U.S. at 693). Counsel's errors must be "so serious as to deprive the defendant of a fair trial." Id. at [104] (citing Strickland, 466 U.S. at 687). The likelihood of a different result must be substantial, not just conceivable. Id.

Brown v. Wenerowicz, 663 F.3d 619, 630 (3d Cir. 2011).

Pennsylvania courts typically articulate Strickland's standard in three parts, while federal courts set it out in two. The legal evaluation is the same, and the differences merely reflect a stylistic choice on the part of state courts. See, e.g., Commonwealth v. Sepulveda, 55 A.3d 1108, 1117-18 (Pa. 2012) ("In order to obtain relief on a claim of ineffectiveness, a PCRA petitioner must satisfy the performance and prejudice test set forth in Strickland[.]"); Commonwealth v. Kimball, 724 A.2d 326, 330-33 (Pa. 1999). As the Pennsylvania Supreme Court explained in Mitchell II, the Pennsylvania Supreme Court "has divided [Strickland's] performance component into sub-parts dealing with arguable merit and reasonable strategy. [Petitioner] must, therefore, show that: the underlying legal claim has arguable merit; counsel had no reasonable basis for his act or omission; and [Petitioner] suffered prejudice as a result." 105 A.3d at 1266. In the instances in which the Pennsylvania Supreme Court, in adjudicating an ineffective assistance claim, ruled on the merits of the underlying constitutional claim of error, this Court must apply § 2254(d)'s standard of review to its adjudication of that underlying constitutional claim. See, e.g., Mathias v. Superintendent Frackville, 876 F.3d 462, 479-80 (3d Cir. 2017).

Because a petitioner cannot prevail on an ineffective assistance claim unless he establishes all prongs of the <u>Strickland</u> test, the Supreme Court permits courts to address only the prejudice prong if it is more efficient to proceed in that manner. 466 U.S. at 697 ("If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.") That is why in many instances the Pennsylvania Supreme Court disposed of a claim by addressing only <u>Strickland</u>'s prejudice prong and determining that Petitioner did not meet his burden under it.

## Claim I

### Background

Trial counsel filed a motion to suppress the confession Petitioner gave to Det. Logan on September 10, 1997, on the grounds that Petitioner was incapable of making a valid waiver of his <u>Miranda</u> rights because "he had just been removed from a psychiatric ward and was not capable of giving his valid consent to be interrogated." (Doc. 57-1 at 36). Trial counsel did not introduce evidence to support the motion at the pre-trial hearing.[5] The Commonwealth presented Det. Logan, who testified, as he would at the subsequent trial, that Petitioner was not under the influence of alcohol or drugs when he waived his <u>Miranda</u> rights, a fact that Petitioner confirmed in response to Det. Logan's questions and when he signed the waiver form. (<u>Id.</u> at 45; Doc. 57-2 at 1). Det. Logan said that Petitioner was in full control of his faculties and understood what he was doing when he gave his confession. (Doc. 57-2 at 2-3). When asked during cross-examination whether Petitioner had been in the hospital's psychiatric ward that day, Det. Logan replied that Petitioner only visited the general emergency room. (<u>Id.</u>) He also said that

---

[5]     At the PCRA hearing, trial counsel testified that, in his opinion, "[i]n a homicide there is no suppression" and that the purpose of filing the motion to suppress was "very much CYA [cover your own ass]." (PCRA Hr'g Tr. at 36; <u>id.</u> at 52 ("In every homicide it is CYA, standard CYA.")).

Petitioner told him that he went to the hospital because his mother had urged him to go there, not because he thought he was in need psychiatric care. (Id. at 3-4). At the conclusion of the hearing, the trial court denied Petitioner's motion to suppress. (Id. at 8).

In Claim I, Petitioner contends that trial counsel was ineffective for failing to introduce at the suppression hearing available evidence that would have shown that, when he waived his Miranda rights, he was an alcoholic, was suffering from alcohol withdrawal, and had brain damage that affected his cognitive function. If evidence of his impairments had been presented at the suppression hearing, Petitioner argues, there is a reasonable probability that the trial court would have found that his waiver of his Miranda rights was not knowing and intelligent and would have granted his motion to suppress.

The PCRA court rejected Claim I because it did not find credible the evidence Petitioner relied upon to support the underlying Miranda claim. (PCRA Op. II, Doc. 38-4 at 15-28; PCRA Op. I, Doc. 38-1 at 19-20). It found that Petitioner's evidence was contradicted by the medical records from his visit to St. Francis Hospital on September 10, 1997, which occurred shortly before he gave his confession to Det. Logan and, therefore, provided an accurate assessment of Petitioner's mental and physical health when he gave it. Those medical records refuted Petitioner's "position that he was physically or mentally incapable of waiving his Miranda rights." (PCRA Op. I, Doc. 38-1 at 19). For example, the PCRA court explained, at approximately 12:00 p.m., Petitioner's breathalyzer reading was .000, and notations in the records described his physical status as "stable," his level of consciousness as "alert," his impulse control as "good," and his behavior as "cooperative." (PCRA Op. II, Doc. 38-4 at 20). The records reflected that Petitioner "deni[ed] any current withdrawal," indicated that his appearance was "appropriate," his speech was "normal in tone, rate, and volume," the "content

of speech and thought" was "normal" and his perception was not distorted. (Id. at 20-21). The PCRA court also found persuasive Det. Logan's PCRA testimony, which was consistent with that which he had given at the suppression hearing and at trial. (Id. at 21; PCRA Op. I, Doc. 38-1 at 19).

Petitioner's friend, Brian Dallas, visited him at the police station on September 10, 1997. Dallas testified at the PCRA hearing that Petitioner looked "confused," "out of it," smelled of alcohol and appeared to be in state of shock. (PCRA Hr'g Tr. at 543-44). The PCRA court found that Dallas's testimony was "neither credible nor persuasive" because his observations were contradicted by the results of the examination given to Petitioner earlier that day at St. Francis Hospital. (PCRA Op. II, Doc. 38-4 at 23-24).

Guy-McCorkle gave testimony at the PCRA hearing that was consistent with that she had given at trial. (PCRA Hr'g Tr. at 98-102). The PCRA court found that the Pennsylvania Supreme Court's prior assessment of Guy-McCorkles's credibility in Mitchell I was "equally applicable to the present issue." (PCRA Op. II, Doc. 38-4 at 22). Specifically, the PCRA court agreed that her description of Petitioner's demeanor at the September 9, 1997, preliminary hearing was "'dubious considering that she was willing to have him sign an acknowledgement that he fully understood the nature of the proceeding and his rights[,]'" and that "'her contact with [Petitioner] was limited, her description of his behavior was vague, and she merely offered her lay opinion of [Petitioner's] demeanor during her three encounters with him around the time of the murder.'" (Id. at 22) (quoting Mitchell I, 902 A.2d at 446).

Petitioner also relied upon the PCRA testimony of Dr. Clark, who did not examine or meet with Petitioner. He formed his opinion based upon a review of Petitioner's medical and psychological records, the trial testimony, and other evidence introduced during the PCRA

hearing.  (PCRA Hr'g Tr. at 389, 403).  The PCRA court found that Dr. Clark's PCRA testimony

"was neither credible nor persuasive" and explained:

> Dr. Clark's opinion that Petitioner was suffering from the effects of alcohol withdrawal or other cognitive defects at the time he was given his <u>Miranda</u> rights on September 10 was legally insufficient as he acknowledged that it was speculation and was clearly not rendered to a reasonable degree of medical certainty…. His general testimony concerning the possible effects of alcohol on a juvenile ignored the findings made at St. Francis Hospital during a detailed examination of Petitioner shortly before he was taken into custody and given the <u>Miranda</u> rights.  Dr. Clark refers to a single entry at 12:00 p.m. that Petitioner had a pulse of 104 but offers no explanation as to how the other findings during the examination as set forth above comport with his opinion.

(PCRA Op. II, ECF No. 38-4 at 21-22).

In affirming the PCRA court's decision denying Claim I, the Pennsylvania Supreme

Court first observed:

> The voluntariness standard of <u>Miranda</u> requires that the prosecution prove by a preponderance of the evidence that the waiver is knowing and intelligent.  This requires a two-step analysis.  First, the waiver must have been voluntary in the sense that it was an intentional choice made without any undue governmental pressure; and, second, that the waiver must have been made with a full comprehension of both the nature of the right being abandoned and the consequences of that choice.

<u>Mitchell II</u>, 105 A.3d at 1268 (quoting <u>Commonwealth v. Logan</u>, 549 A.2d 531, 537 (Pa. 1988)).

It then summarized the testimony and evidence that Petitioner presented in support of Claim I,

<u>id.</u> at 1268-70, explained why the PCRA court had rejected it, and held that under the applicable

standard of review it was "bound by the PCRA court's credibility determinations, which are

supported by the record[.]"  <u>Id.</u> at 1270-71.[6]

---

[6]     Under Pennsylvania law, a PCRA court's credibility determinations, when supported by the record, are binding upon the state appellate court.  <u>Mitchell II</u>, 105 A.3d at 1265 (citing, *inter alia*, <u>Commonwealth v. Roney</u>, 79 A.3d 595, 603 (Pa. 2013)).

The Pennsylvania Supreme Court also addressed additional evidence Petitioner cited in support of his underlying Miranda claim (such as that given by Dr. Crown, Dr. Dudley, Harrell and Petitioner's father), and determined that it did not establish "that he did not make his waiver with full comprehension of both the nature of the right being abandoned and the consequences of that choice." Id. at 1270 n.11. It held:

> We discern no error in the PCRA court's finding that, based on the credible evidence and testimony presented at the PCRA hearing, there was no obvious objective indication that [Petitioner] suffered from any mental illness or diminished capacity at the time he waived his Miranda rights, such that the police conduct can be viewed as unconstitutional manipulation warranting suppression. Moreover, the totality of the circumstances surrounding [Petitioner's] waiver of his Miranda rights and confession do not suggest that [his] alleged mental status interfered with the important, but simple (all he needs to say is "no") choice of whether to waive his constitutional rights. See Sepulveda, *supra*. *Thus, since the evidence [Petitioner] posits trial counsel should have presented at the suppression hearing would not have established that [his] alleged mental health issues interfered with his waiver, we conclude trial counsel was not ineffective in this regard.*

Id. at 1271 (emphasis added).

Petitioner also contends in Claim I that trial counsel was ineffective for failing to present at the suppression hearing and at trial testimony from a forensic pathologist, such as that given at the PCRA hearing by Dr. Wetli, to support the argument that his confession was unreliable because it was inconsistent with the physical evidence. In his confession to Det. Logan, Petitioner stated that he ejaculated in Robin's anus. Dr. Wetli, who examined the forensic laboratory reports and the medical examiner's file, testified at the PCRA hearing "that the report from [Robin's] rectal swab was negative for seminal fluid in the anal or rectal areas and that, although there was sperm inside her vagina, there was insufficient evidence to determine whether the ejaculate was 'fresh.'" Id. (quoting PCRA Hr'g Tr. at 493-94). Petitioner also relied upon evidence that no blood was recovered from the clothes he wore when he killed Robin, and that

the autopsy report indicated that Robin's vagina, perineum and anus did not show any recent injury. (PCRA Op. II, Doc. at 38-4 at 25-26).

The PCRA court rejected Petitioner's contention that Dr. Wetli's testimony "indicates that [his] confession was so inherently unreliable and contradictory that it should not be admissible or is evidence that the confession was coerced." (Id. at 26). Dr. Wetli testified at the PCRA hearing that the absence of blood on Petitioner's clothing did not "shock" him (PCRA Hr'g Tr. at 499), and in rejecting Claim I, the PCRA court quoted Dr. Wetli's explanation that the stab wounds Robin sustained "did not injure or sever any major vessels, so most of the bleeding would have been superficial. It would be less likely to have blood on the clothing at that point. There could be blood, but the absence of blood doesn't tell you very much." (PCRA Op. II, Doc. 38-4 at 25-26) (quoting PCRA Hr'g Tr. at 496). The PCRA court also noted that Dr. Sutkin, who was the doctor who examined Robin at Magee Women's Hospital after the September 1, 1997, rape, testified at Petitioner's trial that it is not unusual for there to be an absence of injury to the vagina or rectum during forced penetration. (Id. at 26-27) (citing Trial Tr. at 100-01).

The PCRA court concluded that "[c]onsidering the testimony of Dr. Wetli and Dr. Sutkin, there is no evidence of inconsistencies that would lead to the conclusion that Petitioner's confession was involuntary or coerced." (Id. at 27). It then summarized the numerous factors that it found undercut Petitioner's contention that his confession was unreliable, such as the accurate details he gave about where he had disposed of Robin's clothing and his clothing following the murder; his relationship with Robin; his rape of her on September 1, 1997; the events leading up to the murder; the PFA hearing (including the room number of the hearing);

and the treatment he received at St. Francis Hospital a few hours before he gave confession, as well as in 1992.  (Id.; see also PCRA Op. I, Doc. 38-1 at 19-20).

In affirming the PCRA court's disposition of this part of Claim I, the Pennsylvania Supreme Court first explained that the PCRA court had concluded that "to the extent that [Petitioner's] confession was inconsistent with the evidence, the alleged inconsistencies did not provide a basis to conclude [his] confession was coerced, particularly in light of the otherwise detailed nature of [his] confession, which [Petitioner] did not dispute.  Moreover, there was no evidence the interrogation was so manipulative or coercive that it deprived [Petitioner] of his ability to make a free and unconstrained decision to confess."  Mitchell II, 105 A.3d at 1271.  It held that the PCRA court's factual findings regarding the reliability of his confession were supported by the record and, therefore, Petitioner failed to meet his evidentiary burden with respect to this part of Claim I.  Id.

**Discussion**

Because much of the Pennsylvania Supreme Court's adjudication of Claim I was premised upon credibility determinations and findings of fact made by the PCRA court, this Court will first address the two provisions of AEDPA that pertain to such findings by the state courts–§ 2254(e)(1) and § 2254(d)(2).  As set forth above, under § 2254(e)(1), this Court is bound by the credibility determinations and findings of fact that the PCRA court made unless Petitioner identified "clear and convincing evidence" that the PCRA court was wrong.  He has not met his burden.  Petitioner cites portions of the testimony and documentary evidence introduced at the PCRA hearings that he contends support his allegations, but none of it is sufficient to satisfy the burden imposed upon him by § 2254(e)(1).  Petitioner likewise has not demonstrated that the Pennsylvania Supreme Court's adjudication of Claim I "was based on an

unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). It had before it the requisite evidence necessary for its adjudication to withstand review under § 2254(d)(2)'s deferential standard. Although there can be the rare case where "[a] federal court can disagree with a state court's credibility determination and, when guided by AEDPA, conclude the decision was unreasonable [under § 2254(d)(2)] or that the factual premise was incorrect by clear and convincing evidence [under § 2254(e)(1)]" Miller-El, 537 U.S. at 340, this case is not one of them. There is no basis on the record before this Court to determine that Petitioner has overcome AEDPA's deference to the state courts' factual determinations. See Vickers, 858 F.3d at 850 (even in pre-AEDPA cases, "'federal habeas courts [had] no license to redetermine credibility of witnesses who demeanor ha[d] been observed by the state trial court, but not by them'") (quoting Marshall v. Lonberger, 459 U.S. 422, 434 (1983) (bracketed text added by the court of appeals)).

Turning next to whether Petitioner has overcome AEDPA's standard of review at § 2254(d)(1) (which applies to mixed questions of law and fact), this Court's only inquiry here is whether he satisfied his burden of establishing that the Pennsylvania Supreme Court's decision was "an unreasonable application of" Strickland.[7] He has not, because none of his criticisms of the Pennsylvania Supreme Court's decision to deny Claim I demonstrate that its adjudication was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Richter, 562 U.S. at 103.

Petitioner argues that trial counsel's failure to present testimony at the suppression hearing, or at trial, to challenge the reliability of his confession was not premised upon a strategic decision to utilize defense funds elsewhere, and that to the extent that the PCRA court held that it

---

[7] Petitioner does not argue that the Pennsylvania Supreme Court's adjudication of Claim I was "contrary to" either Strickland or Miranda, or that it was "an unreasonable application of" Miranda.

was, that decision was a mischaracterization of trial counsel's PCRA hearing testimony. This argument does not satisfy Petitioner's burden under § 2254(d) because the Pennsylvania Supreme Court did not reject Claim I on the grounds that trial counsel proceeded the way he did for strategic reasons. Rather, it denied Claim I because the PCRA court's credibility determinations were supported by the record, Petitioner did not establish that his underlying Miranda claim had merit and that the PCRA court's factual findings regarding the reliability of his confession were supported by the record. Mitchell II, 105 A.3d at 1266-71.

Petitioner also contends that the Pennsylvania Supreme Court's adjudication was an "unreasonable application of" Strickland because it did not consider the cumulative prejudicial effect of trial counsel's failure to present at the suppression hearing the evidence Petitioner introduced at the PCRA hearing in support of Claim I. This argument is not persuasive. The PCRA court's credibility determinations precluded Petitioner from being able to satisfy Strickland's prejudice component because it rejected the evidence that he relied upon to support Claim I.

In conclusion, because this Court is bound by the PCRA court's findings of fact and credibility determinations under § 2254(e)(1), and because Petitioner did not overcome the burden imposed upon him by either § 2254(d)(1) or (d)(2), under which this Court must evaluate the Pennsylvania Supreme Court's adjudication of Claim I, Petitioner is not entitled to habeas relief on it. Jurists of reason would not find it debatable that this claims lack merit; therefore, a certificate of appealability is denied.[8]

---

[8]  AEDPA codified standards governing the issuance of a certificate of appealability for appellate review of a district court's disposition of a habeas petition. 28 U.S.C. § 2253 ("A certificate of appealability may issue...only if the applicant has made a substantial showing of the denial of a constitutional right."). Where the district court has rejected a constitutional claim on its merits, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." Slack v. McDaniel, 529 U.S. 473, 484 (2000).

## Claim II

### Background

At Petitioner's plea hearing on the rape and IDSI counts, the trial court read each of the charges to him and the prosecutor recited the confession that he gave to Det. Logan. (Plea Hr'g Tr., 10/1/99, at 3-16). Petitioner stated that he understood the charges and did not have any mental or physical illness that affected his ability to understand his rights or the voluntary nature of his plea. (Id. at 5, 18). He said that he was pleading guilty because "I admit that I committed these crimes. I'm admitting it." (Id. at 19). Petitioner signed and dated the guilty plea form in which he acknowledged, among other things, that he discussed with trial counsel how the facts of the case proved the elements of each of the charged offenses. (Doc. 25-8 at 1-10).

Before the plea hearing concluded, both the court and the prosecutor made it clear to Petitioner that the jury would hear evidence about, and would receive an instruction on, the rape and IDSI counts because they were the underlying felonies to support a conviction of second-degree murder, one of the crimes to be charged to the jury. (Plea Hr'g Tr., 10/1/99, at 20-21). Had that information conflicted with anything that trial counsel had said to him, Petitioner could have informed the court at that time. He did not do so. The trial court accepted Petitioner's pleas and deferred imposition of the sentence on the rape and IDSI until after the trial on the remaining charges. (Id.)

In December 1999, about two months after his trial but before the trial court imposed his sentences, Petitioner, through penalty-phase counsel, filed a motion to withdraw his guilty pleas. (Doc. 27-1 at 8-10; Hr'g Tr., 12/8/99, at 2-3). At a hearing on the motion held on January 7, 2000, Petitioner testified that he entered his pleas because trial counsel told him that

no evidence pertaining to the September 10, 1997, rape and IDSI would be introduced at trial or considered by the jury as an aggravating factor. (Doc. 58-1 at 3-5). The trial court did not credit Petitioner's testimony and denied his motion to withdraw his guilty pleas. See Mitchell II, 105 A.3d at 1272. It observed that Petitioner entered his pleas "largely for strategic purposes" and that it enabled trial counsel to argue to the jury that Petitioner was remorseful and had taken full responsibility for the rape and IDSI. Id. at 1272 n.13 (quoting Hr'g Tr., 2/10/00, at 3-4).

In Claim II, Petitioner contends that his trial counsel was ineffective for advising him to enter his guilty pleas.[9] The Supreme Court, in Hill v. Lockhart, 474 U.S. 52 (1985), explained that "[t]he longstanding test for determining the validity of a guilty plea is whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant." 474 U.S. at 56 (internal quotations and citations omitted). Where, as is the case here, the petitioner entered his plea upon the advice of counsel, he must satisfy the Strickland standard in order to prevail on his challenge to his guilty plea. Id. at 58-59. The voluntariness of the plea depends on whether his "counsel's advice 'was within the range of competence demanded of attorneys in criminal cases.'" Id. at 56 (quoting McMann v. Richardson, 397 U.S. 759, 771 (1970)). See also Tollett v. Henderson, 411 U.S. 258, 267 (1973)).

Petitioner contends, as he did in his post-trial motion, that he entered his pleas based upon the erroneous advice from trial counsel that, if he did so, evidence concerning the rape and IDSI would not be presented to the jury. It is Petitioner's burden to prove this assertion. The PCRA court found that he did not meet his burden, explaining "[t]here was no testimony at the

---

[9] The Supreme Court has strictly limited the circumstances under which a guilty plea may be attacked on collateral review. Bousley v. United States, 523 U.S. 614, 621 (1998) ("'it is well settled that a voluntary and intelligent plea of guilt made by an accused person, who has been advised by competent counsel, may not be collaterally attacked.'") (quoting Mabry v. Johnson, 467 U.S. 504, 508 (1984). "Indeed, 'the concern with finality served by the limitation on collateral attack has special force with respect to convictions based on guilty pleas.'" Id. (quoting United States v. Timmreck, 441 U.S. 780, 784 (1979)).

PCRA hearing that Petitioner was advised by [trial counsel] that if Petitioner entered into the plea that absolutely no evidence of the rape or IDSI would be presented to the jury during the guilty or penalty phases of the case." (PCRA Op. II, Doc. 38-4 at 32). The PCRA court quoted from the transcript of the plea hearing (id. at 33-34), which demonstrated that Petitioner "was aware that evidence regarding the rape and IDSI would be heard by the jury." (Id. at 34; see also PCRA Op. I, Doc. 38-1 at 22). Additionally, "the PCRA court discounted [Petitioner's] reliance on [the] self-serving testimony" he gave at the January 7, 2000, plea withdrawal hearing. Mitchell II, 105 A.3d at 1272.

Petitioner also argues that trial counsel's advice was deficient because the evidence to support the rape and IDSI charges was "weak." In support of this allegation, he once again relies upon evidence that there was an absence of physical injuries to Robin's vagina and anus and no seminal fluid in her anus. He contends that, instead of advising him to enter his pleas, trial counsel should have contested the rape and IDSI counts at trial and argued to the jury that it should acquit him of those counts, that he was not guilty of even second-degree (felony) murder, and that, at most, he was guilty of voluntary manslaughter.[10]

Trial counsel testified at the PCRA hearing that he was aware that the laboratory reports showed the absence of seminal material in Robin's anus, but he explained that he did not believe that the jury would acquit Petitioner of the rape and IDSI counts and advised Petitioner to plead guilty so as not to focus a defense on the details of those crimes (PCRA Hr'g Tr. at 30, 35-36, 46-47), which trial counsel described as "ugly" and "prejudicial" (id. at 46-47). His aim was to

---

[10] Petitioner contends that another option available to trial counsel was to move to quash the rape and IDSI counts. This argument is precluded by the analysis of Claim I. The state courts did not find credible the evidence he introduced at the PCRA hearing to support his claim that counsel could have prevailed on the suppression motion. Since the confession was admissible, there were no grounds for the defense to move to quash the rape and IDSI counts.

"get the jury not to hate [Petitioner], to try to see him [as] a human being, to try to see that with his disability, he was not cognizant. I did not want to spend a lot of time with the details of dealing with the rape because I thought they would make him more dislikable." (Id. at 35-36).

Trial counsel testified that he did consider whether to argue to the jury that the only crime of which Petitioner was guilty was voluntary manslaughter. (Id. at 61-62). He determined that was not a viable option, because it would have required that Petitioner testify at trial and for the defense to argue that Petitioner killed Robin as a result of serious provocation on her part, an argument he believed would not have gone over well with the jury. (Id. at 62).

The PCRA court credited trial counsel's testimony and held:

> The record establishes that [his] strategy was not designed to completely prevent the admission of the evidence regarding the rape and the IDSI during the guilty and penalty phases of the case but was an attempt to minimize it. It was also noted that the strategy allowed counsel to argue to the jury that Petitioner was willing to accept responsibility for some of his actions.

(PCRA Op. II, Doc. 38-4 at 34). It concluded that, under the circumstances, trial counsel's advice to Petitioner to enter his pleas was objectively reasonable under the Strickland standard:

> [Trial counsel] was faced with fashioning a defense strategy in light of the very compelling evidence against Petitioner. Petitioner gave detailed confessions to both the September 1 and September 10 crimes and had written letters to [Britton] after the murder that indicated that [Robin] "deserved was she got." Petitioner was subject to a PFA order at the time that he killed his wife on September 10 and then later that morning went to the PFA hearing pretending that he was unaware that he had murdered her only hours before, resulting in the PFA hearing being dismissed. His description of the murder was detailed and graphic and demonstrated that he went to lengths to hide the evidence of the crimes. His letters, as noted above, demonstrated not only a complete lack of remorse for his crimes but also expressed disdain for the victim and what she endured and further expressed the belief that "death as too good for her." In addition, it is clear that upon a conviction of first degree murder, Petitioner would be found to be subject to at least one undisputed aggravating circumstance, that is, that he was subject to a PFA order protecting [Robin] at the time he killed her. Therefore, to argue that Petitioner was placed in jeopardy of the death penalty solely as a result of the plea which [trial counsel] recommended is meritless.

(Id. at 35-36) (footnote omitted).

In affirming the PCRA court's decision, the Pennsylvania Supreme Court recognized that "[a]llegations of ineffectiveness in connection with the entry of a guilty plea will serve as a basis for relief only if the ineffectiveness caused [Petitioner] to enter an involuntary or unknowing plea. In determining whether a guilty plea was entered knowingly and intelligently, a reviewing court must review all of the circumstances surrounding the entry of the plea." Mitchell II, 105 A.3d at 1272 (internal quotations and citations omitted). It agreed with the PCRA court that Petitioner failed to establish Strickland's deficient performance prong. Id. at 1271-73. It summarized the PCRA court's analysis and held that its "credibility determinations and findings…are supported by the record and its legal conclusions are free of error." Mitchell II, 105 A.3d at 1273.

**Discussion**

Petitioner argues this Court should not apply § 2254(d)'s deferential standard of review to Claim II, and instead review it *de novo*, because the Pennsylvania Supreme Court allegedly relied "strictly on state law" in finding trial counsel's performance was not deficient. This Court rejects that argument. As set forth above, Pennsylvania courts apply Strickland's standard when they evaluate ineffective assistance claims and both the PCRA court and the Pennsylvania Supreme Court applied that standard when they ruled upon Claim II and all of Petitioner's other ineffectiveness claims. (PCRA Op. II, Doc. 38-4 at 8-9, 28-37; Mitchell II, 105 A.3d at 1266, 1271-73). Moreover, a state court adjudication is not "contrary to…clearly established Federal law, as determined by the Supreme Court," 28 U.S.C. § 2254(d)(1), merely because it does not cite Supreme Court authority. Bell v. Cone, 543 U.S. 447, 455 (2005) (per curiam) ("Federal

courts are not free to presume that a state court did not comply with constitutional dictates on the basis of nothing more than a lack of citation.").[11]

Petitioner next argues that the Pennsylvania Supreme Court applied a rule that was "contrary to" the analysis required by Strickland and Hill because it allegedly improperly equated the ineffective assistance claim with an involuntary plea claim. This argument likewise has no merit. The Pennsylvania Supreme Court recognized that Petitioner could establish that his pleas were involuntary or unknowing if he demonstrated that his trial counsel performed deficiently in advising him to enter them. Mitchell II, 105 A.3d at 1272. It then evaluated Petitioner's claim under the Strickland standard, and held that the PCRA court correctly concluded that Petitioner did not establish that trial counsel gave him unreasonable advice. Id. at 1273 ("The PCRA court deemed trial counsel's PCRA testimony to be credible, thus concluding trial counsel advised [Petitioner] to plead guilty in order to minimize the jury's exposure to the evidence of the sexual offenses, and not, as alleged by [Petitioner], advised that such a plea would absolutely bar the jury from hearing any evidence of the sexual offenses during the guilt and penalty phases."). Therefore, the Pennsylvania Supreme Court applied the analysis required by Strickland and Hill when it evaluated Claim II and its adjudication was not "contrary to" those decisions.

Petitioner also argues that the Pennsylvania Supreme Court's adjudication was "an unreasonable application of" Strickland. Because the Pennsylvania Supreme Court denied Claim II on the basis that Petitioner failed to establish Strickland's deficient performance prong, Petitioner faces a particularly difficult burden here. Trial counsel's advice was premised

---

[11]     In fact, § 2254(d)(1) "does not even require awareness of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." Early v. Packer, 537 U.S. 3, 8 (2002) (per curiam).

precisely upon the type of strategic decisions that the Supreme Court in Strickland held to be protected from second-guessing. 466 U.S. at 690-91. "Even under *de novo* review, the standard for judging counsel's representation is a most deferential one. Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge. It is 'all too tempting' to 'second-guess counsel's assistance after conviction or adverse sentence.'" Richter, 562 U.S. at 105 (quoting Strickland, 466 U.S. at 689). When AEDPA's standard or review applies, as it does here, the burden upon a petitioner is all the more difficult to overcome:

> Establishing that a state court's application of Strickland was unreasonable under § 2254(d) is all the more difficult. The standards created by Strickland and § 2254(d) are both "highly deferential," [Strickland, 466 U.S.] at 689; Lindh v. Murphy, 521 U.S. 320, 333, n.7 (1997), and when the two apply in tandem, review is "doubly" so, [Knowles v. Mirzayance, 556 U.S. 111, 123 (2009)]. The Strickland standard is a general one, so the range of reasonable applications is substantial. [Id.] *Federal habeas courts must guard against the danger of equating unreasonableness under Strickland with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard.*

Id. (parallel citations omitted) (emphasis added).

The Pennsylvania Supreme Court agreed with the PCRA court that trial counsel's advice to plead guilty to the rape and IDSI counts certainly fell within the wide range of reasonable professional assistance. Its decision was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Richter, 562 U.S. at 103. Therefore, Petitioner has not satisfied the "unreasonable application of" clause of § 2254(d)(1).

The only remaining inquiry in this Court's evaluation of Claim II is whether Petitioner satisfied his burden of demonstrating that the Pennsylvania Supreme Court's adjudication of

Claim II "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). He has not. This Court is bound by the PCRA court's credibility determinations and findings of fact under § 2254(e)(1), and the Pennsylvania Supreme Court had sufficient evidence in the record before it to withstand review under § 2254(d)(2).

Finally, this Court rejects Petitioner's characterization of the evidence of rape and IDSI as "weak." He confessed to Det. Logan that he committed those crimes and that confession was powerful and probative evidence of his guilt. Additionally, as the PCRA court pointed out, Dr. Sutkin testified at Petitioner's trial that it is not unusual for there to be an absence of injury to the vagina or rectum during forced penetration. (PCRA Op. II, ECF No. 38-4 at 26-27) (citing Trial Tr. at 100-01). Therefore, the Commonwealth would have been able to use that type of testimony to neutralize any argument from the defense that the lack of injury to Robin's vagina or rectum supported a finding that Petitioner did not commit rape or IDSI during the September 10, 1997, attack. Petitioner argues Dr. Sutkin was testifying about the September 1, 1997, rape, during which Petitioner used a lubricated condom, and that there is no evidence that Petitioner used a condom during the September 10, 1997, rape and IDSI. Trial counsel could have argued that point to the jury, but that would have required the defense to put additional focus on the details of the rape and IDSI, something trial counsel wisely wanted to avoid. As for the absence of seminal fluid in Robin's anus, that fact does not lead to the conclusion that the evidence of the crime of IDSI crime was weak when considered together with Petitioner's confession and the other circumstantial evidence of his guilt. Moreover, the Commonwealth did not have to prove that Petitioner ejaculated to convict Petitioner of either IDSI or rape.

Based upon all of the foregoing, Claim II is denied. This Court is bound by the PCRA court's findings of fact and credibility determinations under § 2254(e)(1), and Petitioner has not overcome the burden imposed upon him by either § 2254(d)(1) or (d)(2), under which this Court must evaluate the Pennsylvania Supreme Court's adjudication of Claim II. Therefore, Petitioner is not entitled to habeas relief on it. Because jurists of reason would not find it debatable that Claim II lacks merit, a certificate of appealability is denied.

### Claims III, IV and V

**Background**

On August 1, 2007, early in the litigation of Petitioner's first PCRA proceeding, one of his attorneys with the FCDO, Carol Wright, and an investigator, Amy Hurd, met with Britton to discuss Petitioner's case. Wright did not testify at the PCRA hearing. Her affidavit (Doc. 6-11 at 17-19), which was dated August 14, 2009, was admitted as an exhibit. In it, Wright averred that she and Hurd interview Britton in person on August 1, 2007. They discussed, among other things, Britton's telephone conversations with Petitioner the morning of the murder. (Id. at 18; PCRA Op. II, 38-5 at 1). Over seven months later, on March 20, 2008, Wright spoke with Britton again. During this conversation, Britton disclosed to Wright the information discussed below, upon which Claims III, IV and V are premised.

Two officers met with Britton on October 3, 2012, prior to the PCRA hearing, and their report (Doc. 6-11 at 44-45) was introduced as an exhibit at it. The officers reviewed Wright's affidavit with Britton, and they wrote in their report that Britton told them that Wright's account was "fairly accurate. But [Britton] mentioned that she felt pressured by Carol Wright while answering questions." (Id. at 44). After Britton's March 20, 2008, interview with Wright, Britton refused to be interviewed by Petitioner's attorneys. (PCRA Hr'g Tr. at 72-75).

When she testified at the PCRA hearing in October 2012, Britton said she spoke briefly with two officers at the scene of the crime the morning of September 10, 1997, not long after Robin's body had been discovered in the vacant lot, which was located beside a firehouse. She "didn't have very much to say" (id. at 79), was "there maybe five minutes," and told them she knew nothing about the murder. (Id. at 84-85). Britton explained that at the time she "was dazed and in shock" and was traumatized by all that had occurred. (Id. at 85-86). She said that it was not until she went to sleep that night that "everything started coming back to me. I started hearing [Petitioner's] voice and the conversations, and I thought I was losing my mind[.]" (Id. at 80). Britton testified that she went to a counselor the next day, later sought treatment with a therapist, and that her doctor told her that the trauma of the event had initially affected her memory. (Id. at 86-89). Britton insisted that her trial testimony was true. (Id.)

Britton further testified that no one from Petitioner's defense team interviewed her prior to the trial and that, if they would have, she would have disclosed how she came to remember her telephone calls with Petitioner. (Id. at 82). She believed she told the prosecutor during a pre-trial interview how her memory came back to her. (Id. at 79-82). However, Britton gave her statement to the police on July 23, 1998, and the report of that statement indicates that she did not disclose to the police how she retrieved her memory.[12] (Doc. 6-11 at 42-43). She also met with the prosecutor prior to the trial, reviewed her July 23, 1998 statement and made handwritten corrections and modifications to it, and that edited statement indicates that she did not disclose the information to the prosecutor. (Doc. 26-2 at 33-35; PCRA Hr'g Tr. at 167-68, 171; PCRA Op. II, Doc. 38-5 at 2).

---

[12]     At the PCRA hearing, Britton said that she could not remember whether she or the police initiated contact on July 23, 1998. (PCRA Hr'g Tr. at 76).

When the prosecutor testified at the PCRA hearing, he said that Britton did not reveal to him how she remembered her telephone conversations, and that the first time he learned that information was when he was notified that his testimony was required at the PCRA hearing. (PCRA Hr'g Tr. at 169). He said that if Britton had disclosed that information to him, or if he had learned of it from any other source, he "[a]bsolutely" would have disclosed it to Petitioner's attorneys. (Id.; id. at 168-73). The prosecutor said that he had "an open file" practice in which he disclosed everything to the defense. (Id. at 165).

The prosecutor testified that the first police officers who arrive at a crime scene generally complete a standard form, referred to as a "3-0" or initial report, registering any persons who were present at the scene "who may have relevant information." (Id. at 173). He said that, to his knowledge, there was no interview of Britton and, therefore, no initial report regarding her. (Id. at 166-67). If in fact she spoke briefly with officers at the scene of the crime, the prosecutor explained, no report would have been generated noting her comments to them because she did not disclose that she had information about the murder and was not considered a witness at that time. (Id. at 166-67, 173-74). He elaborated:

> Interviews were not generated of persons who provided no information, or bystanders. Robin's body was found in an open lot near her home, next to the firehouse. So I would imagine on Hamilton Avenue, [a] busy area of Homewood, there were probably a lot of onlookers who were interested in the case. But Sheila Britton was never initially identified in any of the initial reports as a bystander or a person who had any information.

(Id. at 167).

Trial counsel's PCRA testimony corroborated the prosecutor's testimony. He said that they "had a fabulous relationship in terms of how we tried homicides[,]" and that the prosecutor always told him when there was new discovery. (Id. at 49-50). Trial counsel insisted that if the prosecutor had possessed the information at issue, he would have disclosed it to the defense.

(Id.)  Trial counsel described the prosecutor as "one of the most honorable men I know" and said that he did not play "games" with the defense.  (Id. at 50).

**Petitioner's Claims Pertaining to Britton**

In Claim III, Petitioner alleges that his trial counsel was ineffective for failing to interview Britton prior to the trial.  If trial counsel would have, Petitioner argues, Britton would have told him how she remembered the telephone conversations, and he could have used that information to impeach the portion of her trial testimony regarding those conversations.  In Claim IV, Petitioner asserts that the Commonwealth suppressed the statement Britton gave to the police when she was at the scene of the crime the morning of the murder, in violation of its obligations under Brady v. Maryland, 373 U.S. 83 (1963).  In Claim V, Petitioner alleges that Britton's trial testimony was so unreliable that it rendered his trial fundamentally unfair.

**The Brady Claim**

The Court will first address Claim IV, the Brady claim.  To prevail on it, Petitioner must demonstrate that: (1) the evidence at issue was favorable to the defense; (2) the Commonwealth suppressed the evidence; and (3) the evidence was material.  See, e.g., Strickler v. Greene, 527 U.S. 263, 281-82 (1999).  In denying this claim, the state courts concluded Petitioner failed to demonstrate the second element–that the Commonwealth suppressed evidence.  (PCRA Op. II, Doc. 38-5 at 1-6; Mitchell II, 105 A.3d at 1277-78).  The PCRA court credited the prosecutor's explanation as to why Britton's statements to the police the morning of the murder would not have been recorded in any report.  (Id. at 5-6).  It also found that Britton did not disclose any of the information at issue when she gave her statement to the police on July 23, 1998; or when the prosecutor interviewed her prior to the trial and gave her the opportunity to make corrections and edits to her statement; or, most significantly, when Wright and Hurd interviewed her on

46

August 1, 2007.  (Id. at 2-3, 5).  In fact, the PCRA found, "the first time that Britton informed

any attorney or investigator of her contact with police on the morning of the murder and the

manner in which she recalled the phone calls" was when she spoke with Wright on

March 20, 2008, almost a decade after the trial.  (Id. at 1; id. at 3).

The Pennsylvania Supreme Court affirmed the PCRA court's decision on the basis that

its factual findings were supported by the record and its conclusion that there was no Brady

violation was free of legal error.  Mitchell II, 105 A.3d at 1277-78.  In support of its

adjudication, it cited to specific portions of the prosecutor's and trial counsel's PCRA testimony.

Id. at 1278.

**Discussion**

Petitioner argues that the Pennsylvania Supreme Court's adjudication of Claim IV was an

unreasonable determination of the facts under § 2254(d)(2).  This argument is rejected.  The

Pennsylvania Supreme Court had before it the requisite evidence necessary for its adjudication to

withstand review under § 2254(d)(2)'s deferential standard.  Additionally, Petitioner has not

directed this Court to the required "clear and convincing evidence," 28 U.S.C. § 2254(e)(1), that

the PCRA court's findings of fact and credibility determinations were wrong.  Therefore, this

Court must presume that they are correct.

The only remaining inquiry for this Court in evaluating Claim IV is whether Petitioner

has established that the Pennsylvania Supreme Court's adjudication was "an unreasonable

application of" Brady under § 2254(d)(1).[13]  He has not.  He argues that its adjudication was

unreasonable because the prosecutor's testimony only established that he (the prosecutor) had no

---

[13]     Petitioner makes no argument in support of a conclusion that the Pennsylvania Supreme Court's
adjudication was "contrary to" Brady.

knowledge of whether a report had been prepared at the crime scene regarding Britton, not that no report was generated. His argument misses the mark because it is his burden to prove that the police recorded Britton's statement and the Commonwealth suppressed it, and the state courts concluded he did not meet that burden. There is no disputing that *if Petitioner had proved that officers at the crime scene had recorded Britton statement in an initial report*, that their report would be <u>Brady</u> material even if the prosecutor had no knowledge of it. <u>See</u>, <u>e.g.</u>, <u>Dennis</u>, 834 F.3d at 284 (citing <u>Strickler</u>, 527 U.S. at 280 and <u>Kyles v. Whitley</u>, 514 U.S. 419, 438 (1995)). Here, Petitioner failed to convince the state courts that the police who briefly spoke with Britton at the scene of the crime generated a report pertaining to her. The PCRA court credited the prosecutor's testimony regarding why no report would have been prepared under the circumstances (PCRA Op. II, Doc. 38-5 at 5-6), and as the Pennsylvania Supreme Court explained, "since [Petitioner] failed to prove the evidence at issue ever existed, the PCRA court concluded that [he] failed to establish a <u>Brady</u> violation." <u>Mitchell II</u>, 105 A.3d at 1278.

Based upon all of the foregoing, Claim IV is denied. This Court is bound by the PCRA court's findings of fact and credibility determinations under § 2254(e)(1), and Petitioner has not overcome the burden imposed upon him by either § 2254(d)(1) or (d)(2), under which this Court must evaluate the Pennsylvania Supreme Court's adjudication of Claim IV. Therefore, Petitioner is not entitled to habeas relief on it. Because jurists of reason would not find it debatable that Claim IV lacks merit, a certificate of appealability is denied.

### The Ineffective Assistance of Counsel Claim

Because Petitioner failed to establish the Commonwealth suppressed any evidence, this Court next turns to Claim III, in which he contends that trial counsel was ineffective for failing learn the information at issue because he did not interview Britton prior to the trial. The PCRA

court denied this claim because it rejected its premise, which is "that Britton would have advised trial counsel of that information during any pretrial interview." (PCRA Op. II, Doc. 38-5 at 2, 5). Britton testified at the PCRA hearing that she would have, but the PCRA court did not credit this particular part of her testimony. (Id.) In support of its credibility determination, the PCRA court pointed to the evidence summarized above: that Britton did not disclose any of the information at issue when she gave her statement to the police on July 23, 1998; or when the prosecutor interviewed her prior to the trial and gave her the opportunity to make corrections and edits to her statement; or when Wright and Hurd interviewed her on August 1, 2007. (Id. at 2-3, 5).

The Pennsylvania Supreme Court agreed with the PCRA court that Petitioner did not satisfy Strickland's prejudice prong. Mitchell II, 105 A.3d at 1273-77. It held that the PCRA court's determination that "there was no credible evidence establishing that any interview of Ms. Britton by trial counsel prior to trial would have revealed the information at issue[,]" was "a reasonable one deriving from the evidence presented at the PCRA hearing." Id. at 1277.[14]

**Discussion**

Petitioner contends that the Pennsylvania Supreme Court's adjudication of Claim III "resulted in a decision that was based on an unreasonable determination of the facts in light of

---

[14] The Pennsylvania Supreme Court observed also that "[c]ontrary to [Petitioner's] assertion on appeal, the PCRA court did not make a specific determination affirmatively finding that Ms. Britton's PCRA testimony of how she alleged to have remembered the telephone conversation was credible." Mitchell II, 105 A.3d at 1276 n.18. Petitioner attached to his Reply (Doc. 55-1 at 2) a screenshot from Vista Behavioral Health Associates Inc., showing that Britton was referred to this mental health center on September 11, 1997, the day after Robin's murder. That document, Petitioner asserts, supports his contention that Britton was telling the truth when she explained how she came to remember the telephone conversations. This Court cannot consider that document when it evaluates Claim III under AEDPA's standard of review at § 2254(d) because review under it is limited to the record that was before the state court. 28 U.S.C. § 2254(d)(2) (inquiry when this subsection of AEDPA applies is limited to "the evidence presented in the State court proceeding."); Cullen v. Pinholster, 563 U.S. 170, 180-86, and 185 n.7 (2011) (review under § 2254(d)(1), like that under § 2254(d)(2), is limited to the state court record). Additionally, the state courts did not deny Claim III because the PCRA court did not credit Britton's testimony as to how she remembered her telephone conversations. They denied it because Petitioner did not persuade them that Britton would have disclosed to trial counsel how she remembered those conversations.

the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). In support, he asserts that if trial counsel had interviewed Britton, he would have asked her the obvious question – why did it take her over ten months to go to the police? – and Britton would have disclosed to him how she came to remember the telephone calls. But the PCRA court did not credit Britton's PCRA testimony that she would have disclosed the information to trial counsel, and this Court must apply the presumption of correctness to the PCRA court's determination unless Petitioner directed this Court to "clear and convincing evidence[,]" 28 U.S.C. § 2254(e)(1), that it was wrong.

In support of his contention that he has overcome the deference this Court must afford to the PCRA court's findings, and the Pennsylvania Supreme Court's reliance on those findings when it denied Claim III, Petitioner cites the Court of Appeals for the Third Circuit's decision in Rolan v. Vaughn, 445 F.3d 671 (3d Cir. 2006). In that case, Florencio Rolan told his trial attorney that Daniel Vargas would support his self-defense claim. Rolan, 445 F.3d at 674-75. Rolan's attorney did not interview Vargas prior to the trial. A police detective did, and Vargas refused to cooperate with him and said that he knew nothing about the crimes for which Rolan was being prosecuted. Id. at 674. When Rolan's attorney stated at the trial that he had no witnesses to call for the defense, Rolan "pressed his attorney in open court to call Vargas" and told the trial court that Vargas would be willing to testify on his behalf. Id. at 675-76. "After some wrangling between counsel and the court, [Rolan's attorney] refused to call" Vargas. Id. at 676. Rolan was convicted of first-degree murder and robbery. Id.

Rolan claimed that his trial attorney was ineffective for failing to investigate Vargas's testimony and present him as a defense witness. At Rolan's PCRA hearing, Vargas said that he was not cooperative during his pre-trial interview with the detective because he did not want to

50

testify against Rolan and believed the prosecution wanted him to lie to support its case.  Id. Vargas stated that he would have testified for the defense if requested by Rolan's trial attorney, and he described the testimony that he would have given, which supported Rolan's contention that he acted in self-defense.  Id.

The PCRA court held that Rolan waived his ineffectiveness claim, but the Pennsylvania Superior Court reached the merits and denied it because it "was unable to conclude that Vargas was willing to appear on Rolan's behalf at trial[.]"  Id. (internal quotations omitted).  The Third Circuit held that "[t]he Superior Court's finding that Vargas was not willing to testify on behalf of Rolan was objectively unreasonable because it was not supported by the record.  The Superior Court concluded that Vargas was unwilling to testify on behalf of Rolan based on Vargas's unwillingness to cooperate with a detective.  The court conflated Vargas's unwillingness to cooperate with the police with a purported unwillingness to testify for the defendant."  Id. at 681.

The state courts did not make the same error in Petitioner's case and Rolan is distinguishable.  There was evidence introduced at Petitioner's PCRA hearing to support the PCRA court's conclusion that Britton would not have disclosed the information at issue had trial counsel interviewed her.[15]  That evidence showed more than just that Britton did not reveal to the police or the prosecutor how she remembered her telephone conversations with Petitioner.  It showed that Britton did not disclose the information to Petitioner's attorney, Wright, and his investigator, Hurd, when they interviewed her on August 1, 2007.  Wright and Hurd, like Petitioner's trial counsel, would have wanted to know the answer to the "obvious question" of why she did not give her statement to the police until July 23, 1998.  Yet Britton did not reveal

---

[15]     Another distinction is that Rolan told his counsel to interview Vargas and insisted that Vargas would provide information to assist the defense.  Petitioner has not directed this Court to evidence that he told his trial counsel that he did not have the telephone conversations with Britton the morning of the murder and that a pre-trial interview of her would be worthwhile so that the defense could impeach her testimony in that regard.

her information to Wright and Hurd when they interviewed her, and that is one of the reasons the PCRA court did not find credible Britton's PCRA testimony that she would have revealed the information to trial counsel. There is no "clear and convincing evidence" that the PCRA court was wrong when it found that, for whatever reason, Britton did not share, and would not have shared, her information with any attorney or investigator prior to the trial, including with Petitioner's attorney.

Under the circumstances, the Court must deny Claim III. This Court is bound by the PCRA court's findings of fact and credibility determinations under § 2254(e)(1), and Petitioner has not overcome the burden imposed upon him by either § 2254(d)(1) or (d)(2), under which this Court must evaluate the Pennsylvania Supreme Court's adjudication of Claim III. Because jurists of reason would not find it debatable that Petitioner is not entitled to relief on Claim III, a certificate of appealability is denied.

**Claim V**

In his final claim pertaining to Britton, Claim V, Petitioner asserts that the manner in which she remembered her two telephone conversations renders her trial testimony regarding those conversations so unreliable that it undermined the fundamental fairness of his trial. This is the claim that Petitioner litigated in his second PCRA petition, which he filed on February 13, 2015.

The PCRA has a one-year statute of limitations, which is codified at 42 PA. CONS. STAT. § 9545(b). It is jurisdictional, <u>Mitchell III</u>, 141 A.3d at 1284, and it provides, in relevant part:

> (1) Any petition under this subchapter, including a second or subsequent petition, shall be filed within one year of the date the judgment becomes final, unless the petition alleges and the petitioner proves that:
>               - - -

> *(ii) the facts upon which the claim is predicated were unknown to the petitioner and could not have been ascertained by the exercise of due diligence[.]*
>
> - - -
>
> (2) Any petition invoking an exception provided in paragraph (1) shall be filed within one year of the date the claim could have been presented.

42 PA. CONS. STAT. § 9545(b)(1)(ii), (2) (emphasis added).[16]

Petitioner argued to the state courts that the "facts upon which" Claim V is predicated is the PCRA court's determination in his *first* PCRA proceeding that Britton would not have disclosed the information at issue to trial counsel.[17] Therefore, he contended that he could invoke the exception to the one-year limitations period set forth at § 9545(b)(1)(ii).

The PCRA court rejected Petitioner's argument because the "facts" upon which Claim V is predicated *is the manner in which Britton remembered her telephone conversations with him the morning of the murder*. (PCRA Op. III, Doc. 40-4 at 7-8). Petitioner learned of those facts when Wright interviewed Britton on March 20, 2008. (<u>Id.</u>) He litigated in his first PCRA proceeding other claims predicated upon what Britton had told Wright during that interview, and he obviously could and should have litigated Claim V in that first PCRA proceeding too. Accordingly, the PCRA court held that Claim V was untimely under the state's one-year statute of limitations. (<u>Id.</u> at 2-13).

The Pennsylvania Supreme Court affirmed the PCRA court's decision in <u>Mitchell III</u>. It held:

---

[16]    As set forth above, Petitioner's judgment of sentence became final on January 16, 2007, when the Supreme Court denied his petition for a writ of certiorari from <u>Mitchell I</u>.  <u>Mitchell v. Pennsylvania</u>, 549 U.S. 1169 (2007); 42 PA. CONS. STAT. § 9545(b)(3).

[17]    The PCRA, at § 9543(a)(2), lists what types of substantive claims may be litigated in a post-conviction proceeding.  Federal constitutional claims are cognizable, including <u>Brady</u> and ineffective assistance of counsel claims.  So too are claims alleging "[t]he unavailability at the time of trial of exculpatory evidence that has subsequently become available and would have changed the outcome of the trial if it had been introduced." 42 PA. CONS. STAT. § 9543(a)(2)(vi).  In his second PCRA proceeding, Petitioner asserted that he was raising an "after-discovered evidence" claim under § 9543(a)(2)(vi).

> [T]he PCRA court correctly concluded that [Petitioner] failed to prove the existence of a newly-discovered "fact" that he could not have ascertained previously through the exercise of due diligence. The PCRA court's earlier determination that Ms. Britton would not have disclosed the relevant information to [Petitioner's] counsel prior to trial was part of the court's reasoning for rejecting [Petitioner's] ineffective assistance of counsel claim [Claim III]. The court's legal conclusion, itself, did not establish any new and previously-unknown fact regarding the circumstances surrounding Ms. Britton's recollection of the telephone calls. Accordingly, [Petitioner] has failed to satisfy the newly-discovered fact exception to the PCRA's time bar. Therefore, [Petitioner's] petition was untimely, leaving the PCRA court without jurisdiction to entertain his claims.

Mitchell III, 141 A.3d at 1285.

**Discussion**

A federal habeas petitioner procedurally defaults a claim when the "state court declined to address [it] because the prisoner failed to meet a state procedural requirement." Coleman v. Thompson, 501 U.S. 722, 730 (1991). For the procedural default doctrine to apply, the rule applied by the state court must be, *inter alia*, "adequate." Id. at 729-30. A state procedural rule is "adequate" if it is "firmly established and regularly followed" at the time that the alleged procedural default occurred. Ford v. Georgia, 498 U.S. 411, 423-24 (1991) (quoting James v. Kentucky, 466 U.S. 341, 348-51 (1984)); Albrecht v. Horn, 485 F.3d 103, 115 (3d Cir. 2007) ("Whether a procedural rule was firmly established and regularly applied is determined as of the date the default occurred, and not as of the date the state court relied on it, because a petitioner is entitled to notice of how to present a claim in state court.") (internal citations and quotations omitted).

The Commonwealth argues that because the Pennsylvania Supreme Court dismissed Claim V on the grounds that it was untimely, Petitioner procedurally defaulted the claim for the purposes of federal habeas review. Petitioner counters that the procedural rule that the state courts applied to Claim V was not "adequate," but no argument he makes on that point is

persuasive.  The PCRA's statute of limitations was "firmly established and regularly followed" at the time Petitioner defaulted Claim V, which was when he could have raised it, but did not, during his first PCRA proceeding.  Claim V, like Claim III (the ineffective assistance claim) and Claim IV (the Brady claim) is predicated upon the manner in which Britton said she remembered her telephone conversations with Petitioner.  Britton told that information to Wright on March 20, 2008, and the topic was explored extensively during the course of the five-day evidentiary hearing held in October 2012.

For many years the Pennsylvania Supreme Court applied a "relaxed waiver" rule in capital cases that precluded a finding of "adequacy" for procedural default purposes.  See, e.g., Lark v. Sec'y Pennsylvania Dept. of Corr., 645 F.3d 596, 612 (3d Cir. 2011) (describing the "relaxed waiver" rule).  However, by the time Petitioner litigated his first PCRA petition (which his attorneys with the FCDO amended several times, including in 2009 and also after the 2012 evidentiary hearing), the statute of limitations was "firmly established and regularly followed" in capital cases.  Morris v. Beard, 633 F.3d 185 (3d Cir. 2011) ("a trio of Pennsylvania Supreme Court decisions in 1998 and 1999 interred the relaxed waiver doctrine[.]") (citing Commonwealth v. Banks, 726 A.2d 374 (1999)).  Petitioner was thus on notice during the litigation of his first PCRA petition that he had to raise all claims available to him at that time. Therefore, the Pennsylvania Supreme Court's application of the PCRA's statute of limitations to Claim V was "adequate."  As a result, Petitioner procedurally defaulted Claim V and this Court denies it for that reason.

Petitioner argues that if this Court concludes that Claim V is procedurally defaulted, it should excuse his default based on the actual innocence exception to procedural default recognized by Schlup v. Delo, 513 U.S. 298 (1995) because Britton's testimony was allegedly so

unreliable and crucial to his first-degree murder conviction. "To qualify for this exception, the

petitioner must present new, reliable evidence showing it is more likely than not that no

reasonable juror would have voted to convict him."[18] Reeves v. Fayette, SCI, 897 F.3d 154, 157

(3d Cir. 2018), cert. denied sub. nom. 139 S. Ct. 2713 (2019); id. at 160-61. See also McQuiggin

v. Perkins, 569 U.S. 383 (2013); House v. Bell, 547 U.S. 518 (2006). As the Third Circuit

recently explained:

> "[M]ere impeachment evidence is generally not sufficient to satisfy the [actual
> innocence gateway] standard." Munchinski v. Wilson, 694 F.3d 308, 338 (3d Cir.
> 2012). However, new, reliable evidence that "undermine[s] the [trial] evidence
> pointing to the identity of the [perpetrator] and the motive for the [crime]" can
> suffice to show actual innocence. Goldblum v. Klem, 510 F.3d 204, 233 (3d Cir.
> 2007); see also Munchinski, 694 F.3d at 336-37 (explaining that actual innocence
> was demonstrated where new evidence both showed that the crime could not have
> happened in the way the Commonwealth presented at trial and provided an
> alternative theory that was more appropriate and better fit the facts of the case).
> In weighing the evidence, "[t]he court's function is not to make an independent
> factual determination about what likely occurred, but rather to assess the likely
> impact of the evidence on reasonable jurors"; the actual innocence standard "does
> not require absolute certainty about the petitioner's guilt or innocence." House,
> 547 U.S. at 538, 126 S. Ct. 2064.
>
> The gateway actual innocence standard is "demanding" and satisfied only
> in the "rare" and "extraordinary" case where "a petition presents evidence of
> innocence so strong that a court cannot have confidence in the outcome of the trial
> unless the court is also satisfied that the trial was free of nonharmless
> constitutional error." McQuiggin, 569 U.S. at 386, 392, 401, 133 S. Ct. 1924
> (internal quotation marks and citations omitted).

Id. (altered text added by court of appeals).

Petitioner's new evidence with respect to Britton is impeachment evidence, which

generally is not sufficient to show actual innocence. Id. Additionally, although her testimony

---

[18]    With respect to the default of a claim challenging a capital sentence, the actual innocence exception may
excuse a default if the petitioner showed "by clear and convincing evidence that, but for a constitutional error, no
reasonable juror would have found the petitioner eligible for the death penalty under applicable state law." Sawyer
v. Whitley, 505 U.S. 333, 336 (1992). Because this Court has determined that Petitioner is entitled to sentencing-
phase relief on Claim VI, it will not evaluate whether Petitioner made this showing.

supported the Commonwealth's case that Petitioner acted with the specific intent to kill, there was other important, independent and strong evidence that established that element of first-degree murder, such as his confession, his use of his deadly weapon and his deliberative actions before and after the murder. Petitioner has not demonstrated that this is one of the rare cases in which a procedural default can be avoided under the actual innocence standard.

Based upon all of the foregoing, Petitioner procedurally defaulted Claim V and this Court denies it for that reason. Jurists of reason would not find this Court's determination debatable;[19] therefore, a certificate of appealability is denied.

## Claims VI and VII

### Background

Dr. Bernstein was the defense's sole expert. On April 13, 1999 (almost six months before Petitioner's trial), he sent trial counsel his preliminary report, which he copied to penalty-phase counsel. (Doc. 6-10 at 23-26). He wrote that Petitioner suffered from alcohol abuse and dependence and had a history of concussions, organic mood disorder (depression) and alcoholic hallucinosis. (Id.) He advised that it was his opinion that Petitioner lacked the capacity to form the specific intent to kill and, therefore, he had a viable diminished capacity defense. (Id. at 25). Dr. Bernstein also provided information relevant toward proving mitigating factors in the event Petitioner was convicted of first-degree murder and a capital sentencing hearing was held. He wrote that "there are multiple, significant pre-natal and anti-natal mitigating factors[,]" including Petitioner's in utero exposure to alcohol, genetic loading for alcoholism coupled with chronic

---

[19]  "When the district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim, a [certificate of appealability] should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." Slack, 529 U.S. at 484.

alcohol abuse, history of recurrent depression, and the fact that he "was in desperate need of psychiatric care during the time period in question." (Id. at 25-26).

At the end of his report, Dr. Bernstein wrote:

> Would you please forward to my attention all of the records that pertain to [Petitioner's] arrest, any written or signed statements, and any police records or other records in possession of the district attorney that are available for my review? It is essential that I review these prior to trial, and I will amend or expand my report after reviewing these documents, if appropriate.

(Id. at 26) (emphasis in original).

Notwithstanding Dr. Bernstein's express request for additional records, and despite the obvious importance of any statements made by Petitioner suggesting an intent to kill, Petitioner's attorneys did not provide to Dr. Bernstein three key documents or category of documents. First, Petitioner's attorneys did not provide to Dr. Bernstein the July 23, 1998 statement Britton gave to the police within which she reported the two telephone conversations she had with Petitioner in the early morning of September 10, 1997. As a result, Dr. Bernstein did not know that Petitioner called Britton shortly before he killed Robin and told Britton exactly what he was going to do. (Trial Tr. at 567-68, 599-600). Second, Petitioner's attorneys did not provide to Dr. Bernstein the letters that Petitioner sent to Britton when he was in jail awaiting his trial, including one in which he wrote that Robin deserved to die because of what she had put him through. (Id. at 577, 597). Third, they did not provide to him the entries from Robin's journal in which she wrote that Petitioner had threatened to kill her. (Id. at 564-67). The Pennsylvania Supreme Court referred to these documents collectively as the "Britton and Little documents." Mitchell II, 105 A.3d at 1278.

When he testified on direct-examination during the guilt phase of Petitioner's trial, Dr. Bernstein stated that "in both of [Petitioner's] parents there is strong genetic loading for

alcoholism" and that his mother drank alcohol when she was pregnant with him. (Trial Tr. at 539). He explained that "there is a much higher prevalence of neurological and psychiatric abnormalities in fetuses that are exposed to alcohol in the womb[,]" and that such exposure can lead to other consequences, such as poor attention spans, impulsiveness, aggressiveness and a "variety of psychiatric diseases, attention deficit disorder, major depression, the kind of depression you treat with medication, that sort of thing." (Id. at 540-41).

Dr. Bernstein discussed Petitioner's two admissions to St. Francis Hospital in 1992 when he was 14 years old. (Id. at 547-56). Petitioner began drinking alcohol when he was around age 11 (id. at 542), and Dr. Bernstein testified that the reason for his first admission to St. Francis Hospital, in April 1992, was because "his drinking was pretty out of control" and "he was having homicidal thoughts." (Id. at 543). According to Dr. Bernstein, the records from Petitioner's second admission to St. Francis Hospital, in May 1992, indicated that he was not "able to modulate his aggressive impulses very well[,]" and "the center of the problem was the alcohol use. The other problems arose as the direct result of that." (Id. at 552). The records from that visit also reflected that he had "homicidal ideations" towards his father. (Id. at 556).

According to Dr. Bernstein, Petitioner's St. Francis Hospital records from 1992 demonstrated that by the age of 14, Petitioner had "a severe problem with alcohol" (id. at 548) and had experienced "at least one blackout." (Id. at 549). He said that Petitioner's problems predicted the likelihood that he would develop "significant psychiatric disease." (Id. at 548; id. at 549 ("this level of severe alcoholism in a kid of this age is a bad prognostic indicator for the future.")). When he was age 14, Dr. Bernstein explained, Petitioner's substance abuse problem would have been "treatable" if he had had the proper "family component," but that was absent in his case. (Id. at 554). He stated that individuals like Petitioner, who have had a severe alcohol

problem since a young age, are more "likely to be violent and impulsive" and are at a "greater

risk for participating in unplanned aggressive acts, being wild…clinically depressed and in some

instances psychotic."  (Id. at 548-59).

At the conclusion of his direct examination, Dr. Bernstein testified that, in his opinion, at

the time Petitioner killed Robin he was alcohol dependent and was suffering from (1) "a

condition called alcoholic hallucinosis wherein chronic use of alcohol induces auditory

hallucinations or you hear voices" and (2) "a depression of moderate to severe

severity…primarily due to chronic alcohol use."  (Id. at 556-57).  He also said he believed that

Petitioner may have been in an alcohol-induced blackout at the time of the murder.  (Id. at 557-

59).  Dr. Bernstein concluded:

> those factors coupled with the other factors we discussed, primarily the in utero or
> exposure to alcohol during the gestation when his mom was pregnant with him
> coalesced to the point where his cognitive capacity to premeditate and deliberate
> and form specific homicidal intent and be fully conscious of that intent was
> diminished, which is a forensic conclusion as opposed to a clinical conclusion.
>
> Put a different way, I believe that he was mentally ill at the time of the
> event and that this mental illness diminished his capacity to premeditate,
> deliberate and form specific homicidal intent and be fully conscious of that intent.

(Id. at 556-57).

Significantly, at the time Dr. Bernstein gave the above-cited testimony and opined that

Petitioner lacked the capacity to form the specific intent to kill, the jury – but not Dr. Bernstein –

knew about the evidence that undermined his opinion.  That is because Britton already had

testified that, just before the murder, Petitioner called her and told her that he was going over to

Robin's house to kill her.  (Id. at 325-30).  Britton also had read to the jury the letters in which

Petitioner wrote that Robin deserved to die because of what she had put him through.  (Id. at

332-35).  And, Robin's mother had already testified and read to the jury excerpts from Robin's diary within which she recounted Petitioner's threats to kill her if she left him.  (Id. at 158-67).

During cross-examination, the prosecutor handed Dr. Bernstein a copy of the July 23, 1998 police report of Britton's statement and asked him if he had reviewed either that report or testimony concerning that report.  (Id. at 567).  Dr. Bernstein replied that he had not.  (Id. at 567-68).  The prosecutor then asked him if he was "made aware from any source whatsoever that approximately a half an hour before Robin Little was beaten and killed that [Petitioner] made a statement to [Britton] that he was going over and was going to kill Robin Little?"  (Id. at 568).  Dr. Bernstein replied, "No.  I have never heard that before."  (Id.)  Later, in response to a similar question from the prosecutor of whether he was "aware, either from the notes or any representations made to you," that just prior to the murder, Petitioner told Britton that he was going to Robin's house and to kill her, Dr. Bernstein replied, "No.  I have never heard that."  (Id. at 599-600).

Dr. Bernstein also admitted during cross-examination that he had never reviewed, and had never been made aware of, either Robin's journal entries or the letters that Petitioner wrote to Britton from jail.  (Id. at 564-67, 577, 597).  He handled the matter by saying that it did not surprise him that Petitioner had threatened Robin since he had "made homicidal statements" to other people before (id. at 565), and he attempted to downplay the significance of the letters by stating that Petitioner wrote them months after the crime.  (Id. at 597).  Dr. Bernstein said he would have reached the same opinion about Petitioner's state of mind at the time of the killing if he had known about the journal entries and letters.  (Id. at 565, 596-97).

The prosecutor also posed numerous questions to Dr. Bernstein about notations in Petitioner's 1992 St. Francis Hospital records in an attempt to demonstrate that, during direct-

examination, he had overstated the severity of Petitioner's alcohol use when he was young. (Id. at 569-76, 580-84). For example, the prosecutor pointed to one notation from April 1992 that indicated that Petitioner had reported weekend-only or moderate drinking habits (id. at 574-75), and another which suggested that Petitioner's first admission was for conduct disorders, not for alcoholism. (Id. at 575-76). Dr. Bernstein commented that the prosecutor was "cherry-picking sentences" from the records (id. at 582) and was reading brief passages which did not accurately summarize them. (Id. at 575-76).

Additionally, although trial counsel had promised the jury in his opening statement that the defense would present evidence that Petitioner "suffered from fetal alcohol syndrome[,]" (id. at 42-43), Dr. Bernstein did not so testify during direct-examination, and he in fact admitted on cross-examination that Petitioner "most definitely does not have fetal alcohol syndrome." (Id. at 561).

Petitioner's mother had testified earlier in the trial (and later would testify during the sentencing hearing) that she was an alcoholic when she was pregnant with Petitioner and did not stop drinking until her seventh month of pregnancy. (Id. at 484, 826). Dr. Bernstein relied upon her account when he diagnosed Petitioner. (Id. at 539-40, 563-64). The prosecutor undercut that reliance by reading to Dr. Bernstein a notation from a medical record from 1992 that indicated that Petitioner's mother was a heavy drinker "five years ago." (Id. at 562-63). The prosecutor used that passage to argue that Petitioner's mother *did not begin to have her alcohol problem until* four or five years prior to the date of that record *i.e.*, when Petitioner was around ten years old. (Id. at 562-63, 647-48).

The prosecutor demonstrated also during his questioning of Dr. Bernstein that the more recent hospital records and testing of Petitioner undercut the basis for his opinion that Petitioner

was unable to form the specific intent to kill Robin.  For example, the records from Petitioner's visit to St. Francis Hospital the day of the murder showed that he stated that his last blackout was ten months beforehand and his mental status was listed as "alert, impulse control good, cooperative[.]"  (Id. at 588-89).

Predictably, in his closing argument the prosecutor highlighted the fact that Dr. Bernstein did not review, or have knowledge of, the Britton and Little documents when he made his diagnosis of Petitioner or when he testified on direct-examination.  The prosecutor told the jury not to be swayed by Dr. Bernstein's testimony that his opinion remained unchanged even upon the presentation during cross-examination of evidence that so obviously discredited it.  (Id. at 657-61).  The prosecutor argued that Dr. Bernstein's evaluation, diagnosis and opinion of Petitioner was not "worthy of your consideration and belief."  (Id. at 655).

The prosecutor faulted Dr. Bernstein expressly for forming his opinion without considering the substance of Petitioner's conversation with Britton just prior to the killing:

> Within an hour of Robin Little's death, [Petitioner] told Shelia Britton not once but more than once, as many as three times, that he was going over there to kill [Robin]….
>
> He told Shelia Britton why he was going over there to kill [Robin], because she was disrespectful to him, because she was with another man.
>
> Where is that factored into [Dr.] Bernstein's opinion?  Wouldn't that be reflective on a person's cognitive abilities?  Why didn't [Dr.] Bernstein tell you about that?  Why didn't he comment on that?

(Id. at 659-60).  Of course, Dr. Bernstein did not know about Petitioner's statements to Britton because Petitioner's attorneys did not provide that information to him.

The prosecutor similarly asked "[w]hy didn't [Dr. Bernstein] look at Robin Little's journal?" (id. at 657), and argued that the jury should not credit his opinion because he failed to ask Petitioner about the threats he made to Robin and his abusive relationship with her, all of

which she had chronicled in her journal. (Id. at 658). Dr. Bernstein's failure to take into consideration Petitioner's letters to Britton was yet another reason not to credit his testimony, the prosecutor asserted. (Id. at 659-60).

The prosecutor argued also that none of the disorders that Dr. Bernstein attributed to Petitioner impinged on his ability to form specific intent. (Id. at 657, 664-66). He acknowledged that Petitioner's medical records showed that he had severe conduct disorder and emerging antisocial personality disorder. (Id. at 654). However, he asserted that although the medical records indicated that Petitioner was alcohol dependent, they did not show he was "an alcoholic kid[.]" (Id. at 654). The prosecutor also asserted that Dr. Bernstein "overstated" Petitioner's "exposure to…alcohol before his birth" (id. at 665), and that Petitioner's mother did not develop her alcohol problem until Petitioner was around ten. (Id. at 647-48).

In Claim VI, Petitioner contends that trial counsel was ineffective for failing to provide the Britton and Litton documents to Dr. Bernstein. As a result of counsel's deficient performance, Petitioner argues, Dr. Bernstein's credibility was devastated, thereby prejudicing him at both phases of the trial, since Dr. Bernstein was the key witness presented to support the diminished capacity defense and the mitigation case. In Claim VII, Petitioner contends that his St. Francis Hospital records from 1992 irrefutably established that he had suffered from severe alcoholism since at least age 14. He argues that trial counsel was ineffective because he was not familiar with the contents of those records and, as a result, was unable to rehabilitate Dr. Bernstein's testimony after the prosecutor's cross-examination. This deficient performance, Petitioner contends, prejudiced him at both phases of his trial too.

At the PCRA hearing, Dr. Bernstein recounted that Petitioner's trial was unforgettable because "[i]t was notable for the degree to which I was presented with profoundly important

information on cross-examination that undermined the credibility of my testimony." (PCRA Hr'g Tr. at 187). He said the prosecutor's cross-examination "made me look like I didn't know what I was talking about[.]" (Id.) Although Dr. Bernstein said that he still believed that Petitioner had lacked the specific intent to kill due his disorders (id. at 212-13), he said that if he had been presented with the Britton and Little documents prior to the trial, he would have advised trial counsel "that the pursuit of an affirmative mental health defense [during the guilt phase] could be perilous to [Petitioner] and that thought should be given" to whether the defense should just focus on the penalty phase. (Id. at 200).

This assessment from Dr. Bernstein was consistent with penalty-phase counsel's PCRA testimony. She stated that she told trial counsel prior to the trial that "the diminished capacity defense should not be presented and that the psychiatric evidence should be held back for the penalty phase." (Id. at 116-17). She said that she thought trial counsel and Dr. Bernstein "would come to see that that should be done, and when it wasn't, there wasn't anything I could do." (Id. at 117). Penalty-phase counsel testified that Dr. Bernstein "ended up looking like somebody who didn't have a clue what he was talking about, because on cross-examination the [prosecutor] kept pulling up page after page of reports where things kind of contradicted what Dr. Bernstein had previously testified to, or called into question in some way what he had testified to, and he's the only thing to hang on to for the alleged diminished capacity defense." (Id. at 120).

Penalty-phase counsel stated that Dr. Bernstein was "made to look like a fool" and that, as a result, Petitioner's mitigation case fell apart since Dr. Bernstein was the only expert witness she had to present at the sentencing hearing to explain Petitioner's mental-health disorders, as well as the severity of the drinking problem he had had since he was a child. (Id.) Since the prosecutor revealed that Dr. Bernstein was not "a dependable witness," penalty-phase counsel

stated, Petitioner's mitigation case had "a huge hole in it[,]" as evidenced by the fact that no juror found even one mitigating circumstance. (Id. at 120-21).

Trial counsel acknowledged that his failure to provide Dr. Bernstein with the Britton and Little documents (and particularly the July 23, 1998, police report and Petitioner's letters to Britton) "vitiated" Dr. Bernstein's testimony. (Id. at 43). He also admitted that, if Dr. Bernstein would have advised him prior to the trial to focus on the mitigation case and not a diminished capacity defense, he would have done so and "concentrated all my efforts on the penalty phase." (Id. at 55).

The PCRA court, when evaluating Claim VI, held that Petitioner established Strickland's first prong, concluding that "[t]here is no dispute that counsel did not provide Dr. Bernstein with the materials at issue or that counsel had a reasonable strategy for failing to do so." (PCRA Op. II, 38-5 at 13). It denied Claim VI because it concluded that Petitioner did not demonstrate that he was prejudiced by counsel's deficient performance. (Id.) It reached this conclusion by noting that Dr. Bernstein had testified that the Britton and Little documents did not change his opinion of Petitioner, and because Dr. Bernstein's testimony was, in its estimation, "called into question primarily based on discrepancies between his opinions and the medical records from St. Francis Hospital that he used to form the basis of his opinions." (Id.) In disposing of Claim VII, the PCRA held that "there was extensive testimony and evidence presented to the jury throughout both the guilty and penalty phases regarding Petitioner's history of alcohol abuse and dependence." (Id. at 14).

In its adjudication of Claim VI, the Pennsylvania Supreme Court agreed with the PCRA court's determination that Petitioner did not satisfy Strickland's prejudice prong. Mitchell II, 105 A.3d at 1282. It specifically concluded that, with respect to the guilt phase of the trial,

Petitioner was not prejudiced because he failed to demonstrate there was a reasonable probability that "absent the prosecutor's cross-examination of Dr. Bernstein concerning 'the Britton and Little documents,' the jury would not have rejected Dr. Bernstein's expert opinion that [Petitioner] killed Robin under a state of diminished capacity and without the specific intent to kill." Id.

As for prejudice at the penalty phase, the Pennsylvania Supreme Court explained that, while "guilt-phase ineffectiveness may, under some circumstances, result in sentencing-phase prejudice, we find [Petitioner] did not demonstrate such prejudice in this case" because Dr. Bernstein's "trial testimony indicates his credibility was called into question primary based on discrepancies between his opinion and the medical forms he reviewed from St. Francis Hospital." Id. at 1283. Therefore, it held that Petitioner "failed to prove that, but for trial counsel's failure to provide Dr. Bernstein with 'the Britton and Little documents,' there is a reasonable probability that…[Petitioner] would have been able to prove at least one mitigating circumstance by a preponderance of the evidence and that at least one jury member would have concluded that the mitigating circumstances outweighed the aggravating circumstances." Id. (internal quotations and citation omitted).

In denying Claim VII, the Pennsylvania Supreme Court held that it "found no error of law in the PCRA court's conclusion that, during the guilty and penalty phases, the jury was presented with amble evidence of [Petitioner's] alcoholism since the age of fourteen, and thus, [Petitioner] has not demonstrated the necessary prejudice in connection with is ineffectiveness claim." Id. at 1286. It concluded that Petitioner "is under the mistaken notion that if only the jury had been presented with more details of his alcoholism, it would have accepted the diminished capacity defense and/or would not have returned a sentence of death." Id.

**Discussion**

Petitioner contends that the Pennsylvania Supreme Court's adjudication of Claim VI was both an "unreasonable determination of the facts" under § 2254(d)(2) because Dr. Bernstein's trial testimony was so clearly impeached by the fact that he had not been made aware of the Britton and Little documents, and an "unreasonable application of" Strickland under § 2254(d)(1) because it ignored the close connection between Claim VI and Claim VII. That was particularly egregious here, Petitioner contends, because the two claims are related and the prejudice flowing from all of counsel's deficient conduct must be considered together. See, e.g., Williams, 529 U.S. at 397. Additionally, he asserts, the state court's quantitative analysis was an "unreasonable application of Strickland" because the reviewing court must "evaluate" and "reweigh[]" the evidence at trial and that developed during post-conviction. Id. at 397-98. Here, the Pennsylvania Supreme Court focused on which aspect of the cross-examination was the most extensive, while ignoring the important question – which aspect of the impeachment was most damaging to Dr. Bernstein's credibility and the defense. As for Claim VII, Petitioner contends that the Pennsylvania Supreme Court's adjudication of that claim was an "unreasonable application of" Strickland for numerous reasons, including that it inaccurately described the evidence at issue as "merely cumulative."

**No Prejudice as to the First-Degree Murder Conviction**

If this Court were to agree with Petitioner that he satisfied either §§ 2254(d)(1) or (d)(2), this Court would still deny the guilt-phase portions of Claims VI and VII even under a *de novo* review. That is because, in determining whether he was prejudiced by counsel's deficient performance, this Court must consider the strength of the evidence the Commonwealth introduced at trial to prove to the jury that he acted with the specific intent to kill Robin. Buehl

v. Vaughn, 166 F.3d 163, 172 (3d Cir. 1999) ("It is firmly established that a court must consider the strength of the evidence in deciding whether the Strickland prejudice prong has been satisfied."). See also Saranchak, 616 F.3d at 309-11 (in light of other evidence demonstrating the petitioner's specific intent to kill, he was not prejudiced by his counsel's ineffective assistance with respect to the diminished capacity defense); Zettlemoyer v. Fulcomer, 923 F.2d 284, 297 (3d Cir. 1991) (same).

The Commonwealth's case against Petitioner was compelling and strong. He gave a detailed confession to Det. Logan within which he admitted that he stabbed and strangled Robin to death because he was upset that she was seeing another man. Before he killed her, he had the wherewithal to call her and ask her permission to come over, walk to her house, drag her to the vacant lot and grab a knife. After he killed her, he was able to dispose of her clothing in a sewer and walk back home to his mother's house. He also told Britton what he was going to do. Moreover, "[u]nder Pennsylvania law, the use of a deadly weapon[,]" such as a knife, "on a vital part of the body is sufficient evidence to prove specific intent to kill." Saranchak, 616 F.3d at 309 (internal quotations and citations omitted); Mitchell I, 902 A.2d at 445 (same). And "evidence of manual strangulation is also sufficient to establish specific intent required for first-degree murder." Mitchell I, 902 A.2d at 445 (citing Commonwealth v. Simmons, 662 A.2d 621, 628-29 (Pa. 1996)). "Additionally, specific intent to kill can be inferred from circumstantial evidence of prior verbal threats of murder and prior physical abuse." Id. (citing Commonwealth v. Albrecht, 511 A.2d 764 (Pa. 1986) (finding sufficient evidence of specific intent to kill based on the defendant's numerous physical assaults on his wife and his threats to her that he would kill her)). Robin's diary entries detailed Petitioner's abuse of her, and the Commonwealth introduced evidence that he had threatened to kill her in the past. He also confessed that just

nine days before he killed Robin, he raped her because he was so enraged that she slept with another man. Finally, in the letters Petitioner wrote to Britton from jail following the murder, he referred to Robin as a whore who had gotten what she deserved.

In light of all of this evidence, Petitioner has not demonstrated that, but for his counsel's deficient performance, there is a reasonable probability that the jury would have found him not guilty of first-degree murder. For this reason alone, he is not entitled to a new trial on Claims VI and VII.

It is also important to note that Dr. Bernstein's testimony, even when considered together with that given by Petitioner's other guilt-phase witnesses (his mother, Uncle Curtis and Guy-McCorkle) provided little support that Petitioner "was intoxicated to such an extent that [he] was overwhelmed to the point of losing his sensibilities." Spotz, 896 A.2d at 1218. See also Saranchak, 616 F.3d at 307-08. As for Dr. Bernstein's testimony that Petitioner killed Robin because he was hallucinating, was severely depressed and could not control his impulses, none of it is relevant to the issue of whether Petitioner was able to form the specific intent to kill. See, e.g., Saranchak, 616 F.3d at 308 ("'psychiatric evidence that a defendant lacked the ability to control his actions or that he acted impulsively,' for example, 'is irrelevant and inadmissible on the issue of the defendant's specific intent to kill.'") (quoting Commonwealth v. VanDivner, 962 A.2d 1170, 1183 (Pa. 2009), which quoted Zettlemoyer, 454 A.2d at 943)); id. ("evidence of 'substance abuse, adjustment disorder, antisocial personality features and depressive features[ ]' is 'not relevant to a diminished capacity defense.'") (quoting Commonwealth v. Ventura, 975 A.2d 1128, 1141 (Pa. Super. Ct. 2009); id. ("expert testimony that the defendant suffered from depression, auditory hallucinations, schizoaffective disorder, delusion, pathological paranoia, and even a tenuous ability to apprehend reality is irrelevant to, and inadmissible in support of, a

diminished capacity defense.") (citing <u>Commonwealth v. Kuzmanko</u>, 709 A.2d 392, 397-99 (Pa. Super. Ct. 1998); <u>id.</u> at 310 n.11 (noting that the Pennsylvania Supreme Court "has repeatedly rejected the contention that evidence of a defendant's supposed inability to control his actions – by virtue of an 'irresistible impulse,' a 'compulsion,' or otherwise – is relevant to negate specific intent[.]'") (quoting <u>Taylor</u>, 876 A.2d at 926); <u>id.</u> at 313 (although evidence of major depression is admissible to support a diminished capacity defense, <u>see Legg</u>, 711 A.2d at 444, 448, petitioner was not prejudiced by his counsel's failure to present expert testimony of "alcohol induced depressive disorder when drinking" and "the psychosis that he experience as a result").

All of this is why penalty-phase counsel believed that Petitioner should not pursue a diminished capacity defense and instead save Dr. Bernstein's testimony for the capital sentencing hearing. If Petitioner's attorneys had worked together, as they should have, it is reasonably likely that the defense would have followed that course. As set forth above, Dr. Bernstein testified at the PCRA hearing that, if trial counsel had provided the Britton and Little documents to him, he would have advised trial counsel to seriously consider focusing his efforts on the penalty phase, and trial counsel testified that he would have agreed with that shift in focus if Dr. Bernstein had so advised him. (PCRA Hr'g Tr. at 55, 116-17, 200).

Based upon the forgoing, this Court concludes that Petitioner is not entitled to guilt-phase relief on Claims VI and VII even under a *de novo* review. Because jurists of reason would not find it debatable that Petitioner was not prejudiced with respect to his first-degree murder conviction, a certificate of appealability is denied on these two claims as well.

### Prejudice With Respect to the Capital Sentence

This Court now turns to its evaluation of that part of Claim VI that challenges the results of his sentencing hearing. As the PCRA court held, trial counsel provided Petitioner with

deficient assistance for failing to provide the Britton and Little documents to Dr. Bernstein. The Pennsylvania Supreme Court denied penalty-phase relief on Claim VI because it concluded that he suffered no prejudice based on its estimation that Dr. Bernstein's credibility was primarily called into question by the St. Francis Hospital records. Mitchell II, 105 A.3d at 1282-83. A review of the prosecutor's cross-examination of Dr. Bernstein and his closing argument, as well as the PCRA hearing testimony of Dr. Bernstein, penalty-phase counsel and trial counsel, establishes the unreasonableness of the Pennsylvania Supreme Court's decision, as it is evident from the record that Dr. Bernstein's credibility was severely damaged when the prosecutor demonstrated he diagnosed Petitioner without reviewing, or having knowledge of, the Britton and Little documents. This totally foreseeable disaster, Petitioner correctly asserts, would have been avoided had trial counsel provided to Dr. Bernstein documents that were so obviously important to his evaluation. For these reasons, this Court concludes that the Pennsylvania Supreme Court's adjudication of Claim VI was not just erroneous, it was an "unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). Thus, this Court must review Claim VI *de novo*, and it agrees with Petitioner that he was prejudiced at his capital sentencing hearing as a result of counsel's deficient performance.[20]

The evidence that is relevant to mitigation factors at a capital sentencing hearing is significantly broader than that which is relevant to support the very limited diminished capacity defense to first-degree murder, and Dr. Bernstein was unquestionably the defense's most important witness at the sentencing hearing. When he gave that testimony, he repeated his

---

[20] This Court's determination that Claim VI entitles Petitioner to sentencing-phase relief renders it unnecessary for this Court to address his remaining sentencing-phase claims. Any relief that he could obtain on them would be cumulative.

diagnosis of Petitioner and once again stated that, in his opinion, Petitioner was hallucinating when he killed Robin. (Id. at 799). Dr. Bernstein described alcoholic hallucinosis as "psychiatric manifestations of neurologic injury to the brain as the result of alcohol ingestion or the chronic effect of alcohol use." (Id. at 800; id. ("These are neurological events meaning that you've done some type of damage to the brain through the ingestion of alcohol, which is changing the brain in such a way that you hear these voices."); id. at 801 ("It's physical damage to the brain, which results in these phenomen[a].") According to Dr. Bernstein, Petitioner also "suffered a significant head injury" at some point in the past six years as a result of playing football. (Id. at 802). The area of Petitioner's brain that likely was injured was the frontal and temporal regions, which also would have been harmed by his chronic abuse of alcohol. (Id. at 802-06). Dr. Bernstein further testified that when Petitioner was having his problems in 1992 when he was 14 years old, he should have been placed "in a therapeutic environment" for up to six months and treated with antidepressants, but he did not receive the treatment that he required because he lacked the support he needed from his parents. (Id. at 813-16). He also discussed how Petitioner's parents' alcohol abuse negatively affected his life. (Id. at 807-12).

Dr. Bernstein's testimony was relevant to several of the mitigating factors the defense asked the jurors to find, *i.e.*, that Petitioner was under the influence of extreme mental or emotional disturbance when killed Robin; that his capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired; and the catch-all factor, which a juror could find to be present upon evidence of neglect Petitioner suffered during his childhood, his chronic alcohol abuse and his repeated attempts at treatment and counseling. Dr. Bernstein's testimony also bolstered, and gave context to, the testimony given by the lay witnesses Petitioner presented at the sentencing hearing. The fact that not one

juror found even a single mitigating circumstance is evidence as to just how thoroughly and successfully the prosecutor destroyed Dr. Bernstein's credibility because he had not reviewed the Britton and Little documents prior to diagnosing and forming his opinion of Petitioner.

In order to establish prejudice at his capital sentencing hearing, all that Petitioner needs to show is that, but for counsel's deficient performance, it is reasonably likely that a single juror would have voted for a life sentence. See, e.g., Mitchell II, 105 A.3d at 1283 (Petitioner had to prove that there is a reasonable probability that he would have been able to prove at least one mitigating circumstance by a preponderance of the evidence and that at least one juror would have concluded that the mitigating circumstances outweighed the aggravating circumstances); Blystone v. Horn, 664 F.3d 397, 427 (3d Cir. 2011) (prejudice can be shown if there is a reasonable probability that one juror would not have sentenced the defendant to death); Jermyn v. Horn, 266 F.3d 257, 309 (3d Cir. 2001) (same). Had counsel provided Dr. Bernstein with the Britton and Little documents, it is reasonably probable that the defense would have provided his testimony only at the sentencing hearing, and that at least one juror would have credited the testimony given by him at that hearing and changed his or her assessment of Petitioner's mitigation case and voted for a life sentence. While the Dr. Bernstein's sentencing-phase testimony may not have swayed every juror, Petitioner need only show a reasonable probability that one juror would have found death an inappropriate punishment. He has met his burden.

**Cumulative Error at the Guilt Phase**

Finally, Petitioner contends in Claim XII that even if none of his guilt-phase ineffective assistance of counsel claims (Claims I, II, III, VI and VII) individually are sufficiently prejudicial to require relief, the cumulative prejudice incurred requires that he be granted relief. The Pennsylvania Supreme Court denied this claim on the merits, holding:

This Court has held that no number of failed ineffectiveness claims may collectively warrant relief if they fail to do so individually." [Commonwealth v. Elliott, 80 A.3d 415, 450 (Pa. 2013)] (citation omitted). "However, we have clarified that this principle applies to claims that fail because of lack of merit or arguable merit. When the failure of individual claims is grounded in lack of prejudice, then the cumulative prejudice from those individual claims may properly be assessed." Spotz, 610 Pa. at 146, 84 A.3d at 321 n. 22 (citations omitted).

We have examined [Petitioner's] claims, which we rejected solely because of his failure to prove prejudice. We are satisfied that the ineffectiveness claims at issue are so disparate that there is no cumulative prejudice warranting relief.

Mitchell II, 105 A.3d at 1292.

Petitioner argues that the Pennsylvania Supreme Court's adjudication of Claim XII was an "unreasonable application of" Strickland under § 2254(d)(1). This Court need not evaluate whether it was because, even under a *de novo* review, Petitioner is not entitled to relief on Claim XII. As set forth above, much of the evidence that he relied upon to prove that he was prejudiced as a result of trial counsel's alleged deficient performance in Claims I and III was found to be not credible by the PCRA court, and the Pennsylvania Supreme Court denied Claim II on the grounds that Petitioner did not establish Strickland's deficient performance prong. As for Claims VI and VII, this Court has already conducted a *de novo* cumulative error analysis on them and determined that, due to the strength of the evidence the Commonwealth introduced at trial to prove to the jury that Petitioner acted with the specific intent to kill Robin, he was not prejudiced by counsel's deficient performance.

Based upon the forgoing, Claim XII is denied. Jurists of reason would not find it debatable that Petitioner is not entitled to habeas relief on Claim XII; therefore, a certificate of appealability is denied.

**F.** <u>**Conclusion and Order**</u>

For the reasons explained herein, Petitioner is not entitled to guilt-phase relief, or a certificate of appealability on any of his guilt-phase claims, but he has met his burden of demonstrating that he is entitled to a new capital sentencing hearing. If the Commonwealth still seeks the death penalty for Petitioner, it must conduct a new hearing to determine whether he should receive a life or death sentence.

Accordingly, it is hereby **ORDERED** that:

1. Petitioner's request for habeas corpus relief from his convictions is DENIED and a certificate of appealability is DENIED with respect to all guilt-phase claims;

2. Petitioner's request for habeas relief from his sentence of death is GRANTED;

3. The execution of the writ of habeas corpus is STAYED for 120 days from the date of this Order, during which time the Commonwealth of Pennsylvania may conduct a new sentencing hearing; and,

4. After 120 days, should the Commonwealth of Pennsylvania not conduct a new sentencing hearing, the writ shall issue and the Commonwealth shall sentence the Petitioner to life imprisonment without the possibility of parole.

Date: October 25, 2019            <u>s./ Cathy Bissoon</u>
                                                 Cathy Bissoon
                                                 United States District Judge

cc:      All counsel of record via CM/ECF